IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                           EASTERN DIVISION

UNITED STATES OF AMERICA,          )  Case No. 22 CR 158
                                   )
            v.                     )
                                   )
CHARLES TAYLOR,                    )  Chicago, Illinois
                                   )  May 6, 2025
                 Defendant.        )  9:38 a.m.

          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL - VOLUME 1
               BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Government:     MR. ANDREW S. BOUTROS
                        INTERIM UNITED STATES ATTORNEY
                        BY:  MR. PAUL SCHIED
                             MR. RICHARD M. ROTHBLATT
                        219 South Dearborn Street
                        Suite 500
                        Chicago, IL 60604

For the Defendant:      LAW OFFICE OF GREGORY T. MITCHELL
                        BY:  MR. GREGORY T. MITCHELL
                        19150 Kedzie Avenue, Suite 205
                        Homewood, Illinois 60430

                        RANDOLPH & RANDOLPH, P.C.
                        BY:  MR. LONNIE M. RANDOLPH, II
                        1919 E. Columbus Drive
                        East Chicago, Indiana 46312


Court Reporter:         KATHLEEN M. FENNELL, CSR, RMR, FCRR
                        Official Court Reporter
                        219 South Dearborn Street, Room 2328A
                        Chicago, Illinois  60604
                        Telephone:  (312) 435-5569
                        Kathleen_Fennell@ilnd.uscourts.gov

                        *   *   *   *   *

              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; defendant present; jury out:)

(Call to order.)

THE COURT REPORTER: 22 CR 158, United States v. Charles Taylor.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Good morning. If everyone could please enter your appearances.

MR. ROTHBLATT: Good morning, Your Honor. Richard Rothblatt, and Paul Schied is coming back into the courtroom on behalf of the United States.

MR. MITCHELL: On behalf of defendant Charles Taylor, Judge, Greg Mitchell and Lonnie Randolph, Judge, present in court.

MR. RANDOLPH: Good morning, Judge.

THE DEFENDANT: Good morning.

THE COURT: Good morning.

Is everyone ready to proceed?

MR. ROTHBLATT: Yes, Your Honor.

THE COURT: Okay. So --

MR. ROTHBLATT: Judge, I'm sorry, before we get started, can I flag one issue for the Court just in terms of timing?

THE COURT: Sure.

MR. ROTHBLATT: With regard to defendant's motion in

limine which we argued yesterday, we had told the Court that we believed that witness would not be starting until tomorrow. That still might be the case, but there is an outside chance that that witness is going to be called later today in the afternoon. We just wanted to flag that for the Court in terms of the timing for a ruling.

THE COURT: Okay. Thank you for letting me know, and that should be fine. I mean, please just flag again when it's coming up, and I should be able to give you the ruling.

I mean, I might even be able to proceed with it now, but I just -- I think it's best probably just to proceed with the jury since they're here, but does anyone --

MR. MITCHELL: That's fine, Judge.

MR. ROTHBLATT: That's fine, Judge. We can wait.

THE COURT: Okay. Maybe we can address it either at a break or over lunch.

MR. ROTHBLATT: Very good.

THE COURT: So the next steps are obviously to have the jury sworn. I understand Ms. Smith, who had left a bit early yesterday for -- to take her daughter to therapy, she did come this morning, so she's here. And we now have all the jurors here.

THE CLERK: We have all the jurors.

THE COURT: So the first thing would be swear in the jury, then go through the preliminary jury instructions, and

then go directly into openings.

Does that sound okay with everybody?

MR. ROTHBLATT: Yes, Judge.

THE COURT: Okay. And then we will take a break sometime mid-morning. So if there is a point where you would like to take a break, please just, you know, let me know that. Otherwise, I'll just plan on sometime mid-morning. So at this point probably close to, I don't know, 11:00, 11:15, something like that. And after that obviously, we'll start with the witnesses.

MR. ROTHBLATT: Very good.

THE COURT: All right. Anything else before we start?

MR. ROTHBLATT: Do we have a lapel mic?

THE COURT: Oh, do we have a lapel mic is the question?

I think we should. Normally we do.

MR. ROTHBLATT: Is it working?

THE COURT: Is everybody set with any slides or any AV you might need during the --

MR. ROTHBLATT: Government's not using any, Judge.

THE COURT: Okay.

THE CLERK: Ready?

THE COURT: All right. I mean, if anyone needs a short break to set up or anything as you're getting ready, that's fine. Just let me know that.

(Pause.)

THE CLERK: All rise.

(Jury in at 9:44 a.m.)

THE COURT: Good morning, everybody.

THE JURY: Good morning.

THE COURT: Good morning. You've been selected for the jury and now that we've selected the jury, we need to administer another oath to you. Yesterday you took an oath, and so now we'll need to administer another oath to you as the jury.

THE CLERK: Can you all stand and raise your right hand.

(Jury sworn.)

THE CLERK: You can be seated.

THE COURT: Okay. Thank you very much.

So we will start this morning with preliminary jury instructions, which I will give you, and then we're going to go into opening statements and proceed with the trial.

Just a couple just logistical points which I think at least one of these we covered yesterday. Please continue to use the south elevator banks, which are when you leave the courtroom, you make a left. Please use that set of elevators.

The lawyers and parties are going to use the north elevator banks, the other elevators, which is on your right as you exit the courtroom. That's just to minimize any contact

between the jurors and the case participants.

And, again, if you see any of the people, the lawyers or parties, they will not talk to you if you run into them. And, again, they're not being rude. They're just following my instruction not to have contact with the jury.

If you need a break at any point, so we will be taking breaks. We'll be taking usually a break sometime mid-morning, then a lunch break, and then a mid-afternoon break. If you need a break at another point, either to actually pause and leave the room or if you need a break just to stretch, you can just raise your hand and let me know that.

We do need to take breaks together, and you'll need to stay together during court.

Also, if you can't hear or see something, please raise your hand and let me know that so we can get that -- we can fix that.

So with those logistical points, let me turn to the preliminary jury instructions, which will -- I'll just proceed with those now. Again, after that, we'll be going into the openings.

Members of the jury, you are now the jury in this case and I will take a few minutes to tell you about your duties as jurors and to give you some instructions. At the end of the trial, I will give you more detailed instructions. Those instructions will control your deliberations.

By your verdict, you will decide the questions of fact that arise during the trial based on my instructions of law at the close of the trial. It is important that you give careful attention to the testimony and evidence as it is received and presented for your consideration.

You should keep an open mind, and you should not form or express any opinion about the case one way or another until you've heard all of the evidence, the closing arguments, and my instructions to you on the applicable law.

If you see the lawyers or parties in the courthouse, in the hallways, elevators, or cafeteria, they will not speak to you. They're not being rude. They're following my order not to have contact with you.

One of my duties is to decide all questions of law and procedure. From time to time during the trial and at the end of the trial, I will instruct you on the rules of law that you must follow in making your decision. You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

The trial will proceed in the following manner:

First, the government will make an opening statement.

Next, the defense will make an opening statement. An opening statement is not evidence, but is simply a summary of what the party expects the evidence to be.

After the opening statements, the government will call

witnesses and present evidence. Then the defendant will have an opportunity to call witnesses and present evidence. After the parties' main cases are completed, the government may present rebuttal evidence.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the parties will make closing arguments. After that, you will go to the jury room to deliberate on your verdict.

The charges against the defendant are in a document called an indictment. You will have a copy of the indictment during your deliberations. There may be an additional proceeding after you've deliberated. In total, I anticipate the trial will take approximately one week.

This is a criminal case. Defendant has been charged with being a felon in unlawful possession of a firearm. The defendant has pled not guilty to the charge in the indictment.

The indictment is simply the formal way of telling the defendant what crime he is accused of committing. It is not evidence that the defendant is guilty. It does not raise even a suspicion of guilt.

The defendant is presumed innocent of the charge in the indictment. This presumption continues throughout the case. It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case. The defendant is never required to prove his innocence. He is not required to produce any evidence at all.

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and any facts that I may instruct you to find or the parties may agree or stipulate to.

A stipulation is simply an agreement between both sides that certain facts are true.

You will have to decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also have to decide what weight, if any, you give to the testimony of each witness. Do not make any decisions by simply counting the number of witnesses who testified about a certain point. What is important is how believable the witnesses are and how much weight you think their testimony deserves.

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life. In our lives, we often look at one fact and conclude from it that another fact exists. In law, we call this an inference. You are allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the

evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact.

Circumstantial evidence is proof of a fact or a series of facts that tends to show that some other fact is true. As an example, direct evidence that it's raining is testimony from a witness who says I was just outside and I saw it raining. Circumstantial evidence that it's raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. When the time comes to deliberate on your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: The opening statements, closing arguments, questions and objections by the lawyers, any testimony that I instruct you to disregard, and anything you may see or hear when the court is not in session even if what you see or hear is done or said by one of the parties or by one of the witnesses.

From time to time during the trial, I may be called upon to make rulings of law on objections or motions made by

the parties. You should not infer or conclude from any ruling or other comment I may make that I have any opinions about how you should decide the case. And if I should sustain an objection to a question that goes unanswered by a witness, you should not guess or speculate what the answer might have been, and you should not draw any inferences or conclusions from the question itself.

When an objection is sustained, that means you are not to consider the question or the answer. When an objection is overruled, that means you may consider the evidence.

At times during the trial, it may be necessary for me to talk with the parties out of your hearing or by calling a recess. We meet because often during a trial something comes up that does not involve the jury. We will, of course, do what we can to keep the number and length of these conferences to a minimum, but you should remember the importance of the matter you are here to determine and should be patient even though the case may seem to go slowly.

You have been given notebooks. You may use them to take notes during the trial. Any notes you take during this trial are only aids to your memory. The notes are not evidence.

If you did not take notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not

12

entitled to any greater weight than the recollections or impressions of each juror about the testimony.

When you leave the courthouse during the trial, your notes should be left in the jury room. When you leave at night, your notes will be secured and not read by anyone. At the end of the trial, your notes will be destroyed, and no one will be allowed to read the notes before they are destroyed.

Pay close attention to the testimony as it is given. At the end of the trial, you must make your decision based on what you recall of the evidence. You will not have a written transcript to consult.

All jurors must follow certain rules of conduct, and you must follow them, too. You must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else. This also includes posting anything on social media about the case, whether it's on Facebook, X, or anywhere else, or communicating electronically in any way.

You cannot make any statements about the case. You must not let others discuss the case with you. If anyone tries to talk to you about the case, please let me know about it immediately.

We do this so that you don't form any opinions or judgments about the case until you've heard all the evidence. If you talk about the case, whether it's with someone outside

the case or with each other, you may organize your thoughts in a way that may lead you to form conclusions before you've heard everything. You can tell people that need to know that you are on a jury and you can tell them your schedule, and that's it.

You must not read any news stories or articles or listen to any television or radio about the case or about anyone who has anything to do with it. The same goes with learning about the case and the parties on the Internet. You must not do any research, such as consulting dictionaries, searching the Internet and using other reference materials, and do not make any investigation about the case, the parties, the lawyers, the Court or the general topics that come up in the trial.

You as jurors must decide this case based solely on the evidence presented here within the four walls of this courtroom. Do not try to find out information from any outside source. In order to be fair to both sides, this trial has to be based on the evidence that you learn about here in court, the evidence that you learn about together as a group.

I will give you additional instructions about the law that applies to the case and the definition of some terms at the end of the trial, but to help you understand what you will have to decide, here is an overview: The defendant -- or the indictment charges the defendant with unlawful possession of a firearm by a person who has been convicted in any court of a

crime punishable by imprisonment for a term exceeding one year.

The defendant has pled not guilty to the charge in the indictment. The indictment is simply the formal way of telling the defendant what crime he is accused of committing. It is not evidence that the defendant is guilty. It does not even raise a suspicion of guilt.

In order for you to find the defendant guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:

1. On or about October 10, 2021, the defendant knowingly possessed a firearm.

2. At the time of the charged act, the defendant had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year.

3. At the time of defendant's possession of the firearm, the defendant knew that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year.

And, 4, the firearm had been shipped or transported in interstate or foreign commerce before the defendant received it.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt, then you should find the defendant not guilty.

If you need to communicate with me, you must give a signed note to the courtroom deputy or another member of my staff to give to me. You must not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. You are obligated to keep an open mind until then.

Again, until you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors. After you retire to deliberate, you may begin discussing this case with your fellow jurors, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end.

Now we will begin with opening statements, which are not evidence. These statements are intended to help you understand the issues and the evidence as it comes in, as well as the positions taken by both sides.

We'll now turn to the opening statements, beginning with the government.

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT BY MR. ROTHBLATT

MR. ROTHBLATT: On October 10, 2021, around 9:30 p.m.,

residents of Evergreen Park were shopping for groceries at their local Mariano's. What they didn't know is that the defendant, Charles Taylor, was sitting in a running Volkswagen Jetta with this firearm tucked into his waistband. The firearm was loaded with a bullet in the chamber.

Law enforcement officials responded to a call by Mariano's, and they encountered defendant. This was a problem for two reasons. First, holding a loaded firearm in his waistband was inherently dangerous. But, second, and more importantly, defendant was a convicted felon who could not lawfully possess a firearm.

So when law enforcement officials confronted defendant with the gun and identified the gun in his waistband, defendant had a choice to make. He could submit to the officers and be arrested for being in possession of the gun, or he could run. Defendant chose to run.

The run didn't last very long. As he fled through the parking lot, defendant took the firearm out of his waistband and tossed it on the ground. It was quickly recovered by one officer. Other officers followed in pursuit and arrested defendant.

After the arrest, officers made the gun safe, which means they took the ammunition out of the gun, including that bullet that was in the chamber.

For his actions on October 10, 2021, defendant's been

charged in an indictment, and as Judge Pacold has just instructed you, the government must prove that charge of knowing possession of a firearm by a felon beyond a reasonable doubt, and the government will do that through the course of this trial with overwhelming evidence.

And before I talk about that evidence and what it's going to show, let's go back to October 10, 2021, the events of that night.

At around 9:30 p.m., defendant was with two other -- two other individuals in a black Volkswagen Jetta on their way to that Mariano's. Defendant was the driver of the vehicle, and in the back seat, there's someone who for now we'll call the shoplifter because she was going to that Mariano's to shoplift. In the passenger's seat was the shoplifter's boyfriend.

So they arrived at the Mariano's, and the shoplifter went into the Mariano's to shoplift alcohol. Officials with Mariano's called the police, and the police arrived to investigate.

When they did, they encountered the shoplifter outside the Mariano's and began to question her. They also identified that black Volkswagen Jetta, and they went to go talk to the individuals in the car.

At some point, two things happened almost simultaneously. First, the shoplifter told an officer that the

Case: 1:22-cr-00158 Document #: 204 Filed: 05/16/25 Page 18 of 243 PageID #:1582

vehicle's driver had a firearm. She wanted to get out of trouble, but she also wanted to tell the officers what she knew that could possibly help her out. It was that the defendant was in possession of a firearm.

Almost at the exact same time, two officers were talking to defendant and the shoplifter's boyfriend. One of the officers said, "What's that in his waistband?" Then over the police radio, they said, "This guy might have a gun here." They ordered defendant out of the car, and defendant began to comply.

When they told him to put his hands on the car, he said, "Yes, sir. Yes, sir." Then defendant made a decision. He decided he couldn't be caught with that firearm, and turned around and he ran. As I said before, he tossed that firearm and it was promptly recovered.

This is what the evidence will show on October 10th, 2021. Defendant possessed a firearm as a felon.

Now, let me tell you just for a few minutes how the government is going to prove its case beyond a reasonable doubt.

First, you will hear from the officers involved in the investigation on that day. You will hear from multiple officers, but in particular, you're going to hear from the two officers who encountered defendant at the black Volkswagen Jetta.

opening - government

They will tell you about their observation of a portion of the firearm protruding from defendant's waistband when he sat back and his shirt popped up so they could see the portion of the firearm.

They will tell you about their observation, one officer saying, "What's that in his waistband?" And the other one seeing the firearm in his possession. They will tell you then about the chase and the recovery of the firearm and the arrest of defendant.

Second, you're going to hear and see what the officers heard and saw that day because you will have body-worn camera evidence to review. Now, notably not all of the encounter between defendant and the officers was captured by that body-worn camera because some of the equipment malfunctioned.

But what wasn't captured by video on the body-worn camera was captured by audio because one of the officers had a microphone on his equipment that transmitted to his dash cam. So it is all encaptured in audio recordings, and much of it is captured in the video recordings.

And those recordings will make exactly what I told you clear, that almost at the same time the shoplifter identified the firearm in defendant's possession just as the officers do at the same time. And then defendant's ordered out of the car, they quickly identify him pulling the firearm out of his waistband and recover it soon after. So you'll have body-worn

camera video and dash cam audio to review as well.

Third, you're going to hear from the shoplifter herself. She will tell you about her presence at the Mariano's on October 10, 2021, with defendant and her boyfriend. She will tell you that she was providing multiple lies to officers at the time to try to get out of being arrested for attempted shoplifting.

But she will tell you that she observed a firearm in defendant's possession on the way to the Mariano's, and she will tell you that she disclosed that information to the officers. And notably you will hear that she disclosed that information before the firearm was recovered.

Fourth, you're going to see records and hear evidence about defendant's felony status and his knowledge that he was a felon and that he could not possess a firearm.

You will see certified records of conviction. You will see a letter from the Illinois Department of Corrections from 2018 telling defendant he could not possess a firearm. And you will hear testimony, you will hear testimony read back to you, transcripts of defendant acknowledging he knew he could not possess a firearm because he was a felon.

All of this information will help you understand why he couldn't possess a firearm in the first place and, second, why he ran when he was encountered by the officers.

At the conclusion of the trial, my colleague, Paul

Schied, will appear before you to review the evidence with you, talk through the elements that Judge Pacold has read to you, and ask you to return the only verdict consistent with the evidence: Guilty on the sole count of the indictment.

OPENING STATEMENT ON BEHALF OF DEFENDANT BY MR. MITCHELL

MR. MITCHELL: Good morning, ladies and gentlemen. My name is Gregory Mitchell. I introduced myself to you before. My colleague is Lonnie Randolph, and that's Mr. Taylor that I represent honorably.

As the judge told you, opening statement is not evidence, so I want you to remember that because when you hear the evidence and it doesn't fit the narrative that you were just described, the evidence that you hear is what governs.

Make no mistake, this is not about shoplifting, okay? This isn't about Mariano's. That's all fluff, right? There's only one issue, one issue you've got to decide, and the Judge told you that the elements of the charge, there's basically four, but the one thing, the one thing that controls all the other elements is evidence that Mr. Taylor possessed this gun in -- while he was sitting in his car, right? That's the issue. That's the issue. Did he possess it?

Not was one found near the car. Not one that was found after he ran. The evidence is and what the government has to prove is that he possessed the gun that they found on the ground while he was sitting in the car because if he wasn't

opening - defendant

22

possessing it when he was sitting in the car and there's no evidence of that, the rest of this doesn't make any sense. None of it.

Key pieces. This was in October in 2021, one of those balmy Octobers that we have in Chicago, and you will see on the video that everyone is in a tee shirt. No coats. And they're out, walking around, people walking around at the Mariano's.

Why is that important? You will find out why that's important, but remember that. It was warm. People were wearing tee shirts, not coats. It wasn't cold.

The second thing is you will see evidence that there was a firearm found on the ground. You will see evidence of Mr. Taylor sitting in his car. You will see evidence where the officers who come up flash a flashlight into the car and watched Mr. Taylor and the person right there for minutes with body cameras on. And you will see no weapon. No weapon in the car. No weapon in Mr. Taylor's waistband. No weapon, period.

What you're also going to see is that Mr. Taylor is sitting in his car the entire time, and he's being cooperative. Officers are asking him questions. He's giving his ID. He's being interviewed. Well, he's a convicted felon, he understands, this is not his first rodeo. He's trying his best to cooperate. You'll see that. There's no argument.

In fact, you will see an officer with a flashlight open up the driver's door and talk to Mr. Taylor right within a

foot. It's on body cam video. Not from the officer who's talking to him, of course, but the officer who was flashing and watching across because there's two. That's the safety issue. You don't approach a car parked like that by yourself. It's a safety issue.

What you will not find is Mr. Taylor ever touching a gun, holding a gun, pointing a gun, throwing a gun, kicking a gun. Nothing. You won't see that. It doesn't exist, okay?

What you will see is a bunch of videos. You will see videos of the chase. You will see videos of Mr. Taylor being handcuffed by the officers, four of them. You will see Mr. Taylor essentially ask questions, what is going on?

But you're also going to hear video from a lying shoplifter person who -- who basically is a serial shoplifter with her boyfriend who now the gig is up. They're trying to steal. The officers figure out that the boyfriend has called her, and she puts down the stuff that she was trying to steal, and now she's going to jail, and he might go to jail, too, because he's helping her, and they figured that out.

Even though they're not talking to one another, the girlfriend and the boyfriend, they figure it out. If she's going to jail, I'm going to jail. If I'm going to jail, she's going to jail. If -- you will hear so many lies with respect to these two people until you hear the ultimate lie.

She tells the officers finally after she denies

knowing them, denies that she even came there with them, she denies that she came on the bus, just over -- when the officers finally tell her, "Listen, you're going to jail. I don't want to hear what you got to say."

And she says, "Wait, wait, wait. Wait, wait, wait. Is my boyfriend still over there? Is he still okay?" And she says, "There's a gun in the car. They got a gun." You'll hear it on the video.

She doesn't say he. She doesn't say Charles Taylor. She says there's a gun in the car. The officers are, like, who? What? What's going on?

She says, "Oh, it's the driver. It's the driver. He's got it."

So the officers report not that the driver has a gun. They report what she says. Suspect gun in the car. Suspect gun in the car because even though she's lying and she's been lying and she's doing what she's doing, they need to check this out.

Officers had just been there, you'll see that on the video. They had watched them with their cameras on. They had interchange with these two guys. They didn't see anything. Nothing to even indicate that any safety issue was there because, you know, officers are trained to look for stuff like that. And you'll hear that. They'll tell you that's what we are trained to do. Safety first. We're trained to look for

guns.  That's what part of we are.  We're not rookies here. You will hear testimony in regards to that.

Notwithstanding that, all of a sudden, the junior-most officer, there's like five now there calling help, the junior-most officer now sees something that no one of the other officers ever sees, allegedly a gun in Mr. Taylor's waistband. This, they say, is it.  And I say that's what they say was in his waistband, okay, because you're not going to have any evidence to indicate that Mr. Taylor ever touched this weapon, that this gun ever touched him.

You won't hear anything about fingerprints or DNA or anything.  You will hear from the most junior officer says, I saw it; but you're going to see video of what he claims to be able to see through the windshield of a car at night at 9:30 from somebody sitting in the car.

When you hear all the evidence as the Judge says, your most important issue is two things:  You get to decide who is credible and who is not, and you're supposed to use your common sense and your experience in life, and when something's missing, you need to understand why.  If it should be there, why is it missing?

You're asked -- the Judge says you can draw inferences that are reasonable, but reasonable means you need to understand if something's not there, this jump of reasoning, this inference, why doesn't it exist?

We are convinced, ladies and gentlemen, when you listen to everything and you've -- again, this is not about shoplifting. This is not about shoplifting. There's only one question that the government must prove beyond a reasonable doubt from the evidence that you hear from that stand, both circumstantial and direct, is that Mr. Taylor possessed this gun while he's sitting in his car. He didn't have it when they caught him when he ran. They arrested him at that point. What they're going to tell you is that he must have dropped it. He dropped it. We saw it drop. We heard it drop. We did something.

I understand. I would just simply say at the end of the day, you're only going to be able to return the one verdict that's required by law, and that's not guilty.

Thank you.

MR. SCHIED: Your Honor, the United States would call Darice Goodwin.

THE COURT: Okay.

(Witness sworn.)

DARICE GOODWIN, GOVERNMENT'S WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SCHIED:

Q. Good morning, ma'am.

A. Good morning.

Q. Could you please introduce yourself to the members of the

jury over there.

A.   My name is Darice Goodwin.

Q.   Are you employed, Ms. Goodwin?

A.   Yes.

Q.   Where are you employed?

A.   I am currently working for the Clerk of the Circuit Court of Cook County.

Q.   Do you have a title at the Clerk of the Circuit Court of Cook County's office?

A.   I do.  I am the associate clerk of the Criminal Bureau for Cook County.

Q.   And what do you do in that position?

A.   In that position, I oversee a number of divisions dealing with the Criminal Bureau with a staff of approximately 2- to 300 people.

I oversee the domestic violence courthouse, juvenile courthouse, criminal department, and criminal division.

Q.   And what does the Criminal Bureau do, generally speaking?

A.   The Criminal Bureau records in our files all criminal activity that takes place in the City of Chicago, County of Cook.

Q.   Have you had other positions in the office of the Clerk of the Circuit Court of Cook County?

A.   I have, I have.

Q.   Could you tell us about those?

A.   It runs the gamut from file room clerk, motion room clerk, court clerk, manager, and chief, and now associate.

Q.   How long have you been with the clerk's office in total?

A.   31 years.

Q.   And you said that you oversee the Criminal Bureau and some of the things that the Criminal Bureau does.

In your day to day, what are some of your personal job responsibilities?

A.   Some of my personal job responsibilities are to ensure that court files make it to the courtrooms with the clerks that are there, that the chiefs who work underneath me are doing their job, that recordkeeping is clear and concise, things of that nature.

Q.   And you mentioned recordkeeping.  What are some of the records that your office keeps?

A.   We keep all court activity, all criminal court file jackets, hearings, dispositions, events, things of that nature.

Q.   Are you familiar with documents called Certified Convictions or dispositions?

A.   Yes.

Q.   What are those?

A.   Those are summaries of case events that happened on any particular case.

Q.   So if a case had a hearing, would that be noted in the Certified Disposition?

A.   Yes.

Q.   What if a case was dismissed, would that be noted?

A.   Yes.

Q.   How about if a defendant pled guilty in a case?

A.   Yes.

Q.   I'm showing you what has not yet been entered into evidence but is marked as Government's Exhibit 201C.

Do you see it on your screen in front of you?

A.   Yes.

Q.   What is that?

A.   It is a Certified Disposition.

Q.   I'm going to scroll down to the last page for you here, and I'm going to make that bigger for you.

What is there at the bottom?

A.   That is the seal of the court.

Q.   And is that dated?

A.   Yes.

Q.   What is the date listed there?

A.   September 23rd, 2024.

Q.   Is that -- is there a signature at the bottom of that?

A.   Yes.

Q.   And whose signature is that?

A.   Iris Y. Martinez, the former Clerk of the Circuit Court.

Q.   And was Iris Y. Martinez the Clerk of the Circuit Court of Cook County on the date listed there?

A.   Yes.

Q.   How is a document like this, a Certified Conviction, maintained at the clerk's office?

A.   It is maintained through our criminal case management system.

Q.   How does that system work?

A.   It is our case management system that our clerks who do the work on the daily basis enter information into the system, so filing dates, hearing dates, events that occurred in court, dispositions that occurred in court, whether or not someone was found guilty, pled guilty, a verdict of guilty, things of that nature, all of the clerks are responsible for data entering that information into the system based off of what the judges have written.

Q.   And you talked about the system.  Is this a computer system?

A.   It is a digital computer system.

Q.   And one more question about the bottom of this document there.  Is there a seal on the left side of that?

A.   It is.

Q.   And is that a court seal?

A.   It is the court seal.

Q.   Is a document like this available to the public?

A.   Yes.

Q.   Can anyone obtain documents like this if they come to your

office and pay the -- pay a required administrative fee?

A. Yes.

MR. SCHIED: Your Honor, I would move to admit Government's Exhibit 201C and to publish.

MR. MITCHELL: No objection, Judge.

THE COURT: It's admitted, and you may publish.

(Government Exhibit No. 201C received in evidence.)

BY MR. SCHIED:

Q. I'm going to move back to the top of the document here. Have there been redactions made to this document?

A. Not that I can tell -- oh, yes. It looks like the charges are missing.

Q. Okay. On page 1 here, and I'll highlight the top of the page here for you and the jurors, who's -- what individual is associated with this Certified Conviction?

A. Charles Taylor.

Q. Is there a case number listed at the top of the document?

A. It is.

Q. And what is that case number?

A. 06 CR 2261301.

Q. I'm going to highlight another section of the first page here. What does that section of the document tell you?

A. It tells me the counts, as well as the arrest dates on those counts.

Q. I'm now going to move down the document. As I do, are

there entries there of the type you were describing of things that happened in this case?

A.   Yes.

Q.   I'm going to scroll down to page 12 of the document.

What is that section at the bottom of the document?

A.   It's the disposition section.

Q.   And what was the disposition in this case?

A.   Finding of guilty.

Q.   Were there more than one count in this case?

A.   Yes.

MR. MITCHELL:  Objection.

MR. SCHIED:  Your Honor, the document's been published.  The jury can see the document.

THE COURT:  Can we just go on the sidebar quickly.

MR. SCHIED:  Your Honor, the exhibit is in evidence. Oh, I'm sorry.

(Proceedings heard at sidebar:)

MR. MITCHELL:  The question was is there more than one counts and other issues, Judge.  That's clearly leading.  If he wants to ask her what does this mean, he can, but I don't want him leading her to describe what a count is, what it means, and how many -- what is the separation here.

I mean, we have a conviction.  That's the part that's relevant.  I don't -- I don't see the relevance of how many counts there is and did she know what the counts mean.  She's

not a lawyer, but I don't want him leading her in that regard.

MR. SCHIED: Your Honor, I can rephrase the question and not lead the witness.

THE COURT: Okay. So the leading objection is -- I guess you're just going to rephrase the question, so it's moot.

MR. MITCHELL: Sustained, I guess it is, Judge.

THE COURT: Well, I do think there could be some -- there could be some leading questions that are allowed on direct because it's just helpful to move the testimony along. It depends on the degree of the leading and what's the nature of the questions.

I do think, okay, so she's not a lawyer, but she is -- to the extent you're asking about recordkeeping and what it reflects, she clearly does that and knows about that and so I guess I would say the objection is moot because the government's going to rephrase it.

MR. MITCHELL: Yes, Judge.

THE COURT: Okay. Thanks.

(Proceedings heard in open court:)

THE COURT: Okay. You may proceed.

MR. SCHIED: Thank you, Judge.

BY MR. SCHIED:

Q. Ms. Goodwin, on the left side of this document in that first line there, what does that indicate to you?

A. The count that was initially charged on the case, one of

the counts on the case.

Q.   And how about this second line here?

A.   Where it's 005?

Q.   Yes.  Sorry.  Maybe I'll just -- I'll highlight this one at a time.  What does this section tell you?

A.   The count, the date, and the disposition on the case.

Q.   And what was the count there?

A.   Count 003.

Q.   What does this section of the document tell you?

A.   The count and the date and the disposition, the date of the disposition.

Q.   And how about this one?

A.   Also the count and the date of disposition, as well as the disposition.

Q.   And finally this one?

A.   The count, the date of disposition with the disposition.

Q.   Moving on to page 13, under the heading here that says Sentence, what does this section tell you?

A.   The count and the date, where the sentence -- where the defendant was sentenced to and how much time the sentence received -- the defendant received.

Q.   What is the sentence in that first line there?

A.   Count 003, the sentence was to 12 years IDOC.

Q.   And what about the second line?

A.   The second line is Count 005, and that's 10 years IDOC.

Q.   And how about the third line?

A.   Count 006, 10 years, IDOC.

Q.   I'm going to show you -- if I can unpublish, I am going to show you what has been marked for identification as Government's Exhibit 202C.  Do you see that document there?

A.   Yes.

Q.   What is that document?

A.   Another Certified Disposition.

Q.   And on the last page there, what is at the bottom?

A.   We have the certification and the seal and the clerk's signature.

Q.   Is there a date on that one?

A.   September 23rd, 2024.

Q.   And is the clerk whose name is listed, were they the clerk on that date?

A.   Yes.

          MR. SCHIED:  I'd move to admit and publish Government's Exhibit 202C.

          MR. MITCHELL:  Objection, Judge.

          THE COURT:  Okay, if we could go on sidebar, please.

     (Proceedings heard at sidebar:)

          MR. MITCHELL:  My objection is 403, Judge.  This is cumulative.  It's unduly -- unfairly prejudicial, Judge.  The element they have to prove is that he has to have a conviction. That one has been established already.  Going through multiple,

multiple convictions, Judge, I think it strikes directly at 403.

MR. SCHIED: Your Honor, if I may, this issue was discussed explicitly at the pretrial conference, and the Court ruled that given that the government has to prove the defendant's knowledge that he was a felon, that each subsequent conviction is relevant and useful to meeting the government's burden of proving that element beyond a reasonable doubt.

THE COURT: So I agree with that, and knowledge is an element, and therefore additional convictions are -- are relevant and they do get at that knowledge element.

I -- you know, there could come a point potentially where it's -- the 403 balance starts to outweigh, but I think we've not reached that point. It's not --

MR. MITCHELL: Judge, can I respond?

THE COURT: Sure.

MR. MITCHELL: The government has also identified and intends to call a second witness from the Illinois Department of Corrections, and one of the records that they're going to introduce is a letter signed on -- by Mr. Taylor that talks about possession, acknowledging that he cannot possess the weapon.

You know, the question becomes all of these convictions plus the signatures, that's where -- the cumulative nature, Judge, the unfair prejudice, and so I'm objecting now,

Judge, just so as of the record.

MR. SCHIED: Your Honor, if I could address that and propose a way forward here.

The multiple sources of evidence on this topic are -- are important and appropriate, in part because the defendant may challenge any one witness or piece of evidence, and the government has a high burden here. And so for that reason, we do have multiple witnesses.

The witnesses do address different issues, but to the extent that there's overlap, that is fully appropriate.

If the Court is concerned about cumulative evidence, we can withdraw -- we had four of these certified convictions planned for this witness. We can, if the Court would like, move on to subsequent witnesses who have different pieces of evidence to be introduced, and that would be one way to avoid cumulative evidence, although the government does not think that we are at all close to the cumulative line at this point.

THE COURT: I do think -- I mean, the burden is high, and it's also correct that each piece of evidence, perhaps there could be different challenges to it, and so I don't -- you know, given that knowledge is an element, we have not reached the point where this evidence is more cumulative than prejudicial, so the objection is overruled.

(Proceedings heard in open court:)

THE COURT: Overruled. You may proceed.

MR. SCHIED: Thank you, Your Honor.

BY MR. SCHIED:

Q. Ms. Goodwin, I believe that you had just mentioned that there was a certification --

THE COURT: Actually, I think you moved to admit.

MR. SCHIED: Yes.

THE COURT: The exhibit is admitted.

MR. SCHIED: And I would move to publish, Your Honor.

THE COURT: You may.

(Government Exhibit No. 202C received in evidence.)

BY MR. SCHIED:

Q. Ms. Goodwin, whose Certified Conviction is this?

A. Charles Taylor.

Q. And is there another case number there at the top?

A. Yes. 06 CR 2261401.

Q. Moving to the bottom of this document, page 11, the section titled Disposition, what information does that give you?

A. The disposition says that -- that section says the count number, what the plea was, what the finding was, and the date.

Q. And what is the date there?

A. January 15, 2008.

Q. And in the next section there on the bottom titled Sentence, what information is included there?

A. The count and the sentence term and the location, so this was Count 002, and they received 12 years IDOC.

MR. SCHIED: I have no further questions for this witness, Your Honor.

THE COURT: Okay. Cross?

MR. MITCHELL: No questions, Judge.

THE COURT: Okay. Thank you very much. You may be excused.

THE WITNESS: Thank you.

(Witness excused.)

MR. SCHIED: The United States calls FBI Task Force Officer Chris LeCompte.

(Witness sworn.)

CHRISTOPHER LeCOMPTE, GOVERNMENT'S WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SCHIED:

Q. Good morning.

A. Good morning.

Q. Could you please introduce yourself to the members of the jury.

A. Christopher LeCompte, L-E-C-O-M-P-T-E, and I'm an FBI Task Force Officer.

Q. Officer LeCompte, I'm going to show you what has not yet been admitted into evidence but is marked for identification as Government's Exhibit 208A. Do you recognize that?

A. I don't have it on my screen.

Q. Is it there now?

A.   No -- there, now it is.

Q.   Officer LeCompte, do you recognize that document?

A.   Yes.

Q.   What is it?

A.   It's a certified court transcript.

        MR. SCHIED:  I would move to admit and publish Government's Exhibit 208A?

        MR. RANDOLPH:  No objection, Judge.

        THE COURT:  It's admitted, and you may publish.

    (Government Exhibit No. 208A received in evidence.)

BY MR. SCHIED:

Q.   Officer LeCompte, I'm going to highlight the top of the document there.

        What does it tell you on the left side of that document?

A.   It says The People of the State of Illinois vs. Charles Taylor.

Q.   And how about on the right side?

A.   It has an indictment number, O6 CR 22613.

Q.   Have you reviewed this document before?

A.   Yes.

Q.   And what type of court hearing does this document involve?

A.   The defendant having entered a plea of not guilty.

Q.   And having entered a plea of not guilty, what happens in a criminal case after that?

A.   It goes to trial.

Q.   And you mentioned that you had reviewed this document.  Is this document redacted in any way?

A.   Yes, it is.

Q.   Is this a portion of a larger trial transcript?

A.   Yes.

Q.   I'm going to move to page 2 here.  For this and going forward, I am going to read the part of the court, and I'll ask that you read the part of the witness.

A.   Okay.

Q.   The transcript says:  "Defendant sworn, Charles Taylor, the defendant herein, called as a witness in his own behalf, having been first duly sworn, was examined and testified as follows:" And then the question from the lawyer:  "State your name, please, in a nice loud, clear voice, please."

A.   "Charles Taylor."

Q.   "You knew you couldn't have a gun; isn't that correct?"

A.   The answer is:  "Of course."

Q.   "Because you're a convicted felon; isn't that right?"

A.   The answer:  "Yes."

Q.   I'd like to move on to a different case and show you what has not yet been admitted as Government's Exhibit 205A.

        Do you recognize that?

A.   Yes.

Q.   What is it?

A.   It's another certified transcript for a change of plea.

MR. SCHIED:  I would move to admit Government's Exhibit 205A and publish.

MR. RANDOLPH:  No objection, Judge.

THE COURT:  It's admitted and you may publish.

(Government Exhibit No. 205A received in evidence.)

BY MR. SCHIED:

Q.   Looking at the top of this document, Officer LeCompte, who is the criminal defendant in this transcript?

A.   Charles Taylor.

Q.   And is there a case number on the right side?

A.   There is.

Q.   Is that a different case number from the hearing -- the trial transcript that we just looked at?

A.   Yes.

Q.   Have you reviewed this document before?

A.   Yes.

Q.   Is this document redacted?

A.   Yes, it is.

Q.   I'm going to read in the same way.  I will read for the court.  If you could read for the lawyer during this portion.

"THE COURT:  Charles Taylor."

A.   "That's for sentencing, Judge."

Q.   "Okay.  This is Mr. Taylor.  Mr. Taylor is present in court represented by counsel.

"Mr. Taylor, I understand you're prepared to plead guilty to Count 2 of that charging document; is that, in fact, your intention?"

A.   The defendant's answer was:  "Yes, sir."

Q.   "It's punishable by not less than 6 but not more than 30 years in the Illinois Department of Corrections, followed by 2-year period of parole -- 3-year period of parole; do you understand that?"

A.   His answer was:  "Yes, sir."

Q.   Reading again for the court:  "I have observed the defendant execute a jury waiver in my presence.

"I find the waiver is given knowingly and voluntarily, and it shall be accepted.  Have any promises or threats been made to you to cause you to plead guilty?"

A.   His answer was:  "No, sir."

Q.   "Are you pleading guilty freely and voluntarily?"

A.   His answer:  "Yes, I am."

Q.   "Okay.  Mr. Taylor, in case number 08 CR 22614, you're sentenced to 12 years in the Illinois Department of Corrections.

"So we're taking the plea on Count 2.  You'll be given credit for --"

A.   The response by Mr. Smith was:  "1,543 days."

Q.   "That time, in fact, having been served."

Reading for the court:  "In case 06 CR 22613, after

considering all those things properly before the court, sir, you're sentenced to 12 years in the Illinois Department of Corrections. That's to be served concurrent with the sentence in case number 06-22614.

"Do you have any questions, Mr. Taylor?"

A. His answer was: "No, sir."

Q. "Good luck to you."

A. The response from Mr. Smith: "Judge, just so the record is clear, it's the same 1,543 days on that case as well."

Q. "Thank you."

A. The defendant said: "Thanks a lot, Your Honor."

Q. "Counsel, let me just clarify the record. On Count 3, there was a finding of guilty, the sentence is 12 years. On Count 5, there is a finding of guilty. The sentence is 10 years concurrent with the sentence in Count 3. As to Count 6, finding of guilty, the sentence is 10 years. That's to be served concurrent to Count 3. Count 7, there is a sentence of 10 years, and that merges with Count 6."

Officer LeCompte, there is mention of time served there. What is time served?

A. Time that has already been spent in jail or prison.

Q. When was that time -- when is that time spent in jail or prison?

A. That time was spent while waiting for trial.

Q. And when a defendant is sentenced and they receive time

served, what does that mean relative to the sentence that they receive?

A.   That they will get credit for that time that they already served as part of the sentence.

Q.   And the time that was mentioned in that transcript, 1,000-some days, is that more than a year?

A.   It is.

Q.   And there was a reference in that transcript to the word "concurrent."  What does concurrent mean in the sentencing context?

A.   That they'll be served at the same time.

Q.   And in that last transcript, were there two case numbers referenced in the transcript?

A.   There were.

Q.   And so could you explain why -- if -- if the defendant was given one sentence for one case and one sentence for another case, if they're served concurrently, what does that mean?

A.   The sentence for both those cases were served at the same time.

        MR. SCHIED:  No further questions, Your Honor.

        MR. RANDOLPH:  No questions at this time, Judge. Thank you.

        THE COURT:  Okay.  Thank you.  You may be excused.

    (Witness excused.)

        MR. SCHIED:  The United States calls Syntynese Gray.

(Witness sworn.)

SYNTYNESE GRAY, GOVERNMENT'S WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SCHIED:

Q.   Good morning, ma'am.

A.   Good morning.

Q.   Could you please introduce yourself to the members of the jury.

A.   My name is Syntynese Gray.

Q.   Are you employed, Ms. Gray?

A.   Yes, sir.  I'm an employee with the Illinois Department of Corrections.  I work at the Stateville NRC as the record office supervisor.

THE COURT REPORTER:  Could you spell your name, please?

THE WITNESS:  S-Y-N-T-Y-N-E-S-E.  Last name Gray, G-R-A-Y.

BY MR. SCHIED:

Q.   And you said the Illinois Department of Corrections.  Do you sometimes call that IDOC?

A.   Yes, sir.

Q.   How long have you worked at IDOC?

A.   I've -- it will be 24 years this August.

Q.   Congratulations.  That's a long time.

What are your duties and responsibilities in your

current job?

A. In my current job, I am temporarily assigned as the record office supervisor. I oversee about 15 staff. I'm responsible for processing releases as well as intaking of individuals in custody and maintaining the master files, shipping them to and from different facilities, and court writs. Things of that nature.

Q. That's a lot.

Could you tell us what the master file is?

A. The master file is a record of several different components, being you have the judges' orders, you have the writs with transportating them back and forth. You have visit lists. You have different legal documentations that we keep in there. It's the upkeep of information gathered.

Q. Okay. You mentioned some of the types of records that you keep in the master file I think including the movements of inmates.

Are those records of those activities regular -- keeping records of those activities a regular practice of IDOC --

A. Yes.

Q. -- when conducting those activities?

A. Yes, sir.

Q. And are they made in the course of IDOC's regularly conducted business?

A.   Yes, sir.

Q.   And are making those records a regular practice of that activity?

A.   Yes, sir.

Q.   You mentioned that the master file contains documents related to inmates' time in IDOC.  Are there also some documents related to their release from IDOC?

A.   Yes, sir.

Q.   I'm showing you what has not been -- not yet been admitted into evidence as Government's Exhibit -- but is marked for identification as Government's Exhibit 210A.

Can you see that?

A.   Yes, sir.

Q.   What is that?

A.   This is a project safety neighborhood notification letter that is issued by field services upon release.

Q.   Is it a regular part of IDOC's activities to keep and maintain records of this type, a Project SAFE Neighborhood letter?

A.   Yes, sir.

Q.   And is this document the type that are kept under your custody and control as part of the master file?

A.   Yes, sir.

Q.   Is this a fair and accurate copy of that type of document?

A.   Yes, sir.

MR. SCHIED: I would move to admit Government's Exhibit 210A.

MR. MITCHELL: No objection, Judge.

THE COURT: It's admitted.

(Government Exhibit No. 210A received in evidence.)

MR. SCHIED: And I would move to publish.

THE COURT: You may.

BY MR. SCHIED:

Q. First, Ms. Gray, have portions of this document been redacted?

Does it seem that there are some things that are typically on this that may be missing?

A. Because I don't prepare this, it's normally prepared by another department, which is our field service department, I wouldn't have the knowledge --

Q. Okay.

A. -- to know what's missing.

Q. That's fine. Just asking you about what's here. At the top of the document, who is this document associated with?

A. Charles Taylor.

Q. And is there a number towards the top of that?

A. Yes, sir. That's the IDOC number.

Q. What is an IDOC number?

A. Illinois Department of Corrections identification number.

Q. And how is that used?

A.   It's a tracking number that Illinois Department of Correction use to track the individual in custody.

Q.   Is this the only type of document that that number would appear on, or does it appear on other documents?

A.   Typically, it appears on everything.  Every document that's in the master file, it will have the individual's name and IDOC number on it.

Q.   I just want to ask you about the last sentence in that portion at the top of this letter.  What does that say?

A.   You say the last portion --

Q.   The last sentence.

A.   The last sentence is:  "This new procedure is part of a federally" --

Q.   I'm sorry.  Do you see the highlighted --

     (Counsel conferring.)

BY MR. SCHIED:

Q.   I'm sorry.  Do you see the highlighted portion here?

A.   Yes.

Q.   Could you just read the entire portion there?

A.   "Your name has been given to federal law enforcement agencies because of your arrest and prosecution by the state and local authorities.  Any future offense by your involving the use of mere possession of a firearm or ammunition will be reviewed by the United States Attorney Office for federal prosecution.  This new procedure is part of a federally funded

program named Project" safety neighborhood -- "SAFE Neighborhood.  As a convicted felon, you can be prosecuted in federal court even if you only possess a gun."

Q.   Thank you.  And now I'm going to show you the part -- or going to highlight for you the bottom of this document under Acknowledgment of Information.

Is there a line at the bottom of that that says offender's signature?

A.   Yes.

Q.   And is there a signature there?

A.   Yes, it is.

Q.   Is there a date?

A.   Yes, it is.

Q.   And could you read the start of this portion?

A.   "Acknowledgment of Information.  I have received this information, and I understand that my failure to comply is a violation of state law and, if applicable, my parole or mandatory supervised release agreement Rule 1 and 15.  I further understand that the failure to comply may result in a conviction of a Class A misdemeanor and, if applicable, revocation of my parole or mandatory supervised release."

Q.   Thank you.

I'm going to show you now what is not yet in evidence but is marked for identification as Government's Exhibit 211A.

Do you recognize that?

A.   Yes.

Q.   What is that?

A.   This is the Bureau of Identification Reception Offender Report.

Q.   How is a document like that maintained at IDOC?

A.   It is kept in the Section 5 or Section 6 of the master file.

Q.   Is it a regular part of IDOC's activities to keep and maintain records of this type?

A.   Yes, sir.

Q.   And are these documents the type that are kept under your custody and control as part of the master file?

A.   Yes, sir.

Q.   Is this a fair and accurate copy of this type of document?

A.   Yes, sir.

        MR. SCHIED:   I would move to admit and publish Government's Exhibit 211A.

        MR. MITCHELL:   No objection, Judge.

        THE COURT:   It's admitted.   You may publish.

     (Government Exhibit No. 211A received in evidence.)

BY MR. SCHIED:

Q.   And quickly, are there -- do there appear to be redactions in this document?

A.   Not that I can -- maybe the age and date of birth.

Q.   Some personal identification looks like it may be redacted?

A.   Yes.

Q.   Okay.  What is at the top of the document?

A.   A photo of the individual.

Q.   And in the making of this document, when and why is this photo taken?

A.   It was taken on February 16, 2012.  It's taken to identify the individual to be able to have the picture on file if need be for purposes of maintaining identification, things of that nature.

Q.   Okay.  And here under Offender, what does that tell you?

A.   That is his IDOC number and his last name and first name.

Q.   And what is that name?

A.   Taylor, Charles.  Last name Taylor, first name Charles.

Q.   Under the section titled Arrest Data, what information is included there?

A.   You have different numbers, such as the RR number, the FBI number, sentence, committing county, and the date received to Illinois Department of Corrections.

Q.   What is the sentence listed there?

A.   The sentence listed is 17 years.

Q.   I'm going to scroll down to page 2 here.  Is this a different photo from the first page?

A.   Can I see the first page again?

     Scroll back up.

     One more time -- yes, it is.

Q. And is there a date associated with this photograph?

A. Yes.

Q. What's that date?

A. October 22nd, 2012.

Q. And I think you mentioned that these photos are taken so that an individual in custody can be identified. Why does this document have multiple photos taken on multiple dates?

A. Appearances can change, so we want to make sure that when we're taking them to and from court or things of that nature, that we have an accurate photo.

Q. Okay. And scrolling down through this document, are there additional photos?

A. Yes.

Q. And in terms of when these photos are taken, are they taken when an individual is moved from one facility to another?

A. Yes.

Q. I'm going to show you what's marked for identification and not yet in evidence. It's Government's Exhibit 209A.

Do you see that?

A. Yes.

Q. What is that?

A. This is an Offender Custody History Report.

Q. How is a document like that maintained by IDOC?

A. This is maintained in our -- it's, like, an electronic system in our computer system. It's maintained in our 0360

system.

Q.   Okay.  And you say a O360 system.  Is that a computer system --

A.   Yes.

Q.   -- that you use?

     Okay.  And are these documents that are accessible to you in your role in the IDOC?

A.   Yes, sir.

Q.   And are they -- is this a fair and accurate copy of that type of document?

A.   Yes, sir.

     MR. SCHIED:  Move to admit Government's Exhibit 209A.

     MR. MITCHELL:  Objection, Judge.

     THE COURT:  Okay.

     MR. MITCHELL:  403, it's cumu- --

     THE COURT:  Can we go on the sidebar?

   (Proceedings heard at sidebar:)

     MR. MITCHELL:  Judge, my objection, I'm making it again.  This is extremely cumulative and unfair prejudice.  These pictures introduce another conviction involving 2017, involving a 17-year sentence, which is different than the first one.  So now you have two convictions, more, with respect to more than a year, and now you've got a cumulative history while he's in IDOC to show that he was there for more than a year and being punished.

Judge, this is so unfairly prejudicial and clearly cumulative beyond any necessary basis for the element of knowledge. Given the sheet that he signed acknowledging that he understands he's a felon, that he can't possess a weapon, that it will be produced that was signed way back in 2018, any additional documents reflecting his criminal history, Judge, would be just to try to establish that he is just this -- this terrible person to the jury, which is not an element, and it's clearly unfair, prejudicial.

MR. SCHIED: Your Honor, if I may.

First of all, this is the last document that we plan on introducing related to this topic.

This document is going to show minimus in time the defendant actually spent in prison. That's important and independent from the other evidence in part because people are sometimes sentenced to a long term in prison but don't actually spend that time in prison.

People that have history with the court system are -- tend to be -- like Mr. Taylor, tend to be aware of that, that the sentence is not always what they end up serving. And so by showing that he has spent, has actually spent time in prison of over a year, it makes it -- it's strong evidence that he knew he was a felon.

Defense counsel referenced the Project SAFE Neighborhood letter. Again, the defense could attack that

letter. The defendant could claim -- the defendant could claim that he did not sign that or did not read that document, but this -- this evidence that we're proposing to introduce now makes clear that he actually spent more than a year in prison, which is different evidence than what has been admitted so far, and in the government's view, it's not at all cumulative.

MR. MITCHELL: Judge, I don't think the element requires any evidence concerning how much time someone spends in prison. The evidence is a felony. The definition of a felony is that you could be imprisoned for at least a year to be sentenced.

It's clear that he was sentenced for more than a year at least on two occasions that they've identified and probably three or four now that they've identified.

This is clearly, Judge, clearly unnecessary, cumulative, and unfairly prejudicial.

THE COURT: Okay. So basically there's a line-drawing problem under Rule 403 of striking a balance between the relevance and on the other hand the prejudice and whether it's become unduly prejudicial, and the cumulativeness. And Rule 403 does require that it be substantially more cumulative or prejudicial than probative.

I do acknowledge the defense's point that this sort of testimony is prejudicial. It is when it involves prior convictions, it involves prior sentences.

At the same time, the government has a fair point that it is relevant, and for each individual piece of evidence the government has presented, including as to the number of convictions, the letter, the Project SAFE Neighborhood letter advising the defendant, and the -- now this document which has to do more with the length of the sentence served, it's true that those each -- each of those individual pieces of evidence has probative value on at least one of the elements of the offense.

One element of the offense, of course, is that the defendant was convicted of a crime punishable by a term exceeding one year. Another element of the offense is knowledge of that status, and I do agree that while the evidence -- the more individual pieces of evidence there are on those points, the more there's a risk of cumulativeness, and there is more of a risk of prejudice.

It is also true that each individual piece of evidence is subject to attack on different points. So, for example, the Project SAFE Neighborhood letter, I don't know what the defense will say about it, but they could make an argument that he didn't sign it, he didn't read it, he didn't follow it, anything along those lines. And the government's burden is very high. It has to be beyond a reasonable doubt.

And so despite, you know, the more evidence there is, the more there's a risk of cumulativeness and the more there's

a risk of prejudice and even undue prejudice, I think that given this entire situation and looking at what the elements are of the offense and what the government needs to prove and what the burden -- the high burden of proof the government needs to carry, I am not convinced that at this point the cumulativeness or prejudice or both outweigh the legitimate probative nature of these pieces of evidence.

So I'm going to overrule the objection.

(Proceedings heard in open court:)

THE COURT:  Okay.  Overruled.  You may proceed.

MR. SCHIED:  I would move to publish the document.

THE COURT:  Okay.  So -- and admit?

MR. SCHIED:  Yes.

THE COURT:  So that document is admitted, and you may publish.

(Government Exhibit No. 209A received in evidence.)

BY MR. SCHIED:

Q.  Ms. Gray, what is this document?

A.  This is the Offender Custody History.

Q.  And what does the Offender Custody History tell you?

A.  It tells us the movement date, movement type, and parent facility.  It also tells us the sentencing information.

Q.  I want to ask you to walk us through the top portion of this document here titled Recorded Periods of IDOC Incarceration.

If you could explain what each column means and how you read this section of the document?

A.   Okay.   So the Movement Date section is basically the date that he is -- or the individual is admitted into Illinois IDOC, when they're discharged, when they go on parole.   Any time that they move throughout the State of Illinois or discharge or parole, it's -- it's recorded.

The Movement Type is what type of movement it is, whether he's discharged, admitted in, or paroled.

The Parent Facility is where he's housed.

Q.   Okay.   The movement types I want to ask you about a little bit.   Maybe it's a little bit self-explanatory, but admit in, what does that mean relative to whether someone is outside or inside of IDOC custody?

A.   So you have the first initial admittance in.   Then that's when they first initially come back or come into Illinois Department of Corrections, or if they are released and they come back in, that's what --

Q.   And when someone moves out, there are a couple things there, parole out and discharge out.

A.   Correct.

Q.   Do those both indicate that someone is being released from the Illinois Department of Corrections?

A.   Yes.

Q.   And so do the dates here move chronologically as you read

this column?

A. Yes.

Q. Are older dates on the bottom and more recent dates towards the top?

A. Yes, yes.

Q. And so if you read this chart, top to bottom, are you able to determine a period of time where an individual was in IDOC custody because you have the start time and the end time?

A. Yes.

Q. And so for instance here, this entry, what's the date there if you can see where the cursor is?

A. Yes, sir. That is October 16th, 2012. He was admitted into Illinois Department of Corrections at Stateville Correctional Facility.

Q. And then the entry above that?

A. He was then paroled out, 3/14/2018, from Shawnee Illinois Department of Corrections.

Q. And so for that time period between October 16, 2012 and March 14th, 2018, where was the defendant?

A. He was in Stateville, then transferred to Shawnee.

Q. Was he in the Illinois Department of Corrections for that entire time period?

A. Yes, sir.

        MR. SCHIED:  No further questions, Your Honor.

                        CROSS-EXAMINATION

Gray - cross

62

BY MR. MITCHELL:

Q. Good morning, Ms. Gray. How are you?

A. Good morning. I'm good. How are you?

Q. All right.

You were custodian of records at Illinois Department of Corrections?

A. Yes, sir.

Q. And so the records that you just went through are records that are maintained for anybody and everybody who's maintained -- that's in the Illinois Department of Corrections?

A. Yes, sir.

Q. And so they're given a particular number?

A. Yes, sir.

Q. Okay. And so once they're given that number, that number follows them forever?

A. Yes, sir.

Q. And it also matches numbers that are given to U.S. Marshals, they kind of list all of them?

A. Yes, sir.

Q. Okay. The fact that they have a number doesn't indicate that they are different from any other person who's taken into IDOC custody, right?

I mean, there's no designation by the number. The number doesn't mean one person is more dangerous than the other?

A.   No, sir.

Q.   Okay.  It's just a number?

A.   Yes, sir.

Q.   Okay.  Now, when a person is discharged, right, from IDOC, can you explain that process, if you know?

A.   Yes, sir.  What -- in reference to?

Q.   Well, when it's time to go, right, they're brought out into a room.

A.   Okay.  Are you speaking of the record office aspect of it?

Q.   Well, let me ask you this:  When they've finally served their time, right, it's time for them to go home, they get paroled, whatever, right?

A.   Yes.

Q.   They are brought in, and then they are presented documents to review and sign before they walk out the door.

A.   Now, that part, I don't do.

Q.   You don't know?

A.   I don't do that part.

Q.   I didn't ask you if you did it.  I asked did you know it?

A.   Yes, I know that.

Q.   Okay.  So they're brought in, and they're on their way, and they're presented with documents and information as to you're now going back out in society, right?

A.   Yes, sir.

Q.   And they have to essentially sign anything and everything

before they walk out that door.

A.   Yes, sir.

Q.   In your experience, how long does it take a person who's getting ready to walk out the door to sit through and go through all of these documents?  How long does it take?

A.   As I've stated before, I don't do that part.

Q.   I understand, but we just went through this, and this took about 15 or 20 minutes.

I mean, are you saying that it takes hours, or do they just --

A.   I can't speak for the department that handles that -- that part of it.

Q.   Okay.  And, again, do you know whether or not there's somebody that makes sure that instead of just signing to get out that they actually read the documents and understand the documents, right?

A.   Yes.

Q.   There's no lawyer there to explain to anyone the documents.

A.   Not to my knowledge.

Q.   There's no counselor, in fact, that sits down and explains the documents to them.

A.   It is.

Q.   There is?

A.   The field service department is connected to clinical services.  They're counselors.

Q.   Okay.  So when they're on their way out and they sign these documents, there's someone there to explain each page of everything they're signing?

A.   Yes.

MR. MITCHELL:  Okay, thank you.

THE WITNESS:  You're welcome.

MR. SCHIED:  No redirect, Your Honor.

THE COURT:  Okay.  Thank you very much.  You may be excused.

(Witness excused.)

THE COURT:  Can we go quickly on the sidebar, please?

(Proceedings heard at sidebar:)

THE COURT:  Just checking whether now is a good time for a break or --

MR. SCHIED:  That would make sense, Your Honor.

THE COURT:  Okay.  15 minutes?

MR. SCHIED:  That's fine.

THE COURT:  Does anyone need longer than that?

MR. MITCHELL:  That's fine.  That works.

THE COURT:  Okay.  Thanks.

MR. SCHIED:  Thank you.

(Proceedings heard in open court:)

THE COURT:  We're going to take a break at this point. We'll come back in around 15 minutes, so 11:40.

Just as standard reminder, please don't discuss or

research the case during the break.  Thank you very much.

COURT SECURITY OFFICER:  All rise.

(Jury out at 11:24 a.m.)

THE COURT:  Anything to raise before we leave?

MR. SCHIED:  No, Your Honor.

THE COURT:  And anything from the defense?

MR. MITCHELL:  No, Judge, not at this time.

THE COURT:  All right, thank you.

(Recess at 11:25 a.m., until 11:44 a.m.)

THE COURT:  Are the parties ready to proceed?

MR. ROTHBLATT:  Yes, Your Honor.

THE COURT:  Also, just what is your estimate of how long the next witness will take and just sort of what to expect and around what time should we take the lunch break?

MR. ROTHBLATT:  Yes, Judge.  This witness should actually be fairly brief.  I don't expect his direct examination will last more than approximately ten minutes.  I don't expect, although I never know, how long the cross will be.

Our witness after that will be a fairly lengthy witness that I expect will take approximately maybe an hour, hour and a half on direct and will have a lengthy cross-examination as well.

THE COURT:  Okay.  Does anyone have a preference then on when to do the lunch break, or do you want to just play it

by ear and break at some point?  I would guess -- I mean, the earliest, I would say 12:30, probably -- I wouldn't want to go that much past 1:00, otherwise it starts getting pretty late, but --

MR. ROTHBLATT:  That's fine, Judge.  What I expect we'll be in the middle of the officer's direct at that point, but that will be a fine breaking point for the government.  We can find a portion during the direct that will be a natural breaking point.

THE COURT:  Okay.  Any -- any issues or thoughts from the defense or anyone about that?

MR. MITCHELL:  No, Judge.

MR. ROTHBLATT:  Just to flag, I do expect when that witness is complete, we'll be calling -- we'd be planning to call the witness whose testimony will be implicated by that motion *in limine*.

THE COURT:  Got it.

MR. ROTHBLATT:  So it might be that over the lunch break, we would ask the Court for guidance as to the contours of that testimony.

THE COURT:  Sounds good.

All right.  Thank you.

Okay.  We can -- are we ready for the jury then?

MR. ROTHBLATT:  We are, from the government's perspective, yes.

THE COURT: Okay.

COURT SECURITY OFFICER: All rise.

(Jury in at 11:46 a.m.)

THE COURT: Thank you, everybody.

The government may call its next witness.

MR. ROTHBLATT: Thank you, Your Honor. The government calls Patrick Smith.

(Witness sworn.)

MR. ROTHBLATT: May I inquire, Judge?

THE COURT: Please.

PATRICK SMITH, GOVERNMENT'S WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. ROTHBLATT:

Q. Good morning.

A. Good morning.

Q. Could you please state and spell your name for the record.

A. Yes. Patrick Smith, P-A-T-R-I-C-K, S-M-I-T-H.

Q. Mr. Smith, are you employed?

A. Yes.

Q. Where are you employed?

A. For the Bureau of Alcohol, Tobacco, Firearms & Explosives, better known as the ATF.

Q. And how long have you been working at the ATF?

A. Since 2013.

Q. What do you do at the ATF?

A.   I'm a Special Agent.  I investigate federal firearms crimes and crimes of violence.

Q.   And have you been a Special Agent your entire time with the ATF?

A.   Yes.

Q.   Do you have any law enforcement experience before your time with the ATF?

A.   Yes, I do.

Q.   And what is that law enforcement experience?

A.   I was a patrolman for the Harwich Police Department in Massachusetts in 2000 -- starting 2011.

Q.   Agent Smith, before we get into the more detailed part of your testimony, let me ask, did you have any involvement in this investigation?

A.   No, sir.

Q.   Do you recognize anyone at defense table?

A.   I do not.

Q.   Agent Smith, based on your experience with ATF, are you familiar with the definition of a firearm?

A.   Yes.

Q.   What is a firearm?

A.   A firearm is any weapon that can or can be readily converted to fire a projectile by the means of an explosion.

It also includes any frame or receiver of any such weapon.

It also includes silencers, mufflers, and destructive devices.

Q.  As part of your duties as a Special Agent with the ATF, are you responsible for examining firearms?

A.  As an interstate nexus agent, I am, yes.

Q.  Okay.  And when you say interstate nexus agent, can you explain to the jury what that means.

A.  On top of my normal training, I've received extra training in determining the interstate nexus -- interstate or foreign nexus of firearms.

Q.  When you say interstate or foreign nexus, what do you mean?

A.  Whether or not a firearm crossed international or state borders.

Q.  And when you are conducting an examination as an interstate nexus witness, what kinds of things are you looking for?

A.  Upon initial physical examination, I'm looking for the make, model, serial number of the firearm, looking for any type of stamping or importation markings on the firearm.

Q.  And as part of that role, are you also attempting to determine whether or not a firearm is designed to expel a projectile?

A.  Yes.

Q.  How do you do that?

A.  Based on both my training as an ATF agent and as a nexus expert -- or excuse me -- a nexus agent, I -- there are things,

key factors that we look for whether or not a weapon is a firearm.

Q. And you testified already about certain experience and training you've received.

Can you walk the jury through training that you've received as part of your role in determining whether firearms have traveled in foreign or interstate commerce?

A. Yes. In 2016, I went to the National Interstate Commerce training held at the ATF Firearms Technology Lab in West Virginia. And then as firearms technology increases, we get not always annual, but we get recertifications as -- as the market changes.

Q. Have you ever had occasion in this role to contact firearm manufacturers to determine where certain firearms were manufactured, assembled, or shipped?

A. Yes.

Q. And do most companies that manufacture, ship, or assemble firearms have law enforcement liaisons?

A. We call them compliance officers.

Q. And what do the compliance officers do based on your experience with them?

A. Well, so ATF, it's two-pronged. We have an enforcement side as well as a regulatory side. So all firearms manufacturers and distributors have to comply with ATF 's regulations side. And that gives us inside track on where

their firearms are manufactured, where they're shipped, delivered, or things of that nature.

Q. Are you familiar with something called the Kelley Blue Book of Firearms?

A. Yes.

Q. What is that?

A. It is essentially an open source publicly available publication that goes into great detail about firearms history, pricing, history of the manufacturer, places where the -- where the firearm's manufacturing plants were, whether it's within the U.S. or foreign.

Q. You testified before about your review of physical firearms for certain markers. Do you recall that testimony?

A. Yes.

Q. And did you indicate that you looked for something called a serial number?

A. Yes.

Q. What is a serial number?

A. A serial number is an identifier for a particular make and model of a firearm. It began in 1968. The federal government mandated all firearm manufacturers give an individual serial number to the firearm for that particular manufacturer.

Q. You also testified that you look for manufacturer name and location. Do you recall that?

A. Yes.

Q.   What do you do with that information?

A.   That will help me determine where a firearm, which manufacturer actually made the firearm, and that will give me a better determination on where the firearm was actually constructed.

Q.   So you've testified about this analysis that you do.  Have you ever had occasion to render an opinion about whether or not a firearm has traveled in interstate or foreign commerce?

A.   Yes.

Q.   And approximately how many firearms have you examined in this role with the ATF?  As an interstate nexus determiner, approximately how many firearms have you examined for that purpose?

A.   Over a thousand.

        MR. ROTHBLATT:  Your Honor, at this time, the government would tender ATF Special Agent Patrick Smith under Federal Rule of Evidence 702 as a witness qualified to render an opinion on classifying firearms and determining interstate or foreign nexus.

        MR. MITCHELL:  No objection, Judge.

        THE COURT:  You may proceed.

BY MR. ROTHBLATT:

Q.   Agent Smith, were you asked to examine a particular firearm as part of this case?

A.   Yes, I was.

MR. ROTHBLATT: Your Honor, may I approach?

THE COURT: Yes.

(Tendered.)

BY MR. ROTHBLATT:

Q. Agent Smith, I've just handed you what's been marked as Government Exhibit 1A for identification purposes.

Do you recognize Government Exhibit 1A?

A. I do.

Q. How do you recognize it?

A. This is a firearm that I physically examined for nexus purposes.

Q. Is Government Exhibit 1A a firearm?

A. Yes, it is.

Q. And does it meet the definition that you explained earlier?

A. Yes.

Q. Were you able to determine where Government Exhibit 1A was manufactured?

A. Yes.

Q. And how did you do that?

A. Based on the physical examination of the firearm, I was able to determine that it was a Taurus. Taurus has two manufacturing plants, one in Brazil and one in Florida, in the U.S. This particular firearm was made in Brazil.

Q. And based on your training and experience, do you know how firearms manufactured in Brazil would make their way to the

state of Illinois?

A.   Yes, I do.

Q.   And how would that happen?

A.   They are shipped to the United States through an importer, which coincidentally is the Taurus plant in Florida.

Q.   So if Government Exhibit 1A was recovered in the state of Illinois, what, if anything, is your opinion as to whether or not Government Exhibit 1A traveled in interstate and foreign commerce?

A.   My determination is it affected both interstate and foreign commerce.

        MR. ROTHBLATT:  Your Honor, may I have a moment?

        THE COURT:  Sure.

    (Counsel conferring.)

        MR. ROTHBLATT:  Nothing further, Judge.

        THE COURT:  Okay.  Cross?

        MR. MITCHELL:  Yes, please.

        THE COURT:  Oh, sure.

    (Counsel conferring.)

                    CROSS-EXAMINATION

BY MR. MITCHELL:

Q.   Special Agent Smith, you testified that you had no involvement in this investigation at all, correct?

A.   Yes, sir, other than the nexus, yes.

Q.   Okay.  So how did you come in possession of the weapon that

you examined in this case?

A.   I never came in possession, sir.  I was asked to visit I believe it's the case agent to physically examine the firearm at his office.

Q.   Okay.  So you were assigned someplace else, and you came to Illinois to do that?

A.   No, sir.  I work in Illinois.

Q.   Okay.  So you left your office in Illinois to go to the agent's office here.

A.   Yes, sir.

Q.   Okay.  And do you remember when that occurred?

A.   It was several weeks ago, sir.

Q.   In 2025?

A.   Yes, sir.  My report should reflect the date.  I don't recall right now.

        MR. MITCHELL:  I saw the examples.  I didn't see any dates.

    (Counsel conferring.)

BY MR. MITCHELL:

Q.   From your examination, can you tell when the weapon was actually brought into the state of Illinois?

A.   No, sir.  Just my examination is to determine where the firearm was manufactured.

Q.   Okay.  And so at some point, it was manufactured in Brazil?

A.   Yes.

Q.   And it ended up in Illinois when you examined it in 2025?

A.   That's correct, sir.

Q.   Okay.  And so your conclusion is that because it was manufactured in Brazil and ended up in Illinois in 2025, it had to go across interstate or foreign commerce, right?

A.   That's correct.

Q.   That's just a conclusion that physically it had to do that, right?

A.   Yes.

Q.   You're not indicating that Mr. Taylor had ever possessed this weapon?

A.   No, sir.  My testimony is purely on the interstate or foreign commerce of the firearm itself.

Q.   Okay.  When did it enter -- can you tell when it entered Illinois?

A.   Not -- no, I can't, sir, but I know that there's ways of doing that, yes.

Q.   Okay.  As part of the ATF, you know that the Department of Justice keeps what we call a national tracking of firearms, right, a record?

A.   No, sir, that's -- that's inaccurate.

Q.   So the Department of Justice and the Bureau of ATF does not have a firearm tracing issue?  They don't have that database, when it was sold or anything; you didn't know about that?

A.   Tracing, ATF -- the eTrace system is for recovered firearms

by law enforcement only.

Q.   Okay.  And when you recover the firearm, what do you learn about the firearm when it's recovered?

A.   Not me personally, sir, but the ATF eTrace system, when a firearm is recovered by law enforcement, law enforcement officials enter the make, model, serial number, and other relevant information to the tracing system.

ATF is then tasked to contact the manufacturer and follow the line from manufacturing to first point of sale through a legal distributor or an FFL or a gun store.

Q.   Okay.  And that report essentially confirms, again, your opinion with respect, or at least your finding when you do examine whether or not the weapon was actually manufactured because you testified that this particular Taurus model serial number could have been manufactured either in Brazil or Florida, right?

A.   Tracing, sir, is an assist, but because of things like marking variances and other internal information that ATF has, that's not something that I would rely solely on.

Q.   I wasn't asking for you to rely on solely.  I just wanted to know that with respect to your opinion, you would at least expect that once the tracing was done that, in fact, if you -- in your expert opinion that it was manufactured in Brazil at least to reflect that, correct?

A.   Yes, sir.  I don't believe I even had a chance to look at

this eTrace --

Q.   Okay.

A.   -- to be honest.

Q.   But the eTrace, because it would be submitted in and part of the ATF program, which is your part of ATF, right, as an officer?

A.   I have nothing to do with eTrace, sir, no.

Q.   I didn't -- Alcohol, Tobacco & Firearm, you're a Special Agent with that agency, right?

A.   Yes, sir.

Q.   And as part of your agency, you understand that when they do recover, law enforcement anywhere, they have to report it to your agency, and they do a tracing program, right?

A.   It's suggested.  Unfortunately, not every law enforcement agency complies with the --

Q.   Okay.

A.   -- tracing system.

Q.   I want to show you what I've marked as Defense Exhibit J for identification and ask it to be shown to the witness at this time.

        Do you recognize the document that I'm showing you, Special Agent Smith, as a Firearms Trace Summary Report?

A.   I recognize -- recognize the eTrace format, but not this particular trace, no.

Q.   Okay.  And according to this document, can you determine

Smith - cross

80

whether or not this particular firearms trace is the same weapon that you examined for your interstate foreign commerce trace?

A.   The make, model, and serial number do coincide with the firearm that I examined, yes.

Q.   Okay.  And the country of where it was manufactured is Brazil was consistent with what you found, right?

A.   Yes, sir, on the trace.

Q.   So would it be fair -- based on your experience and knowledge, would you indicate or agree that law enforcement submitted a trace for the gun that was found in Illinois to ATF, and the trace report was completed for that particular weapon?

A.   Yes.

Q.   Okay.  And as you testified earlier, that trace report gives you essentially three pieces of information, right?  At least three.

A.   At least, yes.

Q.   Okay.  It tells you what -- the identification of the firearm, right?

        Yes?

A.   Yes.

Q.   And it also tells you who was the first purchaser of the firearm, correct?

A.   That's correct.

Q.   And it also tells you where it was purchased, where that person's background is, where that individual person lived or what their personal information was, right?

A.   Yes.

Q.   And then it also tells you where the dealer who actually shipped the weapon from to the purchaser, right?

A.   This would be the FFL or gun store where the original purchaser bought the firearm.

Q.   Okay.  And just one other piece of information, right?  It talks about how long or if that piece -- that weapon was actually reported as stolen or lost, right?

        MR. ROTHBLATT:  Objection, Judge.  This document is still not in evidence.

        MR. MITCHELL:  I'm asking the expert in terms of the ATF document, Judge.

        MR. ROTHBLATT:  He's asking him to testify about factual information on a document not in evidence.

        THE COURT:  Overruled.  You may proceed.

BY MR. MITCHELL:

Q.   From the report, can you tell whether or not this particular firearm was missing or lost or stolen for any period of time?

A.   No, sir.

Q.   You cannot tell?

A.   Not from this report, no.

Q.   According to this report, the officers who report and fill out when it was found, they identified the person who they claim they received the gun from, correct?

A.   I'm not sure I understand the question, sir.

Q.   Recovery information.  You see the section that says recovery information there?

A.   Yes.

Q.   That's reported by the officers who basically recovered the weapon?

A.   Yes.

Q.   The location and who they claim they possessed it, correct?

A.   Yes.

MR. ROTHBLATT:  Judge, I'm going to renew my objection.

If defense counsel wants to reference this exhibit and ask questions about it, he should move it into evidence.

THE COURT:  So -- sustained.

BY MR. MITCHELL:

Q.   Other than the date of recovery that's indicated, is there any indication of where the weapon was prior to that?

A.   On this report, no.

MR. ROTHBLATT:  Judge, objection.  This is the same issue.

THE COURT:  Sustained.

MR. MITCHELL:  Nothing further, Judge.

MR. ROTHBLATT:  No further questions, Judge.  Thank you.

THE COURT:  Okay.

Thank you.  You may be excused.

THE WITNESS:  Thank you for your time.

(Witness excused.)

MR. SCHIED:  The United States calls Artur Warniczek, Officer Artur Warniczek.

(Witness sworn.)

ARTUR WARNICZEK, GOVERNMENT'S WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SCHIED:

Q.  Good afternoon, Officer.  Could you please introduce yourself to the members of the jury?

A.  My name is Officer Artur Warniczek, A-R-T-U-R, W-A-R-N-I-C-Z-E-K, Star No. 144, Evergreen Park Police Department.

Q.  Officer, you just mentioned Evergreen Park Police Department.  Is that where you're employed?

A.  Yes.

Q.  How long have you worked there?

A.  Nine years.

Q.  What is your job with the Evergreen Park Police Department?

A.  Patrol officer.

Q.  What are some of your duties and responsibilities as a

patrol officer?

A.   Response to regular calls for service, as well as conducting traffic on the roadways.

Q.   In your time as a police officer, have you had any experience with firearms?

A.   Yes.

Q.   What does that experience entail?

A.   Locating, recovery, processing firearms.  I'm also an evidence technician with the department, so I do process weapons as well.

Q.   Have you had experience in dealing with armed individuals?

A.   Yes.

Q.   Members of the public?

A.   Yes.

Q.   What are some of the things that you think about when dealing with someone who might have a gun?

A.   Generally safety.

Q.   What do you mean by general safety?

A.   Safety for the public, as well as officer safety.

Q.   Officer Warniczek, I want to shift to talking about a specific night.

     Were you on duty the night of October 10, 2021?

A.   Yes.

Q.   Were you dispatched to respond to an incident at a Mariano's in Evergreen Park?

A. Yes.

Q. What was that call about?

A. Retail theft in progress.

Q. Did you respond to that call?

A. Yes.

Q. Were you alone or with other officers?

A. I was alone in my single squad and responding with other officers.

Q. So did you drive there alone?

A. Yes.

Q. Were there other officers who also responded to the call?

A. Yes.

Q. Who were those other officers?

A. Officer Guzman and Officer Hartmann.

Q. What happened when you arrived at the Mariano's?

A. I met with the loss prevention officer at their front or actually the side entrance of the store.

Q. What did you learn?

A. I learned that there's a female offender inside the -- the establishment concealing alcohol.

Q. Officer, were you in uniform that night?

A. Yes.

Q. Were you armed?

A. Can you repeat?

Q. Were you armed?

Warniczek - direct

86

A.   Yes.

Q.   What were you armed with?

A.   Regular service pistol.

Q.   Were you carrying any other firearms that night?

A.   No.

Q.   Do you have experience with wearing a body-worn camera?

A.   Yes.

Q.   How do those generally work?

A.   Generally, they're activated by either manually pressing the button on the camera itself, or they're synched to a patrol unit.  Also, they do synch to other officers' body camera.

Q.   Where on your body is a body-worn camera worn?

A.   Typically in the center.

Q.   When you say "the center," is there an article of clothing or a position on your body?

A.   Yes.  It's typically, like for example, on my -- referencing my vest, center of the vest.

Q.   Okay.  In your time at the Evergreen Park Police Department, have you used different types of body-worn camera?

A.   Yes.

Q.   What were those different types?

A.   There was a different style body camera.  Functions the same way as just we upgraded it or shifted to a different company, but the function's basically the same.

Q.   The older version, were you using that version in October

Warniczek - direct

87

of 2021?

A.   Yes.

Q.   And how would you activate that camera?

A.   That one also functions the same way.  It's either you manually press the button or you -- or it synchs to a squad car or another officer's body cam.

Q.   How would you know if the body-worn camera was turned on?

A.   The body camera when it's in the off position, it's just completely -- there's no indication of it recording.

     When it is activated, there is a red light that illuminates, and it will be on during the course of the recording.

Q.   Do those body-worn cameras ever malfunction?

A.   Yes.

Q.   What are some typical malfunctions?

A.   They either fail to synch to the vehicle, to the squad car, fail to synch to other officers' camera, or they just simply do not activate unless you manually activate them.

Q.   And malfunctions aside, the way they're supposed to work, when you turned it on, would you see a red light?

A.   Yes.

Q.   Were you wearing body-worn camera -- a body-worn camera on the night of October 10th, 2021?

A.   Yes.

Q.   Did your body-worn camera record your response to the

Mariano's and other activities that night?

A. Yes.

Q. Prior to your testimony today, have you reviewed a series of videos titled Government's Exhibit 101 and then Government Exhibit 101A through J?

A. Yes.

Q. Were those portions of your body-worn camera footage from that night?

A. Yes.

Q. And were those true and accurate depictions of what you saw on October 10th, 2021?

A. Yes.

MR. SCHIED: Your Honor, I'd move to admit Government's Exhibit 101 and Government's Exhibit 101A through J.

MR. MITCHELL: No objection, Judge.

THE COURT: Okay. They're admitted.

(Government Exhibits Nos. 101 and 101A through J received in evidence.)

BY MR. SCHIED:

Q. Officer Warniczek, did you meet with me a few weeks ago to discuss this case?

A. Yes.

Q. I'm showing you what is marked for identification as Government's Exhibit's 301.

Have you seen that before?

A.   Yes.

Q.   What is it?

A.   This is a satellite image of the parking lot of Mariano's.

Q.   Does that image accurately depict the layout of the Mariano's parking lot?

A.   Yes.

MR. SCHIED:   I would move to admit Government's Exhibit 301 and publish to the jury.

MR. MITCHELL:   No objection, Judge.

THE COURT:   It's admitted.   You may publish.

(Government Exhibit No. 301 received in evidence.)

BY MR. SCHIED:

Q.   Now, you said that you reported to the Mariano's at night. This image appears to be during the day.

Just to be clear, this is not a photograph, is it, of the night that you reported to the Mariano's?

A.   Correct.   This is just an overview satellite image.

Q.   Okay.   And so the cars that you can see in this image, were those the cars that were present the night of October 10th, 2021?

A.   No.

Q.   And is your squad car or any of the cars that were there that night on this image?

A.   No.

Q. When we met previously, did you assist in the preparation of a demonstrative exhibit by identifying locations on this image?

A. Yes.

Q. I would move to -- I'll show the witness what has been marked for identification as Government's Exhibit 302.

Officer Warniczek, what is that on the screen there?

A. This is the -- again, the satellite image of the location marked off with No. 1 is where I met --

Q. That's okay. But is this the image that you helped create by identifying locations?

A. Yes.

MR. SCHIED: I would move to publish Government's Exhibit 302 as demonstrative.

MR. MITCHELL: No objection, Judge.

THE COURT: You may publish.

BY MR. SCHIED:

Q. Officer Warniczek, can you identify on the image where you were standing when you initially talked to the Mariano's employee?

A. Location No. 1.

Q. Can you identify on the image where your squad car was parked that night?

A. No. 2.

Q. Okay. So you said when you initially reported to the

Mariano's, you met with the loss prevention employee.

What happened next?

A. The loss prevention employee advised that there was a female inside concealing alcohol at the self-checkout register.

Q. And what happened after that?

A. The loss prevention officer told me that --

MR. MITCHELL: Objection, Judge. It's hearsay.

MR. SCHIED: Your Honor, the question is not for the truth of the matter. It's for the effect on the witness.

THE COURT: Can we go on the sidebar quickly?

(Proceedings heard at sidebar:)

THE COURT: What's the statement that you're intending to elicit?

MR. SCHIED: I'm really just trying to elicit what happened in the sequence of events, so the alleged shoplifter exiting the store, but prior to that happening, Officer Warniczek was receiving information from the loss prevention employee.

THE COURT: Okay. What is the -- do you know what the statement is though? You know, like the statement of the loss prevention employee?

MR. SCHIED: I believe the statement was that the -- one moment, Your Honor.

(Counsel conferring.)

MR. SCHIED: I believe it's information about the

alleged shoplifting, but it's not for the truth of the matter. It's for the police's actions, informing their actions.

THE COURT: Okay. So it's -- so I'm going to overrule the hearsay objection. So I want to hear what the -- what the statement itself is, that would be helpful, but I -- at this point, based on what's occurred, the Q and A so far, it's not within the definition of hearsay because it's -- under Rule 801(c)(2), it's not being offered to prove the truth of the matter asserted in the statement, namely, you know, if the statement is that someone was shoplifting, it's not to prove the truth that someone was shoplifting. It's to show the effect on the officer and why the officer continued to proceed as the officer did.

(Proceedings heard in open court:)

THE COURT: Okay. Overruled. You may proceed.

BY MR. SCHIED:

Q. Officer Warniczek, what happened after you initially spoke with the loss prevention employee?

A. He told me there was a female inside the store shoplifting, concealing items on her person, and that he wants her prosecuted and arrested for shoplifting.

Q. What did you do?

A. I waited outside until the female exited with the proceeds.

Q. What did you do when the female exited?

A. The loss prevention employee pointed to her, identifying

her as the offender, at which point we stopped her.

Q. I'm showing you what's in evidence as Government's Exhibit 101A, and I would move to publish.

THE COURT: You may.

(Video played in open court.)

BY MR. SCHIED:

Q. Officer Warniczek, is this a portion of your body-worn camera footage?

A. Yes.

MR. SCHIED: I'm going to play the video from time zero.

(Video played in open court.)

MR. SCHIED: Pausing at 11 seconds into the video.

BY MR. SCHIED:

Q. A couple of questions for you, Officer Warniczek.

What is the text in the bottom left-hand corner of the screen?

A. That is the date and time of this incident.

Q. And how is the time rendered there, is it in military time?

A. Yes, it's displayed in military time, referencing 21:41 hours, which is 9:41 p.m.

Q. And what is the date there?

A. 10/10/2021.

Q. In the still image that's on the screen right now, who is on the left side of the screen?

A.   On the far left side, that would be the female offender.

Q.   Who's in the center of the image?

A.   That's Officer Guzman.

Q.   And how about behind Officer Guzman?

A.   That is the LP for Mariano's.

        MR. SCHIED:  I'll play the video again from 11 seconds.

     (Video played in open court.)

        MR. SCHIED:  Pausing at 35 seconds into the video.

BY MR. SCHIED:

Q.   What do you see there?

A.   I see Officer Guzman, and that right there in the center of his chest with the red dot on it, that is the body-worn camera activated.

Q.   I'm making the middle of that image larger.  Is that what you're referring to?

A.   Yes.

Q.   And what does that indicate to you, that that red light is illuminated?

A.   To my knowledge, that would indicate that the video is being recorded.

        MR. SCHIED:  I'm going to play again from 35 seconds.

     (Video played in open court.)

        MR. SCHIED:  I'm pausing again at 42 seconds into the video.

BY MR. SCHIED:

Q.   Who is that on the right side of the image in the mask?

A.   That is Officer Hartmann.

Q.   And making that portion of the image larger, what do you see on his chest?

A.   That is, again, the body-worn camera on his upper -- looks like upper torso area, also with the red dot activated, indicating it's recording.

Q.   I want to ask you in your experience, what does it mean to run a name over the air?

A.   It means that I'm communicating with Central Dispatch who sits at a computer, and they're able to run whatever I'm asking them through their computer through a database.

Q.   How are you communicating with them?

A.   Radio.

Q.   Do you wear a radio on your person?

A.   Yes.

Q.   And is that something that most police officers carry in order to communicate with Central Dispatch?

A.   Yes.

Q.   What kind of information can dispatch provide you over the radio?

A.   Typically, if you ask for a name check or a -- we refer it in ten codes, as far as 99.  That's referring to a warrant or any active wants.

MR. SCHIED: Okay. I'm going to play the video again from 42 seconds.

(Video played in open court.)

MR. SCHIED: Pausing at a minute 56 seconds.

BY MR. SCHIED:

Q. Did you see Officer Guzman walk out of frame at the end of that video?

A. Yes.

Q. What was he going to do?

A. I believe he was running the name that the female provided over the air with Central Dispatch.

Q. And what information did he learn?

A. We both learned the same information. It was relayed that Ms. Ficarella had previous contacts with our department in the past.

MR. SCHIED: I'm showing you and I would move to publish what's in evidence as Government's Exhibit 101D.

THE COURT: You may.

(Video played in open court.)

BY MR. SCHIED:

Q. Officer Warniczek, is this a portion of your body-worn camera footage with you talking to Ficarella?

A. Yes.

(Video played in open court.)

BY MR. SCHIED:

Q. So at this point, you've learned that there was a prior incident at the Mariano's involving the person who had identified herself to you as Sylyna Ficarella.

What did you do after talking to her there?

A. After learning those facts, I returned. At some point, I returned back to my squad car to check on the information myself and see if I can pull up a report of that particular incident.

MR. SCHIED: I'm going to show you and I would move to publish what's in evidence as Government's Exhibit 101F.

THE COURT: You may publish.

(Video played in open court.)

BY MR. SCHIED:

Q. Is this a portion of your body-worn camera, Officer Warniczek?

A. Yes.

Q. And is this depicting right now the inside of your squad car?

A. Yes.

MR. SCHIED: I'm going to play from the beginning.

(Video played in open court.)

BY MR. SCHIED:

Q. Who was speaking in that video?

A. Myself speaking with Officer Guzman.

Q. Did you learn that there was a vehicle involved in the

prior incident at the Mariano's?

A.   Yes.

Q.   What was the series of letters and numbers that you read off there?

A.   That began with the letters CT.

Q.   I'm sorry, what did those letters and numbers signify?

A.   The license plate number for that vehicle that was used in the previous incident.

        MR. SCHIED:  Showing you, and I would move to publish what's been admitted into evidence as Government's Exhibit 101G.

        THE COURT:  You may publish.

    (Video played in open court.)

BY MR. SCHIED:

Q.   Is that another portion of your body-worn camera?

A.   Yes.

        MR. SCHIED:  Playing from the beginning.

    (Video played in open court.)

BY MR. SCHIED:

Q.   Who is that talking about a black Volkswagen Jetta?

A.   That is myself speaking with Officer Guzman.

Q.   What did you do next after what was depicted in that clip?

A.   I learned that the same vehicle that was used in the previous incident is in the parking lot.

Q.   How did you come to discover that?

A.   I asked Officer Guzman to see if he sees the same vehicle in the parking lot, at which point he did.

Q.   What did you do after you had identified that the same vehicle that was involved in the prior incident was in the parking lot?

A.   I suspected it's once again involved in this similar incident, and I began to approach that vehicle on foot.

Q.   What did you do once you arrived at the vehicle?

A.   I approached on foot from the passenger's side while Officer Guzman approached from the driver's side.

Q.   Okay.  I'm going to show you again Government's Exhibit 302 as demonstrative.  This is the same image you saw previously.

     Could you identify where on this image the Volkswagen Jetta was located?

A.   Yes, Location No. 3.

Q.   You mentioned that you approached the vehicle with Officer Guzman.

     What did you see as you approached the vehicle?

A.   I saw the vehicle with its headlights on, and I saw it occupied two times.

Q.   When you say occupied two times, what do you mean by that?

A.   That it was occupied by two persons, two people.

Q.   And what did you do as you arrived at the vehicle?

A.   I began to speak with its occupants.

Q.   What were the men doing?

A.   Just sitting in the vehicle.

Q.   Did you eventually get both of their names?

A.   Yes.

Q.   What were those names?

A.   There was a passenger, Mr. Percy, and the driver on the driver's side was Mr. Taylor.

Q.   Going to show you what's in evidence as Government's Exhibit 101H and move to publish.

THE COURT:   You may publish.

(Video played in open court.)

BY MR. SCHIED:

Q.   Officer Warniczek, is that a portion of your body-worn camera footage?

A.   Yes.

MR. SCHIED:   I'm going to play from the beginning.

(Video played in open court.)

BY MR. SCHIED:

Q.   Officer Warniczek, where were you positioned at that point?

A.   On the passenger's side of this vehicle.

Q.   And who -- who did you say the passenger was?

A.   Mr. Percy.

Q.   Who -- and who was in the driver's seat?

A.   Mr. Taylor.

(Counsel conferring.)

BY MR. SCHIED:

Q.   The passenger, was his first name Percy?

A.   I believe so, Percy Walker.

Q.   Where was Officer Guzman at this point in time?

A.   He was speaking with Mr. Taylor on the driver's side.

         MR. SCHIED:  I'm going to play the video again starting from 6 seconds in.

     (Video played in open court.)

         MR. SCHIED:  Pausing at 34 seconds into that video.

BY MR. SCHIED:

Q.   What did you do after your initial conversation with the two individuals in the black Volkswagen Jetta?

A.   I told both -- I told Mr. Percy Walker that suspicious that they're involved in this criminal activity, that they're somehow tied with Ficarella and it involved a retail theft.

Q.   Once you obtained the names of both of the individuals in the car, what did you do?

A.   I was trying to verify through our LEADS system through the database to make sure that they don't have any active warrants.

Q.   Where was Officer Hartmann at this point in time?

A.   I believe he was still talking to Ficarella at the front entrance.

Q.   Did you go and talk to him briefly before returning to your squad car?

A.   I believe so.

         MR. SCHIED:  I am going to show you again Government's

Exhibit 302.  This is the demonstrative exhibit.  Move to publish that again.

THE COURT:  You may.

BY MR. SCHIED:

Q.  You said that Officer Hartmann was with who we'll refer to as Ms. Ficarella, where on this image were they at this point in time?

A.  No. 1.

Q.  And you mentioned that you wanted to go back to your squad car to run those names.  Where was your squad car located?

A.  No. 2.

MR. SCHIED:  I'll show you and move to publish what's in evidence as Government's Exhibit 101I.

May I publish, Judge?

THE COURT:  Yes.

(Video played in open court.)

BY MR. SCHIED:

Q.  Officer Warniczek, is this another portion of your body-worn camera?

A.  Yes.

Q.  And are you located in the squad car after talking to Officer Hartmann and Ficarella?

A.  Yes.

MR. SCHIED:  Playing the video.

(Video played in open court.)

Warniczek - direct

103

BY MR. SCHIED:

Q.   You mentioned earlier that you wear a radio on your person and sometimes communicate with Central Dispatch.  Is that something that other officers also do?

A.   Yes.

Q.   So when someone radios out and you're in a facility -- or in the vicinity or on the same channel, are you able to hear that?

A.   Yes.

Q.   And so the voice that we heard in the video there, where was that coming from physically?

A.   My radio.

Q.   And whose voice was that?

A.   Officer Hartmann.

Q.   So at this point in time, you said that you were in your squad car.  Was Officer Hartmann still at the Mariano's?

A.   Yes.

Q.   Where was Officer Guzman?

A.   I believe he was at the -- the Volkswagen.

Q.   And how many subjects were on the scene at that point, subjects meaning individuals that you were investigating?

A.   Three.

Q.   And how many were at the Volkswagen with Officer Guzman?

A.   Two.

Q.   How many officers were at the Volkswagen?

A.   At that particular time, it's either he was by himself or with Officer Hartmann, one of the two.  I don't recall.

MR. SCHIED:  I'm showing you Government's Exhibit 101J, and I would move to publish.

THE COURT:  You may.

(Video played in open court.)

BY MR. SCHIED:

Q.   Is this another portion of your body-worn camera footage, Officer Warniczek?

A.   Yes.

Q.   At one second into the video, who is in this image?

A.   This is Officer Hartmann and Ms. Ficarella.

Q.   And do you notice anything about Officer Hartmann there?

A.   His body cam with the red dot, meaning it's activated, recording.

Q.   And is this portion of your body-worn camera footage at the Mariano's after you left your squad car?

A.   Yes.

MR. SCHIED:  I'm going to play the video from one second in.

(Video played in open court.)

BY MR. SCHIED:

Q.   At that point in time, Officer Warniczek, had the police recovered a gun?

A.   No.

Warniczek - direct

105

Q. Had officers seen a gun?

A. No.

Q. Had they ordered anyone out of a car, or was there any yelling at that point?

A. No.

Q. After Ficarella told you that the driver had a gun, what did you do?

A. I attempted to radio in as a caution alert to other officers responding, as well as on scene, of a possible weapon being involved in the vehicle and the driver being in possession of that weapon.

Q. At the -- towards the beginning of that clip when we saw you walk up, did Officer Hartmann walk out of frame and towards the Jetta?

A. Yes.

Q. At that point in time, you were at the Mariano's with Ficarella. Where were the other two officers?

A. Officer Guzman and Officer Hartmann were at the Jetta.

Q. And why did you -- what did you want to do at that point?

A. At that time, I made a decision to place Ms. Ficarella into custody and approached her to do so.

Q. And after she told you that there was a gun there, what did you want to communicate?

A. I wanted the other officers to use caution, as Ficarella just advised me that there might be a safety concern and

possible weapon in that vehicle.

MR. SCHIED: I'm playing the video from 52 seconds.

(Video played in open court.)

BY MR. SCHIED:

Q. What does "there's a 32 in the car" mean?

A. That's a ten code for police code referencing 32, meaning a weapon.

Q. Why do you use a code in that situation?

A. We communicate sometimes in ten codes so the officers know what I'm talking about and to prevent civilians knowing what we're saying.

Q. So if you were to just use the word "gun," if you were to say there's a gun, would your concern be that --

MR. MITCHELL: Objection, Judge.

BY MR. SCHIED:

Q. What would your concern be if you said that?

A. It would be concerning for a possible offender in possession of that gun to now know and be alerted that we know that there might be a gun in there.

Q. After you radioed out in that video, was there a tone that sounded?

A. Yes.

Q. What does that mean?

A. That means another officer is trying to key up on the radio and transmit over the radio at the same time.

Q. So what happens when two people are trying to use the radio at the same time?

A. Sometimes the transmission is not going through.

Q. What does "hold the air" mean?

A. That means for other officers or other agencies to not use the radio and that particular officer that's calling "40 air" is requesting to hold the air for him so he could speak.

Q. Who was the officer that requested to hold the air in that clip?

A. Officer Hartmann.

Q. How did you interpret that?

A. His voice.

Q. Sorry. How did you interpret his request to hold the air?

A. Usually it's emergency situations where you don't want nobody else to use it, to use the air; and at the same time, I attempted to relay the same information, so that told me that he, in fact, saw a gun.

Q. Could you see what was happening at the Jetta from your position near the Mariano's?

A. Yes.

Q. And you said you -- earlier that you wear your body-worn camera on your chest. Does the body-worn camera turn in the way that a human neck can?

A. No.

Q. So right now -- in this video, if your body-worn camera is

facing a wall, is that necessarily what you're looking at?

A.   No.

Q.   So at that point in time when you're standing at the Mariano's, Officer Hartmann and Officer Guzman are at the Jetta and you and Officer Hartmann have both just tried to radio out simultaneously, where was your focus at the time?

A.   Initially with Mrs. Ficarella.

Q.   And once you learned that there may be a dangerous situation at the car, were you also trying to monitor that situation?

A.   Yes.

    MR. SCHIED:  I'm playing the video from 1 minute 5 seconds in.

    (Video played in open court.)

    MR. SCHIED:  Pausing at 1 minute and 33 seconds into the video.

BY MR. SCHIED:

Q.   Was Ficarella trying to talk to you at that point?

A.   Yes.

Q.   And what was happening over at the Volkswagen Jetta?

A.   There was a commotion, and Mr. Percy Walker and Mr. Charles Taylor were being ordered out of the vehicle at gunpoint.

    MR. SCHIED:  I'm playing the video again from 1 minute 33 seconds.

    (Video played in open court.)

BY MR. SCHIED:

Q. I want to take a pause.

Did you curse in that last clip? Did you say something along the lines of "it's the same shit"?

A. Yes.

Q. Was this a stressful situation at this point in time?

A. Yes.

Q. Do you sometimes curse when you're on the job dealing with a potentially dangerous situation?

A. Yes.

Q. So in that clip, there was some -- some yelling. What was going on at the vehicle?

A. Mr. Percy Walker was being ordered out of the vehicle by one officer and an assistant officer, while Officer Hartmann was at the driver's side ordering Mr. Charles Taylor out of the vehicle.

Q. What did you see, from your position at the Mariano's, Charles Taylor do?

A. He was -- he got out of the vehicle. He was initially facing the vehicle, and at one point, he turned east and began to run away.

Q. I'm going to show you what's marked for identification and not yet in evidence as Government's Exhibit 401.

Do you recognize that?

A. Yes.

Q.   What is that?

A.   That is Mr. Taylor.

Q.   And is that a true and accurate depiction of the person you saw and interacted with that night by that name?

A.   Yes.

MR. SCHIED:  Move to admit Government's Exhibit 401.

MR. MITCHELL:  No objection, Judge.

THE COURT:  It's admitted.

(Government Exhibit No. 401 received in evidence.)

MR. SCHIED:  And I would move to publish that.

THE COURT:  You may publish.

BY MR. SCHIED:

Q.   Officer Warniczek, do you see the man that you interacted with that night named Charles Taylor in the courtroom today?

A.   I do.

Q.   Could you identify him based on where he is sitting and an article of clothing he's wearing?

MR. MITCHELL:  We stipulate, Judge.

THE COURT:  Okay.

MR. SCHIED:  Please let the record reflect that the witness identified the defendant -- yes, assuming that's what defense counsel is stipulating to.

MR. MITCHELL:  Yes, Judge.

THE COURT:  Okay.  So stipulated.

BY MR. SCHIED:

Q. You said that you saw Mr. Taylor, you saw the defendant, get out of the car.

What did you do after he got out of the car?

A. I asked the loss prevention to stay with Ms. Ficarella, and I assisted in the foot pursuit.

Q. What did you observe of the chase as -- as you entered it?

A. As I ran through the parking lot, I observed Officer Hartmann chasing in close proximity, and he eventually stopped due to a weapon being dropped on the floor by Mr. Taylor, and I continued running past that location after Mr. Taylor.

MR. SCHIED: I would like to publish again Government's Exhibit 101J.

THE COURT: You may.

(Video played in open court.)

MR. SCHIED: Playing again from 1 minute 57 seconds into the video.

(Video played in open court.)

BY MR. SCHIED:

Q. What is on the left side of the screen?

A. More so towards the center?

Q. Yes.

A. That's Officer Hartmann.

Q. And did you continue to run past Officer Hartmann?

A. Yes.

Q. What was Officer Hartmann doing at that time?

A.   He stood by the weapon that was dropped.

          MR. SCHIED:   Playing again from 2 minutes 7 seconds.

     (Video played in open court.)

BY MR. SCHIED:

Q.   How did the chase end, Officer Warniczek?

A.   Mr. Taylor was attempting to climb over the fence, at which point he was placed into custody.

Q.   Did you assist in placing him into custody?

A.   Yes.

Q.   And had you ever met the defendant before that night?

A.   No.

          MR. SCHIED:   I'd move again to publish Government's Exhibit 302.

          THE COURT:   You may.

BY MR. SCHIED:

Q.   Could you identify where on this image the chase ended?

A.   Location No. 5.

Q.   And where did you see Officer Hartmann standing over the gun?

A.   Location 4.

Q.   And I think you should be able to draw on that screen.   Are you able to -- could you please draw the path that the defendant ran on with your finger?

A.   The defendant ran (indicating).

Q.   Thank you.

I'm going to show you what has not yet been entered into evidence as Government's Exhibit 406.

Do you recognize that?

A.   Yes.

Q.   What is it?

A.   That is the Volkswagen Jetta parked in the Mariano's lot.

Q.   And is that a fair and accurate depiction of where the Jetta was located the night of October 10th, 2021?

A.   Yes.

MR. SCHIED:   I would move to admit Government's Exhibit 406 and publish.

THE COURT:   Any objection?

MR. MITCHELL:   No, Judge.

THE COURT:   It's admitted, and you may publish.

(Government Exhibit No. 406 received in evidence.)

MR. SCHIED:   No further questions, Your Honor.

THE COURT:   Okay.   Let me -- let's go on the sidebar, please.

(Proceedings heard at sidebar:)

THE COURT:   Is now an okay time for a break?

MR. MITCHELL:   This would be good, Judge.

MR. SCHIED:   Yes, Your Honor.

THE COURT:   Okay.   Thanks.

(Proceedings heard in open court:)

THE COURT:   Okay.   We're going to take the lunch break

now. We'll be back in an hour, so at 2:00 p.m.

Just for the witness, you're on the stand. Please don't discuss your testimony with anybody during the break. And to the jury, same reminders, please don't discuss or research the case during the break.

Thank you.

COURT SECURITY OFFICER: All rise.

(Jury out at 1:00 p.m.)

THE COURT: Okay. Is there anything we should discuss at this time? I know we still need to address the issue, the motion *in limine*, motion *in limine* No. 1 by the defense.

Is there anything else we should address?

MR. ROTHBLATT: Your Honor, may we have a moment?

THE COURT: Sure.

(Counsel conferring.)

MR. ROTHBLATT: Judge, just to the extent the Court would entertain just a brief argument on Officer Coughlin's testimony.

We do think that defense counsel flagged in his opening a particular line that would make Officer Coughlin's proffered testimony significantly more probative for the jury. He specifically said something to the effect of if something is not there, you're entitled to ask why, and he talked about the jury making inferences.

Again, I think the argument that he was teeing up is

the absence of body-worn camera video from two of the officers in question, and whatever inferences he's going to ask the jury to draw from that, that argument that has already been teed up further establishes the government's need to present the testimony of Officer Coughlin to explain the historic issues with the malfunctioning of the prior body-worn camera equipment, his understanding again that the body-worn camera equipment based on the images that have already been published was activated and should have led to recordings, and his understanding that any body-worn camera video that's obtained from these kinds of events cannot be altered once it's uploaded to the Evergreen Park Police systems.

THE COURT:  Okay.  Any response?

MR. MITCHELL:  Judge, the idea that somehow that I've teed up this issue to allow Coughlin to now speculate and provide information concerning cameras that he never evaluated or didn't do on that day, that somehow he gets to now provide a lay opinion or an expert opinion or whatever they're trying to establish that he knows why or there's a reason why that things were missing because they likely malfunctioned because of the light.

He can testify with respect to the light being on, but, again, he cannot give an opinion, Judge, with respect to whether or not these particular cameras on this particular day malfunctioned as the way he speculates.  And so I would still

raise that he cannot provide that -- that testimony.

In regards to once videos are docked, they cannot be altered or something in that regard or deleted, I'm not concerned with that, Judge.

MR. ROTHBLATT: Judge, just to clarify, we clarified this in our response briefing, in our argument on this the other day, the government will not ask Officer Coughlin to speculate as to whether or not the equipment malfunctioned on this particular instance.

He is providing background testimony to explain that the equipment did malfunction, and he knows from his personal experience. He's not talking about these particular units. He's not talking about a post-mortem after the events on October 10, 2021. It's just to provide the context to the jury that I believe has already been teed up by defense counsel as to why there is -- there may be an absence of evidence.

It's set up for the government to present that evidence and then argue later. It's not for him to conclude and provide any kind of opinion about the particular equipment in this case.

THE COURT: Okay. So let me just ask for a proffer about the specific testimony the government is looking to present because there may be differences based on the type of testimony.

So is the government intending -- it sounds like the

government's intending to present, first of all, just generalized evidence about the malfunctioning of cameras and testimony that the red light on generally meant the camera was activated, was on.

And then beyond that, how much are you intending, you, the government, intending to get into specific, you know, like stills from the video and what that -- what a particular still means, in other words, are you going to ask him, okay, you see this still, the red light's on, and, therefore, are you going to elicit testimony because the red light's on in this still, that means the camera is on, given that we can see the red light's on?

MR. ROTHBLATT: That's correct, Judge. Not only would that be appropriate testimony, Officer Warniczek just testified to that on direct, and defense counsel didn't object.

It would be perfectly appropriate for Officer Coughlin to provide the same testimony, considering his experience with the body-worn camera equipment.

He will testify, he will lay sufficient foundation that he utilized the equipment, he worked on the equipment, he had an understanding as to what indicator light would be on if the equipment had been activated. And so based on his review of certain stills, he could identify that the equipment had been activated or was on and should have led to recordings.

THE COURT: Okay. Let me just ask the defense if

you'd like any further argument.

MR. MITCHELL: No, Judge. I think it's already been teed up with respect to the issue of the red light being on. That's clear. But to give some sort of indication, which I think is what they offered before, that the officers would not know that it wasn't recording, they would assume that it was recording and all of these other opinions in regards to that, that would be totally inappropriate, Judge, at all.

I mean, any person can testify that the light is on, but in terms of whether or not those particular cameras were malfunctioning, I think, is the next level that they can't. Warniczek didn't say that it was malfunctioning. His wasn't malfunctioning. I don't think anyone can come in here and say that it was malfunctioning, particularly Mr. Coughlin.

THE COURT: Okay. Also, the government is offering Mr. Coughlin as -- remind me, offering him as -- offering his testimony as opinion testimony by a lay witness under Rule 701 or offering as an expert under Rule 702?

MR. ROTHBLATT: To the extent the Court deems testimony about the red light indicator meaning that the units had been activated as an opinion, it would be lay opinion testimony under Rule 701.

Certainly, the government is not tendering or offering Officer Coughlin as an expert under Rule 702.

THE COURT: Okay.

MR. MITCHELL: And, accordingly, Judge, 701 refers to his personal knowledge to help the jury with respect to these cameras, and he has no personal knowledge with respect to helping the jury with respect to these cameras.

MR. ROTHBLATT: Judge, that's an issue for foundation for the government to lay. We have proffered sufficient foundation. This is an individual who used this same exact equipment. He worked on this equipment. This is his role at the Evergreen Park Police Department.

So first off, to the extent defense counsel wants to make that objection, I think it's inappropriately timed.

Second of all, we've already proffered more than sufficient foundation for him to render that opinion. It will be helpful to the jury to know that these officers had, in fact, activated their body-worn camera equipment, and he will be able to testify that the indicator light was on, which indicates that the units had been set up to function.

That's the extent of the testimony he will offer with regard to these particular pieces of body-worn camera equipment.

THE COURT: Okay. So first of all, let me just explain the legal standard and then talk about how it applies.

So the government is looking to present the testimony of Officer Coughlin to discuss malfunctioning of body-worn cameras and the history of -- or the department's experience

with the different camera systems they have used, including the system that was in place at the time of this incident in 2021.

The government is also looking to present Officer Coughlin's testimony to review particular stills from the video and point to the fact that the red light in a particular officer's body-worn camera is on. And then the government also is intending to ask Officer Coughlin whether that means that the -- that, meaning the fact that the red light is on in a particular still from the video, means that the camera is on and is functioning.

So Rule 701, which is opinion testimony by lay witnesses, that rule says if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Moore's Federal Practice, so 6 Moore's Federal Practice Civil Section 26.23, has some discussion of Rule 701, and first it's discussing Rule 702, 703, 705, which is the -- you know, 702, of course, is the rule on expert witnesses. And so the section of Moore's is saying, on the other hand -- after discussing 702, 703 or 705 and points out the parties must disclose those witnesses, it says: On the other hand, a party

is not required to disclose as an expert the identity of a lay witness who will provide opinion testimony under Rule 701 of the Federal Rules of Evidence. Rule 701 permits a lay witness to testify in the form of opinions or inferences when the testimony is rationally based on the perception of the witness and the testimony will be helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

It is sometimes difficult to distinguish between a lay witness providing Rule 701 testimony and an expert providing testimony under Rule 702, particularly if the witness might otherwise qualify as an expert in his or her field, especially in courts that have adopted a liberal view toward the admissibility of Rule 701 testimony.

An essential difference is that Rule 701 requires direct personal knowledge of a factual matter at issue. Only then does it allow introduction of a limited degree of opinion testimony to help convey that information and only if the Court finds that it would be helpful to the jury.

The Third Circuit has noted that a lay witness with firsthand knowledge may offer an opinion akin to expert testimony in most cases, as long as the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion. Only a qualified expert may answer hypothetical questions. A lay witness

testifying under Rule 701 may not.

And so that's the portion of Moore's that's discussing or a portion of Moore's that's discussing Rule 701. And within that discussion is the point that an essential difference between Rule 701 and 702 is that Rule 701 requires direct personal knowledge of a factual matter at issue. Only then does it allow introduction of a limited degree of opinion testimony to help convey that information and only if the court finds that it would be helpful to the jury.

So just now thinking about how does that apply in this situation, so Officer Coughlin, I would say that the majority of what the government is proposing Officer Coughlin to testify about is admissible. A majority of it does not -- it's not even necessarily an opinion because Rule 701, again, governs opinion testimony by lay witnesses. And so Rule 701 in the lead-up or the very first sentence of that rule says if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is, and then goes through requirements (a), (b) and (c).

So just first of all want to make clear that this Rule 701 governs Officer Coughlin's testimony to the extent that he's testifying in the form of an opinion. So to the extent that he's just testifying based on personal knowledge and not offering an opinion, this rule doesn't kick in, and so he can testify, like any other fact witness, to facts that are

within his personal knowledge.

Most of the -- what the government intends to offer him for sounds more like it's based on Officer Coughlin's personal knowledge, not opinion testimony. So that would include the experience, his own experience dealing with the body-worn camera systems in use by the police department, the Evergreen Park Police Department.

That would include his own experience dealing with malfunctions under the old system, and, you know, the change to the new system, what was in place at various times.

To the extent that he has direct personal knowledge of those facts, he can testify to those, and they are facts that are not opinions.

I think when it -- when it comes to analyzing evidence that's otherwise been admitted in this case, so analyzing video stills, that -- he obviously was not one of the arresting officers. He was not at the scene, so it starts to get -- you know, the concern about Rule 701 doesn't permit someone to testify beyond their personal knowledge. That concern starts to increase.

When he talks about -- if he points out in a still that the red light is on, that seems fine. That's available to him. That's an inference he can -- or that's a fact that's available to anybody, and he can point that out in a still.

I think his personal knowledge also fairly includes

the general point that when a red light is on, that means in his own personal experience and knowledge that that means the camera's on. He can talk about the equipment generally. He can talk about the connection between the two parts of the camera and the DVR and the cable, the two connections. All that's within his personal knowledge. That's not opinion.

I think the very last step of, okay, we're looking at this still. The red light is on. That's fine, he can point that out. I think the very last step of the red light is on in this still and, therefore, this means that this particular camera was on at that time, that seems like a bit more of an opinion that's outside his personal knowledge. That sounds more like an expert opinion that -- it's true, Officer Warniczek testified to it already, but that's because Officer Warniczek was there, and so it is within -- you know, that particular step, inference, is within Officer Warniczek's personal knowledge. It's not really within Officer Coughlin's personal knowledge.

And, you know, does that mean that the government can't argue that inference to the jury? No, the government's free to argue that inference in closing, but I think just that very last step of, okay, this still has the red light. He can testify to that. Just that very last step of the still has the red light and, therefore, the camera was on at this time, that particular inference seems like the one step that's a little

bit too far, that's an inference from personal -- and outside his personal knowledge.

And it also -- I -- I'm not sure it is -- well, okay, I guess I would just leave it there. I think that one opinion is beyond his personal knowledge.

MR. ROTHBLATT: Very good, Judge. We understand the Court's ruling.

THE COURT: Okay.

MR. MITCHELL: Understood, Judge.

THE COURT: Okay.

All right. Does anyone have anything else to raise?

MR. SCHIED: No, Your Honor.

MR. MITCHELL: No, Judge.

THE COURT: Okay. See you at 2:00. Thanks.

(Adjourned at 1:24 p.m., until 2:00 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,              )  Case No. 22 CR 158
                                       )
          v.                           )
                                       )
CHARLES TAYLOR,                        )  Chicago, Illinois
                                       )  May 6, 2025
                   Defendant.          )  2:03 p.m.

              TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
             BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Government:    MR. ANDREW S. BOUTROS
                       INTERIM UNITED STATES ATTORNEY
                       BY:  MR. PAUL SCHIED
                            MR. RICHARD M. ROTHBLATT
                       219 South Dearborn Street
                       Suite 500
                       Chicago, IL 60604

For the Defendant:     LAW OFFICE OF GREGORY T. MITCHELL
                       BY:  MR. GREGORY T. MITCHELL
                       19150 Kedzie Avenue, Suite 205
                       Homewood, Illinois 60430

                       RANDOLPH & RANDOLPH, P.C.
                       BY:  MR. LONNIE M. RANDOLPH, II
                       1919 E. Columbus Drive
                       East Chicago, Indiana 46312


Court Reporter:        KATHLEEN M. FENNELL, CSR, RMR, FCRR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2328A
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5569
                       Kathleen_Fennell@ilnd.uscourts.gov

                    *    *    *    *    *

               PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; defendant present:)

THE COURT:  Is everybody ready to proceed?

MR. SCHEID:  Yes, your Honor.

MR. MITCHELL:  Yes, Judge.

THE COURT:  Good morning.

Bring in the jury.

(Jury in at 2:03 p.m.)

THE COURT:  Thanks, everyone.  We'll proceed next with the cross, and we'll wait a minute for the witness.

ARTUR WARNICZEK, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. MITCHELL:

Q.  Good afternoon, Officer Warniczek.  How are you?

A.  Good afternoon.

Q.  I'm Gregory Mitchell.  I'm the attorney for Mr. Charles Taylor.  So, I've got some questions I need to ask you, okay?

A.  Yes, sure.

Q.  The testimony that you gave this morning, you had met with the government.  They said you met with them to talk about what -- your testimony and review it?

A.  Yes.

Q.  How many times would you say you reviewed and reviewed your testimony?

MR. SCHEID:  Objection, your Honor.  Could we go to sidebar?

THE COURT: Sure.

(Proceedings heard at sidebar:)

MR. SCHEID: Your Honor, the government has prepped witnesses in this case multiple times in large part due to litigation initiated by the defendant. We had a suppression hearing in this case. We had a previous trial where we had a mistrial, as the Court is well aware, following the defendant's withdrawal of stipulations.

If defense counsel's line of questioning is to suggest that Officer Warniczek's testimony is coerced because he met with the government on multiple occasions, it's the government's view that that's an inappropriate line of questioning, given that the government is not in a position to explain that there was a mistrial in this case caused by the defendant, and that the government had to prep witnesses in response to a motion from the defendant.

MR. MITCHELL: Judge, there's no suggestion that it's going to be coerced. This witness basically gave multiple statements. Once right after -- with the report back in 2021. He also testified at the suppression hearing. He was also prepped recently with respect to this -- to his testifying today, and I received those notes.

I'm not trying to indicate that he at all is being coerced. But I think it goes directly to his credibility with what he remembers for the jury to know that he's been prepped

and he reviewed his notes, he reviewed what he said, and the questions and answers that he gave are pursuant to that. This isn't improper, Judge.

MR. SCHEID: Your Honor, why is the number of preps relevant? The witness has said that he reviewed the case. But the number of preps gives a potentially misleading portrait and, again, one that the government is not in a position to correct, given the fact that we cannot point out to the jury that the number of preps is directly related to the defendant's actions.

MR. MITCHELL: I won't use a specific number, Judge. And I won't ask him to recall. I will just simply refer to the cases and the statements that I know that he's made in regards to preparation prior to the first trial and the preparation that he most recently gave, the preparation of testifying today, not any other preparations at all.

MR. SCHEID: Your Honor, the question asked the number of --

MR. MITCHELL: I'll withdraw that question, Judge.

THE COURT: Okay. Also, I mean, there is a pattern instruction, 3.02, about attorney interviewing witness. And that says: It is proper for an attorney to interview any witness in preparation for trial.

I mean, I can give that at the end of the -- along with all the instructions at the end.

MR. SCHEID: Your Honor, I might propose that you give that instruction now and again at the end in responding to this objection.

THE COURT: Mr. Mitchell just said he was going to withdraw the question. I guess if there's more questions about the topic, then I would consider giving that.

MR. MITCHELL: I'm not going to ask how many times anymore, Judge.

THE COURT: Okay.

MR. MITCHELL: I'll go specific to the dates.

MR. SCHEID: I'm sorry, specific to the dates of each prep session? Because that has the same effect.

MR. MITCHELL: No, I don't -- not to the dates of each prep session. With respect to the statements that he's given himself. One under oath, one in the report, and the prep session that I was recently told and provided a copy of this past month. Those are the three.

THE COURT: Okay. I mean, that sounds fine.

MR. MITCHELL: Thank you, Judge.

MR. SCHEID: Thank you, your Honor.

(Proceedings heard in open court:)

BY MR. MITCHELL:

Q. Let me start again. You testified today about what you recall your interaction was on October 10th, 2021, right?

A. Correct.

Q. And recalling that, I mean, you've been an officer for nine years. You have had several incidents that you've had to recall and arrests that you made, correct, in that period of time?

A. Yes.

Q. So, in preparation for today's testimony, did you review the report that you prepared the day after this, like October 11th, concerning your involvement?

A. Not till next day.

Q. You didn't look -- the report that was prepared that you provided in support of this, you prepared it the next day or the day after, right?

A. I prepared it that particular night --

Q. Oh, the same night?

A. -- of the arrest. Yes.

Q. Okay. And you did that because it's fresh in your memory at that point?

A. No. It's our standard protocol. As soon as the arrest is made, you complete the report.

Q. Okay. And what you put in that report, you want to be accurate because that's what you remember, right?

A. Correct.

Q. Okay. Not verbatim necessarily, but just what you recall happening at the time and your involvement?

A. Yes.

Warniczek - cross

132

Q.   Okay.  And, then, in addition to preparing your testimony today, did you review the testimony that you had given in another hearing about this case?  You remember testifying before, right?

A.   Yes.

Q.   Did you review that?

A.   I have not read over the -- my last testimony, no, I have not.

Q.   Okay.  And, then, in preparation for today, you actually sat down with the government, again, and reviewed your video again and what you remember back three years ago that night, four years ago?

A.   Yes.

Q.   Okay.  You recall specifically that when you learned or heard Ms. Ficarella, her name was -- you knew it was at the time -- said there may be a gun in the car, right?

A.   Yes.

Q.   And you said 32 because you wanted to convey -- I think that's what you told the jury -- to the other officers that there may be a gun in the car?

A.   Yes.

Q.   Okay.  And, in fact, when you said 32, you said there may be a gun in the car, right?  Do you recall that?

A.   I said, use caution, there may a 32 in the vehicle.

Q.   In the vehicle.

You didn't say that the driver may have a vehicle -- a gun. You didn't say the passenger. You said 32, be caution, it may be in the vehicle, right?

A. Yes.

Q. Because that's what you knew at the time. That's what was told to you?

A. Incorrect.

Q. That's what you were told at the time?

A. Ms. Ficarella directly told me and confirmed it was the driver. I just haven't relayed that right then and there. I said, use caution, there's a 32 in the vehicle.

Q. Do you recall her telling you it was the driver or you asking her if it was the driver?

A. Both.

Q. And when you asked -- before you asked her if it was the driver, did she say it was the driver or did she say there was a car -- they have a gun? Do you recall? Because the video --

A. It's in the video. I remember watching it specifically today, this morning.

Q. Okay. And she basically said they have a gun in the car and you had to ask her, right? Remember?

A. She said, he has a gun.

Q. Okay?

A. I asked, who, the driver? And she said, yes.

Q. Okay. So, you asked whether it was the driver. And that

was after she asked about my boyfriend, right? She had asked you about her boyfriend several times? Is he there, right? She told you about the boyfriend, right?

A. I don't remember.

Q. You don't remember asking you about the boyfriend. You don't remember going back to talking to her after talking to her boyfriend Percy about how he was going to be arrested and he was helping you? It was all about the boyfriend, right?

A. She was --

Q. Okay. I'll switch up. It's a minute.

You started your testimony about your experience, right?

A. Yes.

Q. Nine years, patrol officer, right?

A. Yes.

Q. Part of your training, you learned about approaching vehicles, right?

A. Yes.

Q. The safety that's required and the inherent danger it may be, particularly at night, right?

A. Sure.

Q. And, so, in your training, you were very much concerned about your safety, the officer safety, and approaching an officer -- a vehicle, right?

A. Yes.

Q. And it's heightened if it's at night, correct?

A. Typically.

Q. And if you don't know who the occupants are, right, that makes it even more heightened? Yes?

A. Potentially, yes.

Q. Okay. So, part of making sure that the officers were safe and you're safe approaching it, your training tells you to be very observant, right? Be observant, yes?

A. Yes.

Q. It tells you to be aware of the surroundings and what's going on?

A. Sure.

Q. It says be cautious as you approach. And they even tell you how to approach, on the side and other issues, right? That's your training?

A. Okay.

Q. Because it's safety, correct?

A. Yes.

Q. And the bottom line, as a good officer for nine years, your job is to be vigilant, right? To make sure that you go home safe and officers were safe and public is safe and everything else, right?

A. Yes.

Q. Okay. So, let's direct your attention to October 10th, 2021. You were investigating a retail theft, right?

Warniczek - cross

136

A.   Correct.

Q.   And at the time that you started the investigation, you were focused on Ms. Ficarella, yes?

A.   Yes.

Q.   And, then, you learn, because of memory or Guzman or whatever, that he's seen her before.  He's seen this movie before, right?  That she had been arrested before, same kind of thing, right?

A.   Yes.

Q.   And at that point, you knew that there might be other people involved, didn't you?

A.   Based on the previous report, yes.

Q.   Okay.  So, your caution and vigilance and awareness was heightened when you knew it was more than just her, right?

A.   At which point when I reviewed that report, yes.

Q.   Absolutely.

     So, when you decide to approach the vehicle that you've now identified that was involved with Ms. Ficarella, you make sure that you can see what you're approaching; isn't that correct?

A.   Yes and no.

Q.   Okay.  You have your flashlight, yes?

A.   Yes.

Q.   You turn it on?

A.   Yes.

Q. And you approach the car with the flashlight on?

A. Sure.

Q. And you make sure when you approach the car, that you can see what's going on, right?

A. Try to the best of my ability.

Q. Because you want to make sure that the occupants in the car -- I think you testified you could see two occupants, but you really couldn't make them out at that point, right? You didn't know if they were male or female?

A. I knew they were both males.

Q. You could see that before you walked up to the car?

A. As I'm walking up to, yes.

Q. As you walked up to the car, you can make out that they were males?

A. Yes.

Q. As your training, you're watching to see if there's any sudden movements, any sort of thing that's happening in the car with the males, right?

A. I watch for hands initially.

Q. Exactly. When you're coming into the car, when you're walking up, you're watching to see because that's a safety issue, right?

A. Main concern is the hands.

Q. Right. And, so, you're watching that?

A. Yes.

Warniczek - cross

138

Q. You're hyper on that, right?

A. Yes.

Q. Okay. So, do you recall when you started whether you punched your body-worn camera to turn it on or did it come on because you turned on your car lights and it synced automatically? Do you recall?

A. No, I don't. It's one or the other.

Q. But you don't recall?

A. No.

Q. But you know that if you were going to respond and you turned on your lights, it's supposed to come on and sync, right?

A. Yes.

Q. So, you don't have to worry about that, turning it on or turning it off or anything. You just -- it's automatic?

A. Sometimes it malfunctions. You have to double-check, to look down to make sure the light's activated. And, therefore, you would manually activate it.

Q. Okay. And how would you know that at the time when you get out of the car after you turn your lights on? How would you know?

A. You look down and you see if it's activated or not.

Q. Okay. So, you can check, right?

A. Yes.

Q. Okay. So, just so I understand, when you approached the

Warniczek - cross

139

vehicle, you could see occupants and you're watching hands, right? You're watching because that's the safety issue, correct?

A. To the nearest view where I can potentially see. I focus on the person that I'm dealing with. I'm focused on that particular person and their hands.

Q. I understand. But as you approach the car, you're approaching it from the front, right?

A. I -- everybody has restricted line of view. I only see what I can see. If I can't see the other person's hands, then I can't see him. I'm focusing on who I'm speaking with and my initial surroundings.

Q. You're just getting ahead of me a little bit. I wasn't asking when you finally got to the car who you were speaking with.

I wanted know as you were walking up to the car, your focus is on the two occupants, right?

A. Yes.

Q. Okay. At some point, Officer Guzman aids you, right? He accompanies you to the car?

A. Yes.

Q. Because two officers, that's a safety issue, right?

A. Initially we're together, so we approached together.

Q. That's right. So, one can take one side and one can take the other, and you can sort of make sure you're both covered?

A.   That's what happened.

Q.   And you can focus in on two separate people, each one?

A.   Sure.

Q.   And that's not something you talk about.  That's just training in how to approach it, right?

A.   It just happened that way.

Q.   Okay.  So, you saw the video, the clip that the government showed you when you approached, right?  You saw part of that?  I have a clip of it, as well.  Can I show it to you again?

A.   Sure.

        MR. MITCHELL:  Judge, I would ask to publish this. This is another clip of the same that has already been admitted.

        THE COURT:  You may publish.

BY MR. MITCHELL:

Q.   This is your body cam video, right?  This was at the beginning.  You reviewed it before this testimony, correct?

A.   Yes.

    (Pause.)

        MR. MITCHELL:  Judge, I need to back up just a bit. This particular clip, the government didn't put in.  So, I would ask, first of all, to just simply publish it to the witness at this time.

        THE COURT:  Okay.

BY MR. MITCHELL:

Q.   I'm going to show you this small clip of your video.  I want you to take a look at it.  It's only 37 seconds, okay?

(Said video was played in open court.)

BY MR. MITCHELL:

Q.   Did you get a chance to take a look at that, Officer?  Does that accurately reflect the portion of your body cam video on October 10th, 2021, concerning the incident that we're talking about today?

A.   I believe that's my video.

MR. MITCHELL:  I'd ask, Judge, at this point, that the video with respect to Defendant's Exhibit A-1 be admitted into evidence.

MR. SCHEID:  No objection, your Honor.

THE COURT:  Okay.  It's admitted.

(Defendant's Exhibit No. A-1 received in evidence.)

MR. MITCHELL:  I'd ask to publish it, Judge.

THE COURT:  You may publish.

BY MR. MITCHELL:

Q.   I'm going to play it for the jury now.  I want you to take a look at it.  And I think the sound is up, too.  I think -- let me put the sound up so you can hear yourself and watch the video.

Can you see inside the car now at this point?

A.   According to the video, maybe not as clear.  But where I'm coming from, I'm looking from the top.  So, I see two bodies in

there.

Q.   Two occupants --

A.   Yes.

Q.   -- which you testified to?

A.   Yeah.

Q.   Okay.  Can you see the waist of the driver?

A.   No.

Q.   Okay.

     (Said video was played in open court.)

BY MR. MITCHELL:

Q.   Did you hear what you said in the video just now?

A.   No.

Q.   Let me see if I can get it again.  It sounds as if the person, the words that you say is Charles Taylor.  Do you recall saying that when you listen to the video?

A.   I can't hear any audio.

Q.   Let me see if I can get it up a little higher.

     (Pause.)

          MR. MITCHELL:  I'm sorry, I can't get it loud enough. I'm sorry.

     (Pause.)

          MR. MITCHELL:  I think I got it.  Bear with me.

BY MR. MITCHELL:

Q.   I'm going to play it again and ask you to hear what you say as you're walking up, okay?

(Said video was played in open court.)

BY MR. MITCHELL:

Q.  Did you hear that?

A.  Can you play it again?

(Said video was played in open court.)

BY MR. MITCHELL:

Q.  Did you hear that?

A.  I believe I said, Charles Tom.

Q.  Charles top?

A.  As in characters to their license plate, CT, Charles Tom.

Q.  Okay.  So, you were just reporting the license plate number that you saw, Charles Tom?

A.  I was confirming that the plate is the same plate.

Q.  CT.  Okay.

So, when you walk up, you go to see Mr. Percy, right?

(Said video was played in open court.)

BY MR. MITCHELL:

Q.  That's what you're asking, which one of you are Percy?

(Said video was played in open court.)

BY MR. MITCHELL:

Q.  And you have your flashlight on at this point, right?

MR. SCHEID:  Your Honor, if we could let the witness answer the questions.

THE COURT:  Yes.

BY THE WITNESS:

A.   Yes, the flashlight's on.

BY MR. MITCHELL:

Q.   And the flashlight is not in the face of Mr. Percy, is it?

A.   Can you say that again.

Q.   Take a look at the photo, at this clip.  It's not directed at Mr. Percy's face, the person you're talking to, is it?

A.   I'm talking to -- I'm asking who is Charles -- Percy or --

Q.   I understand.  My question was:  You have your flashlight on looking inside the vehicle.  It is not directed at Mr. Percy, is it?

A.   I don't understand the question.  It's directly at Percy.

Q.   The flashlight looks like it's directed at the driver's hands.

A.   Not from my perspective.

Q.   You don't see that?

A.   Maybe that's the way the beam is bouncing off of the vehicle, but it's not directed at the driver.  It's directed at --

Q.   Okay.

     (Said video was played in open court.)

BY THE WITNESS:

A.   Typically --

     (Said video was played in open court.)

BY MR. MITCHELL:

Q.   Let me ask you this:  This is a still from that same video,

right?  And you said you can see the occupants in the car, right?  Correct?

A.  Yes.

Q.  Can you see the waist of the occupants in the car?

A.  This is down here (indicating).  What I see is above and a little down.

Q.  Right.  So --

A.  So, I can see --

Q.  So, what you can see is the top part of their bodies up to the driver?

A.  Correct.

Q.  So, when you're walking up to the car -- how far would you say you're from that car, couple of feet?

A.  Yes.

Q.  Okay.  Let me ask you about this still that I took.

        This still that you see was taken off of that same short part, correct?

A.  I don't know.

Q.  You didn't -- you haven't seen this before as part of your video?

A.  You said it's been taken off that.  That's --

Q.  Is it not a still from your video?

A.  Apparently it is, yes.

Q.  Do you recognize it as part of the video that you took with your body cam worn on 10-10-21?

A.   Yes.

MR. MITCHELL:  I'd ask that it be published, Judge. This is Defense Exhibit A --

THE COURT:  Yes.

MR. MITCHELL:  I mean B at this time.  Publish it to the jury.

BY MR. MITCHELL:

Q.   My question, Officer Warniczek, you --

MR. SCHEID:  Your Honor -- I'm sorry, Judge.  I don't believe that that last exhibit has been admitted.  The United States does not object to it being admitted, but I don't think it has yet been admitted.

THE COURT:  Okay.  So, Defense Exhibit B is admitted.

MR. MITCHELL:  I move to admit, Judge, as evidence.  I will make sure that it's admitted.

THE COURT:  Okay.  Defense Exhibit B is admitted.

(Defendant's Exhibit B received in evidence.)

MR. MITCHELL:  And it's being published.

THE COURT:  It may be published, yes.

BY MR. MITCHELL:

Q.   You saw stills that the government showed you from your body cam worn video that you had that day, correct?

A.   Yes.

Q.   And I just showed you the clip where you identify it as being the clip of your body-worn cam video as you're

approaching the car, yes?

A.   Yes.

Q.   And you -- this is a clip from that same video when you first come up to the car.  You see that?

A.   Yes.

Q.   Would it be fair to say that the light that's focused and your concern for safety and looking at hands, that that's what you're doing in this video?  That's what that shows, yes?

A.   Not necessarily.

Q.   Not necessarily.  Okay.

        I'm going to show you what I've marked as Defense Exhibit C.  This is another still from the same clip.  Do you recognize it?

A.   Yes.

Q.   Do you recognize it to be from the same clip of your body worn that day?

A.   Yes.

        MR. MITCHELL:  Judge, I ask that Defense Exhibit B be admitted -- or C be admitted at this time, Judge.

        THE COURT:  It's admitted.

    (Defendant's Exhibit C received in evidence.)

        MR. MITCHELL:  I'd like to publish it to the jury.

        THE COURT:  You may.

BY MR. MITCHELL:

Q.   Again, you have your light on, correct?

Warniczek - cross

A.   Yes.

Q.   That hand that you see there on the top of the car, that's your hand?

A.   I believe so.

Q.   Yes?

A.   I think so.

Q.   You're the only one that's by the car, right?

A.   Yes.

Q.   Okay.  And, again, you can see the hands of Mr. Taylor, the driver of the car, correct, from your body-cam worn -- I'm not saying your eyeballs was watching it.  I'm just simply saying your camera --

A.   Correct.

Q.   -- on your center --

A.   My camera.  Not necessarily my eyes.

Q.   I got it.

A.   My eyes are up here.  Camera --

Q.   Your eyes are up here.

     But your camera is facing from the front capturing what you see or could see, yes?

A.   No.

Q.   It's not capturing that?

A.   It's capturing this area right here (indicating).  I'm a little bit above where the door frame -- you see the door frame in the picture?

Q.   Right.   So, you don't know at the time to see Mr. Taylor's hands at all?

A.   My main focus is on Mr. Percy, who was the passenger.

Q.   I understand that.   But you just testified that for safety reasons and caution and vigilance, you're watching hands?

A.   Yes.

Q.   So, are you telling me that when this video that you walk up to next to the car and you rest your arm on the car, you're not looking at Mr. Taylor's hands?

A.   I'm doing both.   That's why I have a partner that's speaking with the driver.

Q.   So, you were doing both.   You were talking to Mr. Percy and you were watching Mr. Taylor's hands?

A.   I tried my best, but if I can't see them, that's my partner's job.

Q.   All right.   Let me ask you about the next one year.   This is Defense Exhibit D.

     Do you recognize that portion of the video when Mr. Percy is talking to you and you're asking him questions?

A.   Yes.

Q.   And, again, in this video, it appears that your camera at least can see Mr. Taylor's hands in his lap and waist and the rest, right?

A.   Appears that way.

Q.   Okay.   But you can't recall whether or not you with your

own eyes ever looked that way?

A.   Correct.

Q.   But it would be part of your training and being vigilant and being careful to at least take a look at the hands of the people in the car that you're questioning, right?

A.   Try my best, but if I can't --

Q.   Okay.

MR. MITCHELL:   I'd ask that Defense Exhibit D be admitted, Judge.

THE COURT:   It's admitted.

(Defendant's Exhibit D received in evidence.

BY MR. MITCHELL:

Q.   I'm going to show you one other still from your video camera.   Do you recognize Defense Exhibit D --

A.   Appears to be the same thing.

Q.   It's just a continuation?

A.   Correct.

Q.   And in this occasion, Mr. Percy is now responding to you because you're asking, well, who is -- what is he doing? What's going on?   And he's responding and he's moving, right? You remember that?

A.   Mr. Percy?

Q.   Yes.

A.   Yes.

Q.   And you see him turning around in this still?

Warniczek - cross

151

A.   His head's turns.

Q.   Pardon me?

A.   Are you referring to his head?

Q.   To Mr. Percy facing, turning away from you.  You're talking to him, but yet he's turning away from you?

A.   His head's turning away from me.

Q.   His head is turning away.

Are you still watching him carefully?

A.   Yes.

Q.   Because, again, you're being vigilant and you're making sure that nothing happens to question your safety or anyone else's, right?

A.   To my best ability.

Q.   And you can see -- you can see Mr. Taylor's hands there, too, correct?

A.   My camera can see it, correct.

Q.   So, you don't recall, again, while you're talking right here whether or not you were watching Mr. Taylor's hands or not?

A.   My partner's job, that's his job.

Q.   That wasn't my question.  My question was:  Are you saying that you were not watching his hands?

A.   I do my best to interact with the driver -- with the -- my person, which is Percy at this particular time.

Q.   So, you're saying you could have been watching his hands,

too, but that wasn't your main focus?

A. Correct.

Q. Okay. At any point, as you're watching and questioning, you were concerned about your safety and the officer safety and everything, correct?

A. Yes.

Q. That's always first in your mind, right? That's part of your training?

A. We multitask. That's part of it.

Q. Okay. I'm going to show you Defense Exhibit F as a still, which is, again, another clip.

Now, this one actually shows, what? Can you recognize it?

A. Yes. The two occupants and Officer Guzman at the driver's side.

Q. And you recognize that your camera's recording what is going on when Officer Guzman now starts to engage, right?

A. Correct.

Q. Okay.

MR. MITCHELL: I'd ask that Defendant Exhibit F be admitted, Judge.

MR. SCHEID: No objection, your Honor.

THE COURT: It's admitted.

(Defendant's Exhibit F received in evidence.)

MR. MITCHELL: Ask that it be published at this time.

THE COURT: Yes.

BY MR. MITCHELL:

Q. From this still, does it appear that not only is your flashlight on, but also Officer Guzman?

A. I can't tell.

Q. You can't tell that given the angle, that you can see at the top of Mr. Taylor's shirt the light is flashing on it, whereas before, your light was on his lower portion, right? I mean, you didn't move up. You didn't get in there and look to see up. It had been to Officer Guzman's flashlight, yes?

A. Appears that way.

Q. Okay. And, so, now there's two flashlights in the car, one from you and one from Officer Guzman.

And how close would you say you are to the passenger and the driver? Less than a foot?

A. About two, three feet.

Q. Okay. You can reach out and touch them, right?

A. Potentially.

Q. You could reach in about a arm's length, you could touch them, yes?

A. Potentially.

Q. Okay. And, again, just like you, Officer Guzman is trained to be concerned, be aware, right, as an officer?

A. I can't speak for other officers.

Q. Okay. I'm going to show you Defense Exhibit G last. I

shouldn't say last because I have a couple more.

Do you recognize Defense Exhibit G as part of your video recording of the same incident?

A. Yes.

Q. At the same time. In fact, the little part at the corner tells you exactly when it happens, right?

A. Correct.

Q. And from this, you can see Mr. Taylor, can't you? At least the camera was capturing it?

A. It appears that way.

Q. And you know that Officer Guzman is on the other side, right?

A. Right.

Q. And you can actually see his flashlight in this one, correct?

A. Yes.

Q. And he's right there at the door, yes?

A. Yeah.

Q. Okay. And, again, Mr. Taylor is responding to Officer Guzman, right? Because you're talking to Percy, but he's talking to Officer Guzman?

A. I believe so.

Q. And you can hear this. You can hear the conversation because you're there. You're paying attention. You're listening?

A.   I don't remember exactly what the conversation --

Q.   I'm not asking if you remember the -- I'm just making sure that you're saying that I understand as an officer you're listening and watching what's going on, not necessarily memorizing the conversation?

A.   Trying best, yes.

Q.   At any point in time from your memory, was Mr. Taylor ever being uncooperative?

A.   Upon initial approach, yes, he was uncooperative.

Q.   When you say "uncooperative," you said because you reported that you thought he was faking sleeping?

A.   Correct.

Q.   And faking sleeping when you're asking about Percy is being uncooperative?

A.   I asked him what his buddy was doing.

Q.   I'm sorry?

A.   I asked Percy --

Q.   Okay.

A.   -- what the driver was doing.

Q.   Okay.

A.   And if he was pretending to sleep or is he intoxicated.

Q.   Okay.  So, you --

A.   It was the beginning stages of the approach.

Q.   I understand.  But you didn't talk to Mr. Taylor?

A.   No.

Q. You didn't ask him anything?

A. No.

Q. But you concluded he was being uncooperative?

A. Initially, it felt like he was ignoring us.

Q. Okay. Last still.

THE COURT: I don't think -- did you intend to move to --

MR. MITCHELL: I'm sorry. I move to admit Defendant Exhibit G.

THE COURT: It's admitted.

(Defendant's Exhibit G received in evidence.)

THE COURT: Did you intend to publish?

MR. MITCHELL: I thought I did. I did not publish it? I'm sorry. I thought I published it already, Judge. I'm sorry. Let me ask. Put it up again.

BY MR. MITCHELL:

Q. This is Defendant Exhibit G, Officer Warniczek. I was just asking you about --

MR. MITCHELL: To publish, Judge, at this point?

THE COURT: Yes.

BY MR. MITCHELL:

Q. You see Mr. Taylor in this video -- or in this still, correct? And my question was: As you were talking to Mr. Percy, as you can see, he's talking to you, correct?

A. Correct.

Q.   You never asked Mr. Taylor anything, right?

A.   I don't believe I did.

Q.   Okay.  And my question was:  At any point in time as you see him now in these different stills, he was being cooperative, correct?

A.   I don't remember.

Q.   Okay.  You don't remember him being cooperative once he woke up?

A.   He was interacting with Officer Guzman.

Q.   Okay.  And as best as you can see, was he being cooperative?

A.   Best as I could see.

Q.   Okay.  I'm going to show you what's been marked Defense Exhibit A-2, which is another short clip from your body-cam worn video for the same incident, okay?  I want you to take a look at it.  And I think it's, like, 17 seconds.

     (Said video was played in open court.)

BY MR. MITCHELL:

Q.   So, again, you remember talking to Mr. Percy, right?

A.   Yes.

Q.   No comment to Mr. Taylor, correct?

A.   Well, I don't think so.

Q.   And you didn't give him any commands that he ignored, right?  Mr. Taylor?

A.   I don't remember.

Q.  Well, looking at your video, do you recall ever giving him any commands to do anything?

A.  I don't remember.  You would have to replay it for me with the volume higher.

(Said video was played in open court.)

BY MR. MITCHELL:

Q.  You don't make any comment or request Mr. Taylor to do anything, do you?

A.  No.

Q.  Okay.  After you --

THE COURT:  Did you want to admit or --

MR. MITCHELL:  I don't need to admit that one, Judge. It's already admitted as part of their clip.

THE COURT:  Okay.

BY MR. MITCHELL:

Q.  So, after you go through this, this period of time where you are talking and going back and forth and flashing a light and the rest, you're looking to be safe, right?

A.  Try to.

Q.  You were trained to be vigilant, right?

A.  Yes.

Q.  You were making sure that there were no guns or dangerous weapons or anything that could endanger you or your partner who was now a foot from the door?  You're watching hands?

A.  You do your best.  You watch hands.

Q.   Okay.  And you didn't see anything?

A.   I watched hands.  I didn't see anything in his hand.

Q.   Okay.  When you then reported your -- that same night, you wrote down in your report that Ms. Ficarella told you it was Taylor.  She never told you it was Taylor.  She never used that name; isn't that true?

A.   She referred to the driver, which was Taylor.

Q.   I understand.  But when you wrote your report, you basically wrote down she identified Taylor.  Taylor.

          MR. SCHEID:  Objection, your Honor.

BY MR. MITCHELL:

Q.   She told you Taylor.

          MR. SCHEID:  Could we go to sidebar?

          THE COURT:  Yes.

     (Proceedings heard at sidebar:)

          MR. SCHEID:  Sorry, your Honor, could we have one second?

          THE COURT:  Sure.

     (Pause.)

          MR. SCHEID:  Your Honor, the government's view is that this is improper impeachment.  Defense is referring to a report that's not in evidence, and also that's not contradictory to any of the testimony that the witness has given.

          MR. MITCHELL:  Judge, I'm trying to refresh his recollection of a prior statement that he wrote.  I didn't even

get there yet.

MR. SCHEID:  Your Honor, he's not refreshing his recollection.

MR. MITCHELL:  I didn't get there.  I didn't get an opportunity.

THE COURT:  I mean, so the question was --

MR. SCHEID:  Your Honor, in order to refresh the witness' recollection, he would have to ask him if there was something that would refresh his recollection, and he has to show him the report.  He can't be quizzing him on the report.  That's -- he's at the impeachment stage.  He's not attempting to refresh recollection.

THE COURT:  Right, but then why is it improper impeachment?  I guess I don't --

MR. SCHEID:  Your Honor, the report's not in evidence and does not contradict the witness' testimony.  The defense is trying to argue that there's a fact not in the report, but that doesn't contradict the witness' testimony.

MR. MITCHELL:  I'm not trying to argue anything, Judge.  I'm trying to cross-examine this witness, Judge, about prior statements that he's made, what he knows, what he said, what he wrote.  That's all I'm trying to do, Judge.  And if he says he doesn't remember what he wrote, then I will show him to refresh his recollection.  I just asked him, do you remember writing that?  She didn't tell you that.  If he says he doesn't

remember writing that, then I can show him the report to refresh his recollection. I was trying to get there.

THE COURT: Right. I guess I just -- I guess I'm not -- I don't think the report has to be in -- why does the report have to be in evidence in order to ask questions about what he wrote in it?

MR. SCHEID: Your Honor, the report itself is hearsay. If we want to get into the report, then the witness should be questioned on if he remembers what he wrote in the report and, if not, if reviewing it would refresh his recollection.

THE COURT: Okay. Any response to the report being hearsay?

MR. MITCHELL: Judge, you can refresh recollection with anything. It doesn't have to be admitted. It can be hearsay. It can be anything.

THE COURT: Okay. But in terms of refreshing recollection, then I guess a question that's asking, did you -- then it should be more open-ended about it. What did you write in the report as opposed --

MR. MITCHELL: I was getting there, Judge.

THE COURT: Okay.

MR. MITCHELL: Thank you.

THE COURT: Thanks.

    (Proceedings heard in open court:)

BY MR. MITCHELL:

Q.   Officer Warniczek, you remember -- you testified earlier that you wrote the report the very same night, yes?

A.   I believe so, yes.

Q.   Of the initial.

Do you recall what you wrote in --

THE COURT REPORTER:  Mr. Mitchell, I didn't hear the beginning.

BY MR. MITCHELL:

Q.   You wrote your report concerning your involvement in the incident the same night?

A.   I believe so.

Q.   Okay.  And do you recall what you wrote in your report?

A.   In reference?

Q.   To what you said in your report that Ms. Ficarella said to you.

A.   Yes.

Q.   Do you recall what your report says?

A.   Which part of it are you referring to?

Q.   What you reported that she said to you about Mr. Taylor possessing a gun.

A.   The video says referring to the driver.  As far as whether I put it in the report referring to the driver or Mr. Taylor, I do not recall which one I wrote.

Q.   Okay.  If you saw your report, would it refresh your recollection?

A.   Sure.

          MR. MITCHELL:  May I approach, Judge?

          THE COURT:  Yes.

BY MR. MITCHELL:

Q.   Take a look at it.

     (Tendered.)

BY MR. MITCHELL:

Q.   I want you to read it to yourself and give it back to me, concerning what you wrote, concerning what Ms. Ficarella told you.

     (Pause.)

BY MR. MITCHELL:

Q.   Now that you've seen the report that you wrote that night, does it refresh your recollection of what you wrote in your report concerning what Ms. Ficarella said to you?

A.   Yes.

Q.   Isn't it true you wrote that she told you that it was Taylor --

A.   Correct.

Q.   -- with the gun?

     But you now know, because you listened to the video, that's not what she said to you, right?  The first thing she said, there's a gun in the car.  She talked to you about her boyfriend, and then she said, not him.  And you said, the driver?  And she answered, yes.

A.   Correct.

Q.   Okay.  She never told you Taylor.  She responded to your question, right?

A.   Yes.

Q.   And she was telling you about her boyfriend because that's who you were telling her who was going to go to jail along with her, correct?

A.   No.

Q.   Okay.  Do you know as you sit here today as you were preparing for this whether or not Officer Guzman pressed his body-worn camera or was this part of the syncing?

A.   I don't know how he activated it.

Q.   Okay.  And what about Officer Hartmann?  Do you know whether or not he pressed the button or he relied on it being synced?

A.   I don't know.

Q.   Okay.  You testified that Officer Hartmann then said, hold the air?

A.   Correct.

Q.   I thought the code for when you see a weapon or you're concerned about a weapon is 32.

A.   That's referencing a weapon, yes.

Q.   Okay.  So, Officer Hartmann never referenced a weapon when he said, hold the air?

A.   He did.

Warniczek - cross

165

Q.   He did?

A.   I believe he said -- I was keying up.  That's where you heard the tone.  He was trying to key up at the same time.  It didn't go through, which is why he said, central, hold the air.  And, then, after that, if you listen to the video, he says, there's a gun in the car.

Q.   Okay.  So, I understand what the video reflects.  I was just trying to remember what you heard at the time and what you testified that what officers report when they see a weapon or they suspect a weapon.  That's a 32, right?  That's what you testified to.

A.   That's -- you refer to it, a weapon, as a 32.

Q.   And Hartmann nowhere in the video talks about 32?

A.   I believe he does.

Q.   He does.  You heard that?

A.   I believe so.

Q.   Okay.  That night or after you listened to the video later?

A.   On that video, where you see me radioing and then you see the tone, then you see -- hear Officer Hartmann.

Q.   Say, 32?

A.   I don't know how he referred to it.  I believe he does reference a weapon, yes.

Q.   Okay.  You testified again that at the time that Officer Hartmann and Guzman went back over to the Jetta, you were over with Ms. Ficarella?

A.   Yes.

Q.   Were you focused on her at that time?

A.   Tried to be, yes.

Q.   And, so, you were talking to her face to face because you were right there?

A.   Part of me initially was.  When the commotion began, I shifted.

Q.   I'll get there.  I'll get there.

You were focused on Ms. Ficarella, right?

A.   Yes.

Q.   And she was talking to you, correct?

A.   Yes.

Q.   And she was telling you to come here and you don't want to hear this.  You were focused on her?

A.   Correct.

Q.   Okay.  When she told you that they have a gun in the car, gun in the car, you're asking about the officers, which driver, were you looking at her or were you looking at the car at that time?

A.   Initially, I was looking at her.  When the commotion began, I shifted my focus to the right, where the commotion was taking place.

Q.   And we'll get to the commotion.  But when she's talking to you at that point, you're not looking at the Jetta.  You're looking at her?

A.   Initially.

Q.   Okay.  And you can hear Officer Hartmann, whatever he's doing, right?  You can hear it?

A.   The minute that she told me that there's a gun in the vehicle, I shifted my focus and I was watching what's taking place at the car.

Q.   And at that very moment, was the occupant still in the car when you turned around?

A.   Yes.

Q.   So, they were still in the car?

A.   Yes.

Q.   Could you see them in the car or did you just assume they were in the car because you didn't see them out of the car?

A.   No, I still seen.

Q.   Pardon me?

A.   I saw Officer Hartmann and Officer Guzman at gunpoint ordering them out of the vehicle.

Q.   And they had their guns drawn?

A.   Yes.

Q.   You saw that?

A.   Yes.

Q.   Okay.  And when you saw the individuals get out of the car, could you see their hands?

A.   No.

Q.   So, when you said "commotion," are you referring to Officer

Warniczek - cross

168

Hartmann and Guzman pulling their guns or are you referring to something else?

A. Just generally yelling.

Q. Okay. So, when they point the guns, they're yelling. That's the commotion you're referring to that shifted your focus?

A. Yes.

Q. But even though it shifted your focus, you didn't see the hands of Mr. Perkins -- Percy Walker?

A. No.

Q. You didn't see the hands of Mr. Taylor?

A. Not at that time, no.

Q. You didn't see any guns?

A. No.

Q. You didn't see anything other than the fact that the officers were pointing their weapons at both of them?

A. Yes.

Q. Okay. So, now you hear the commotion. According to the video, you don't leave Ms. Ficarella there immediately and go and assist the officers?

A. Correct.

Q. You still stay there?

A. Yes.

Q. At some point, you leave?

A. Yes.

Warniczek - cross

169

Q. At the time you leave, was Mr. Taylor already past Mr. Hartmann -- Officer Hartmann?

A. Yes.

Q. So, you didn't see Mr. Taylor run past Mr. Hartmann -- Officer Hartmann?

A. He ran away from Officer Hartmann.

Q. That wasn't my question. You didn't see him run past Officer Hartmann?

A. He was never -- it's impossible.

Q. What do you mean?

A. It's impossible.

Q. You saw Officer Hartmann chasing?

A. Yes.

Q. You saw him right behind him?

A. Yes.

Q. You saw Officer Hartmann chasing Mr. Taylor right after you saw Mr. Taylor come out of the car?

A. Yes.

Q. Did you see Mr. Taylor's hands at that time?

A. No.

Q. Did you see him drop anything?

A. No.

Q. But you were watching, right?

A. Yes.

Q. So, you first learn, just so I understand, that Mr. Taylor

allegedly dropped a weapon when you were told that by one of your fellow officers?

A.   In progress, yes.

Q.   That's when you learned about it?

A.   Yes.

Q.   Wasn't something you saw with your own eyes?

A.   Both.   I ran past Officer Hartmann as he stood over the gun.

Q.   I understand that.   But my question was:  You didn't see what they claim they saw?

A.   No.

Q.   Okay.   One last question -- series of questions.   Your body-worn camera, you talked about sometimes you've used an old system and sometimes it doesn't function?

A.   Correct.

Q.   Can you explain to the jury what you are trained to do when you identify that your body-worn camera is not functioning or has not functioned properly?

A.   Typically, when a body-worn camera is activated, it signifies a red dot that tells you that it's recording.  If the battery goes dead or basically stops working, sometimes -- it should start to vibrate.  That gives you a signal or some type of indication that either the battery died or video has stopped working.  In a stressful situation like this, sometimes you may or may not feel the vibration.

You can always look down to see if it's recording. You look down and you don't see the red dot, it's probably your battery died or something has happened for it to malfunction to lead to not recording.  Otherwise, the only way to know is if the red dot is on.

Q.   And if -- in your experience, you've actually had a camera actually stop working and not record when you're at an incident, right?  You've had that happen?

A.   Numerous times.

Q.   Okay.  In fact, you recall about a month after this one, you were at an incident, retail theft, and it didn't record anything on that occasion.  Do you remember that?

A.   No.

Q.   If I showed you the reports you completed, would that refresh your recollection?

A.   I guess so.

     (Pause.)

        MR. SCHEID:  Your Honor, can we have a sidebar, please?

        THE COURT:  Yes.

     (Proceedings heard at sidebar:)

        MR. SCHEID:  Your Honor, we have an objection as to relevance here.  Whether or not this witness filled out a report a month after the events of this case has no bearing on any material fact.  So, this line of questioning is irrelevant.

MR. MITCHELL: Judge, as we've already argued about Mr. -- Officer Coughlin and his knowledge of malfunctioning and checking malfunction and he can talk about how it's done, this report is essentially the officer's letting Officer Coughlin know that something's malfunctioning. They reported it to him as soon as they know it's malfunctioned. That's it.

I think it is directly relevant, Judge, with respect to him saying this is how you can tell if it's malfunctioning, this is how you look at it. And he says that he fills out a report when it's not. He's done it in the past, but he can't remember the one that he did a month after this incident. And, so, I just simply want to refresh his recollection about it that he filled it out and what he reports to Coughlin.

THE COURT: Okay. Any further comment from the government?

MR. SCHEID: No, your Honor. It's the core fact that is irrelevant. Refreshing his recollection is immaterial when the evidence seeking to be elicited is irrelevant.

THE COURT: Okay. I think it goes to -- I think it is relevant because it's -- the defense is just asking about -- trying to pursue a line of questioning that they're trying to argue against his credibility, and it has to do with just the general process about the cameras and whether -- you know, how you deal with malfunctions. And, so, I think it's fair for that reason.

MR. MITCHELL: Thank you, Judge.

(Proceedings heard in open court:

BY MR. MITCHELL:

Q. Officer Warniczek, I just asked you do you recall about a month after this happened, October -- November 10th, same retail kind of thing, and your camera malfunctioned and you had to fill out a report? Do you recall filling out that report?

A. No, I do not.

Q. If you saw the report, would it refresh your recollection?

A. I hope so.

MR. MITCHELL: May I approach, Judge?

THE COURT: Yes.

(Tendered.)

BY MR. MITCHELL:

Q. Take a look at it again. And, then, give it back to me.

(Pause.)

BY MR. MITCHELL:

Q. Finished?

A. Yes.

Q. Having reviewed the report that was completed November 12, 2021, does it refresh your recollection that you actually completed the report?

A. This is not a report. This is just me acknowledging that now I've been made aware that this is a malfunction, that my footage was not captured.

Q. Okay. So, you were able a day afterwards, maybe the same day, to identify that your camera had malfunctioned --

A. No.

Q. -- and didn't capture it?

A. No, sir. That is not my job. That is a job for a different officer or an employee hired by the department who tracks these recordings.

Q. Okay.

A. Who then realized that my footage was not captured. And he brought that to my attention. I acknowledged that now I'm aware that it wasn't recording.

Q. Okay. So, the way this report and these reports are done is once you dock your camera, you turn it in so it can be recorded. You were told by whoever the officer is that it didn't record, right?

A. Yes.

Q. And even though you were recording at the time, you testified earlier that you could tell if it vibrates or the light goes off or the battery. On this occasion, you didn't know any of that?

A. For that particular incident, correct, I did not know.

Q. Okay.

A. Until I was -- it was brought to my attention, where you acknowledge that your camera wasn't working that day.

Q. And after you were told that, were you given any rationale

as to why it didn't work?

A.   No.   Happens all the time.

Q.   Were you told that it just stops recording?

A.   That's a technology issue, not my issue.

Q.   Thank you.

A.   Yes, sir.

THE COURT:   Redirect.

MR. SCHEID:   Yes, your Honor.   Thank you.

REDIRECT EXAMINATION

BY MR. SCHEID:

Q.   Officer Warniczek, hello again.   There was some back-and-forth there about what Ms. Ficarella told you when you were with her in front of the Mariano's.   I wanted to just give you another opportunity to review.   We have the video for that.

MR. SCHEID:   And, so, I would move to publish Government Exhibit 101-J.

THE COURT:   You may publish.

(Said video was played in open court.)

BY MR. SCHEID:

Q.   Pausing at 10 seconds there, was Ms. Ficarella referring to her boyfriend there?

A.   I believe so.

Q.   Did you hear her identify what he was wearing?

A.   I don't think so.

Q.   I'll play that again from zero.

(Said video was played in open court.)

BY THE WITNESS:

A. I can't make out what she's saying. She said, my boyfriend, where's he at? I don't know what she's saying.

BY MR. SCHEID:

Q. Okay. That's fine.

But was she referring to her boyfriend?

A. Yes.

Q. How did you interpret who she was referring to when she said, my boyfriend?

A. From the -- from the initial encounter to me reviewing the report, to her later identifying Percy Walker as her boyfriend.

Q. Okay. I'm going to keep playing the clip here.

(Said video was played in open court.)

BY MR. SCHEID:

Q. Did you hear in that portion of the clip Ms. Ficarella say, not my boyfriend, the other guy?

A. Yes.

Q. And who did you understand the other guy to be?

A. This -- as I questioned her, the driver? And she said, yes.

Q. I want to ask you about your interaction at the Jetta initially with Mr. Walker and the defendant.

MR. SCHEID: I'm going to move to publish what's in evidence as Government Exhibit 101-H.

THE COURT: You may.

(Said video was played in open court.)

BY MR. SCHEID:

Q. Is this your body-worn camera footage while you're standing at that Volkswagen Jetta?

A. Yes.

Q. And is this substantially the same orientation that your camera was at during the cross-examination when defense counsel showed you some images?

A. Yes.

Q. When you were standing at the side of the Jetta, what was the driver, the defendant, wearing?

A. The blue T-shirt with a Bears jersey -- or Bears logo.

Q. And was that T-shirt extending over his waistband?

A. I believe so.

Q. Could you see the actual waistband of his pants?

A. Me physically, no.

Q. And is that because you can't see through a T-shirt?

A. Right.

MR. SCHEID: This has been admitted, Defense Exhibit A.

THE COURT: Okay.

MR. SCHEID: Could I publish --

THE COURT: Yes.

MR. SCHEID. -- from the document camera, please?

THE COURT: Yes.

BY MR. SCHEID:

Q. Is this Defense Exhibit A -- or this is Defense Exhibit A. Is this one of the screenshots that defense counsel showed you?

A. Yeah.

Q. Does there appear to be a glare on the headlight in that image?

A. Yes.

Q. And is that something that can happen with a camera still image?

A. Yes.

Q. Would this have looked differently to you using your eyes to observe it on that night?

A. Yes.

Q. You mentioned that when you initially approached the vehicle, you suspected that the driver of the vehicle may be pretending to be asleep. Were the driver's eyes open?

A. I -- no. I think they were closed.

Q. The vehicle itself, was it running?

A. I think so.

Q. We just saw in Defense Exhibit A, were the headlights on?

A. Yes.

Q. Were the keys in the ignition?

A. Yes.

Q. Did those things contribute to your suspicion that the

defendant may be pretending to be asleep?

A. Yes.

Q. And you mentioned when you were walking up to the vehicle, that you said, Charlie Tom. Could you explain again what you meant by that?

A. That was referring to the registration of the vehicle. On approach, I was looking at the registration. The first characters of the registration is CT, or Charles Tom.

Q. And did that license plate match the license plate that you had seen when you were in your squad car as being associated with a prior incident at the Mariano's?

A. Yes.

Q. As you approached -- I think you testified on direct that you had not met Charles Taylor before that night. As you were approaching the car, did you know the name Charles Taylor?

A. I've never seen him in my life. The only -- I just knew the name because I just read the report from the previous incident.

Q. On the report from the previous incident, did you learn the name Percy Walker?

A. Yes.

Q. And when you approached the vehicle, did you ask, which one of you is Percy Walker?

A. Yes.

Q. Was that question addressed to one or both of the

Warniczek - redirect

180

passenger- -- of the occupants of the vehicle?

A.    Both.

Q.    Did the defendant give you an answer?

A.    Eventually, he said -- he confirmed he was Percy.

Q.    Who confirmed that?

A.    The passenger.

Q.    Okay.  Did the driver give you an answer to that question?

A.    No.

Q.    I think you discussed this a little bit, but you wear your body-worn camera on your chest; is that right?

A.    Yes.

Q.    And could you explain a little bit about the angle of the body-worn camera versus what you can see with your eyes?

A.    So, typically, this is the style that we wear where it's mounted on the center of your -- whether it's this camera or a different camera, it's typically mounted somewhere on your vest.  And it captures basically that view.  There's some type of, like, an angle.  But it doesn't record anything, you know, depending on how tall you are, I guess.

But if the body-worn camera sits here (indicating), it records from here on with a small -- I guess, small radius, if you will.  But it won't necessarily capture exactly what I'm looking from my height and where my head is actually physically positioned.

Q.    And, so, your eyes and the body-worn camera may have

different angles of something?

A.   Yes.

Q.   And if you were a different height, if you were taller than you were, that might be a different angle still?

A.   Correct.

Q.   When you were interacting with the occupants of the Jetta, you said you were primarily focused on the passenger; is that right?

A.   Yes.

Q.   And were you having a conversation with the passenger?

A.   Yes.

Q.   Was he animated at points?

A.   Yes.

Q.   And did you know that Officer Guzman was on the driver's side of the vehicle interacting with the driver?

A.   Yes.

Q.   When you were interacting with the occupants of the Jetta, did you see a firearm anywhere in the car?

A.   No.

Q.   There was no loose firearm sitting on the dashboard?

A.   No.

Q.   There was some back-and-forth about the -- Ms. Ficarella telling you that the driver had a gun --

A.   Yes.

Q.   -- and, then, you writing in a report that Charles Taylor

had a firearm.  Did you learn in the course of your investigation that the driver was Charles Taylor?

A.   Yes.  To me, same individual.

Q.   And, so, did you connect those dots that the person that Ms. Ficarella was referring to --

MR. MITCHELL:  Judge, I've got to object to this line of leading, please.

THE COURT:  Sustained.

BY MR. SCHEID:

Q.   Officer Warniczek, did you make a connection between the person that Ms. Ficarella was talking about --

MR. MITCHELL:  Objection, Judge.  Leading.

MR. SCHEID:  Your Honor, I'll rephrase.

BY MR. SCHEID:

Q.   Why did you put the name Charles Taylor in your report?

A.   Because to me, Charles Taylor is the same individual and the driver of that vehicle.

Q.   I'm going to go back to Government's Exhibit 101-J.

MR. SCHEID:  And I would move to publish that again.

THE COURT:  You may.

BY MR. SCHEID:

Q.   I'm starting this at 26 seconds into the video, and I'm going to play it a little further than I did the last time.

(Said video was played in open court.)

BY MR. SCHEID:

Q. Who did you hear over the radio there?

A. That was myself speaking of Ficarella and then Officer Hartmann calling the air.

Q. Did Officer Hartmann say, gun?

A. I believe that's what he said.

Q. And you testified earlier that you will sometimes refer to a gun as a 32 in a code?

A. Yes.

Q. Is it mandatory that you always use that code?

A. No.

Q. Could you tell from Officer Hartmann's --

MR. MITCHELL: Objection, Judge. Leading.

MR. SCHEID: I haven't asked the question, your Honor.

THE COURT: Okay. What's the question?

BY MR. SCHEID:

Q. How would you describe Officer Hartmann's tone when he went over the radio there?

A. There was some slight panic. And you could tell his voice is heightened and he's a little stressed out maybe.

Q. In that circumstance, are you surprised that he said gun instead of 32?

A. No.

Q. There was some discussion of where you were facing when you were talking to Ms. Ficarella at the Mariano's. I just wanted to give you an opportunity to explain when you were facing her

and when you were not.

A. So, initially when I was speaking to her here, I was facing her. As the minute that I found out that there's a potential threat of a weapon being inside a vehicle, I shifted my focus and my body kind of in between. But my head shifted over to where the officers were standing, and I was watching them while trying to still maintain some type of distance with Ficarella being on my left side.

Q. You testified that the defendant ran after he got out of the car. At any point did Percy Walker run?

A. No.

Q. Did Ms. Ficarella run?

A. No.

Q. I want to show you Government's Exhibit -- Demonstrative Exhibit 302.

MR. SCHEID: And move to publish.

THE COURT: You may.

BY MR. SCHEID:

Q. Where were you when the defendant ran from the Jetta?

A. At Location No. 1.

Q. And where was the defendant when he began to run?

A. Location 3.

Q. Where did he proceed to run?

A. Towards across northeast through the parking lot towards Location 4, through that parking lot and towards Location No.

5.

Q.  And were you close enough to --

MR. MITCHELL:  Objection, Judge.

MR. SCHEID:  I'll rephrase.

BY MR. SCHEID:

Q.  Could you see the defendant's --

MR. MITCHELL:  Objection, Judge.

MR. ROTHBLATT:  Let him finish the question, Greg.

THE COURT:  What's the --

MR. SCHEID:  I'm asking --

THE COURT:  What's the question?

MR. SCHEID:  Could you see the defendant's body from where you were standing?  It's a "Yes" or "No" question.

MR. MITCHELL:  It's leading.

MR. SCHEID:  Can we have a sidebar, your Honor?

THE COURT:  Yes.

    (Proceedings heard at sidebar:)

MR. ROTHBLATT:  Judge, this is repeated instances here where defense counsel is objecting before the question is even articulated.  He's wrong on the substance of leading versus non-leading questions.  And, frankly, it's unnecessarily disturbing the course of the examination.

        I think we do him the courtesy of waiting until his questions are complete before we object.  He should extend the same courtesy to government counsel.

MR. MITCHELL: Judge, on cross-exam, I get the right to ask "Yes" or "No" questions. I can lead. This is direct examination. He does not get the right to ask "Yes" or "No" questions. He can ask them open-ended questions to provide the answers, but not "Yes" or "No" questions and leading.

MR. ROTHBLATT: That's not a correct understanding of what leading questions are. A "did you" question can be non-leading.

And, again, even where defense counsel asked objectionable questions during his cross-examinations when he can lead -- for one reason or another, irrelevant, a variety of objectionable bases -- we gave him the courtesy to wait until he was done asking the question to object. This is multiple instances where he has not done that, and it's disturbing the flow of the entire examination. And he should extend that courtesy to counsel.

MR. MITCHELL: I'm not trying to be discourteous, Judge. I just don't want the prosecutor testifying. That's what I don't want.

THE COURT: Okay. I mean, I think I would -- there have been one or two that are leading. There's some that are not leading. Like the last one, could you see the defendant's body from where you were standing, I don't view that as leading. That doesn't suggest -- it is a "Yes" or "No" -- it's a question that calls for a "Yes" or "No" answer, but it's not

leading.

So, I think let's just try to -- I guess I would say let's try to let the examiner get the full question out. And, then, if you think it's leading, you can object at that point. And there may be some valid objections. Maybe some not. So -- but, yeah, I think it makes sense. Let's finish the question and then do the objection.

MR. MITCHELL: Yes, Judge.

(Proceedings heard in open court:)

BY MR. SCHEID:

Q. Officer Warniczek, from where you were standing at the Mariano's, could you see the defendant's body when he began to run?

A. Yes.

Q. Could you see his hands?

A. No.

Q. Were Officers Hartmann and Guzman closer or farther from the defendant when he began to run than you were?

A. Closer.

Q. From your position in front of the Mariano's with Ms. Ficarella, did you see Ms. Ficarella throw a gun from Location No. 1 to Location No. 4?

A. No.

Q. Did you see Mr. Walker throw a gun from Location No. 3 to Location No. 4?

Warniczek - recross

188

A.   No.

Q.   Did you see a gun drop from the sky onto Location No. 4?

A.   No.

          MR. SCHEID:  Nothing further, your Honor.

          THE COURT:  Okay.  Any recross?

          MR. MITCHELL:  Just a moment, Judge.

          THE COURT:  Sure.

     (Pause.)

                    RECROSS EXAMINATION

BY MR. MITCHELL:

Q.   Officer Warniczek, you were asked some questions about --
on direct and then on redirect about what the meaning was of
the CT and what it was.  Do you remember those questions?

A.   Yes.

Q.   Now, when you got the license plate number, you also got
the identification of the people involved in that prior
incident in that car, right?

A.   Yes.

Q.   So, you knew it was Charles Taylor, you knew it was Percy
Walker, and Sylvia Ficarella?

A.   In the previous incident, yes.

Q.   And, in fact, when you were reading it inside your vehicle,
you recalled that these were the same people?

A.   When I was inside my vehicle, I haven't met Mr. Taylor or
Mr. --

Q. I didn't know that -- I didn't say if you had met them. I said you commented that this is the same --

A. Vehicle.

Q. -- this is the same folks; they're doing the same thing?

A. Yes.

Q. You recalled that they are the three that had done this before?

A. I didn't recall nothing. I just basically read the report and I said that this is the same thing going on right now. This is my suspicion.

Q. Okay. You didn't see a gun fall out of the sky, right?

A. No.

Q. You didn't see anybody drop the gun, right?

A. No.

Q. Thank you.

MR. SCHEID: No redirect, your Honor.

THE COURT: Okay. Thank you. You may be excused.

(Witness excused.)

MR. SCHEID: Your Honor, would you like to take an afternoon break or for us to call our next witness?

THE COURT: I think it would be a good time for a break. Why don't we take a 15-minute break. So, we'll be back at 3:50.

Same reminder to the jury. Please don't discuss or research the case during the break. Thank you.

(Jury out at 3:35 p.m.)

THE COURT: Okay. Anything to discuss?

MR. ROTHBLATT: Not from the government, Judge.

MR. MITCHELL: We're good, Judge.

THE COURT: Okay. One question. If the defense intends to play more videos, do you want any assistance? Like we could bring either IT or maybe even one of my clerks could try to help with the audio to make sure it's loud enough during the -- when you're playing a video.

MR. MITCHELL: I thought that this -- that the HMDI would pick up the audio, as well, but --

MR. ROTHBLATT: Judge, what I can offer is that if defense counsel sends us the clips that he wants to publish, we could add them to the trial database so that it will publish through the court system the same way. We've done that in several other cases.

MR. MITCHELL: I can do that.

MR. ROTHBLATT: We're happy to do that.

MR. MITCHELL: I have three or four clips. But I'll see.

THE COURT: Okay. Thanks. Just let us know if we can help in any way, either by calling IT or one of my staff.

Okay. Thanks.

(Recess at 3:37 p.m., until 3:56 p.m.)

(Proceedings heard in open court; jury out:)

THE COURT:  All right.  Is everybody ready?

MR. ROTHBLATT:  Yes, Your Honor.

THE COURT:  Okay.  Also, just a reminder, we're going to try to finish by 5:00.

MR. ROTHBLATT:  Very good, Judge.

THE COURT:  Does that work?

MR. ROTHBLATT:  Yes.

THE COURT:  Okay.  Ready for the jury.

COURT SECURITY OFFICER:  All rise.

(Jury in at 3:56 p.m.)

THE COURT:  Thank you.

The government may call its next witness.

MR. ROTHBLATT:  The government calls Daniel Coughlin.

(Witness sworn.)

MR. ROTHBLATT:  May I inquire, Judge?

THE COURT:  Yes.

DANIEL COUGHLIN, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. ROTHBLATT:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  Could you please state and spell your name for the record.

A.  Daniel Coughlin, C-o-u-g-h-l-i-n.

Q.  Mr. Coughlin, are you employed?

A.  I am.

Q.   Where are you employed?

A.   Evergreen Park Police Department.

Q.   And what do you do at the Evergreen Park Police Department?

A.   A number of responsibilities.  One is body camera collection, dashboard camera collection and processing.

Q.   And do you have an official title with the Evergreen Park Police Department?

A.   Administrative service officer.

Q.   So how long have you been employed by the Evergreen Park Police Department?

A.   2015.

Q.   And you have talked about a number of different responsibilities you have.  Can you describe to the jury what you do on a day-to-day basis?

A.   I start the morning by going over what's called the bulletin, which is I review all the calls for services, and I identify those that resulted in arrests.  I transfer that to what I call my yellow pad.  And then my yellow pad dictates to me to go into the system, the body camera system -- it's now the combined body camera system and dashboard camera system -- to identify what I call and what we call tag it, which means you identify -- you put an identifier on there which is the case number.

Q.   Okay.  You just provided a lot of information.  We'll come back to all of that in detail.

Coughlin - direct

193

Did you have any experience before you began working at the Evergreen Park Police Department in 2015?

A.   Of any kind?

Q.   Yes.

A.   I was with a not-for-profit organization working with former offenders, and by the time I left there after 23 years, I was the executive vice president.

I went from there to Cook County as a consultant and then as a grant writer.  And I became the executive director of the Judicial Advisory Council.  Also after 9/11, I became the Cook County coordinator for emergency management.

When I left the county, I taught at a state university and community college.  And then I went with Evergreen Park.

Q.   What did you teach?

A.   At the graduate level, I taught government.  And at the community college level, I taught criminal justice classes.

Q.   So, Officer Coughlin, you talked before about your work with body-worn cameras.  Have you been trained on the operation of body-worn cameras?

A.   Yes.

Q.   And have you been trained in the use of systems that maintain body-worn camera recordings?

A.   Yes.

Q.   Have you been trained in how to upload or manage those systems?

Coughlin - direct

194

A.   I have.

Q.   And let's start from the very beginning here for those who are unfamiliar.

What is body-worn camera?

A.   It's a miniature recording device with a lens to it so it records both audio and video.  And it has basically a memory or a DVR inside its internal workings.  That collects recordings that the officer will initiate by pressing a button on the unit.

And then at the end of the shift, they'll bring it in and put it into a unit called a dock.  And once they set it into the dock, in some cases the new units now you set in the dock and that's it; but the old units, you set it in a dock and then you attach a cable to it, and it uploads the data and it puts it on a server.

Q.   How big is body-worn camera of recording equipment?

A.   I would use an example of a small cigarette package, if someone can imagine it.

Q.   And where is it usually affixed to an officer?

A.   Depending upon the type of unit, in -- from 2015 through 2000 -- early 2024, the DVR portion of the unit would go into a pocket, a vest pocket, and the camera head would be attached someplace along the middle of the trunk of the body.  The new units are a one-piece unit, and they would be affixed to the trunk of the body.

Q. Now, you mentioned before your work with dash camera videos. Can you explain for those who are unfamiliar what dash camera video is?

A. It's the same concept. It's a unit, a recording unit, primarily video but sometimes audio, that's affixed to the windshield or someplace around the windshield of a police vehicle, or in our case a police vehicle.

Q. You mentioned that you have been with the Evergreen Park Police Department since 2015. Has the Evergreen Park Police Department always had body-worn camera equipment since you've been there?

A. When I got there, they did not have it. I wrote a grant that received federal funding to initiate body cameras back in 2015.

Q. Okay. And was that grant approved?

A. It was.

Q. And at some point did the Evergreen Park Police Department begin to use body-worn camera equipment?

A. It did.

Q. Approximately when?

A. Later in 2015.

Q. And what system was employed at that point?

A. It was a manufacturer called Digital Ally.

Q. And is that the system currently used by the Evergreen Park Police Department?

A.   No.   Presently we use the Axon body camera and dashboard camera system.

Q.   Approximately when was the system switched over from Digital Ally to Axon?

A.   Towards the first quarter of '24, we switched over to the Axon system.

Q.   So between 2015 and early 2024, it was Digital Ally?

A.   That's correct.

Q.   I'm going to show you two exhibits that have not yet been introduced into evidence.  I'm going to show you Government Exhibit 404.

     Can you see that?

A.   I have a blank screen here.

Q.   It should be popping up momentarily.

A.   I see it.

Q.   Okay.  And I'm going to show you Government Exhibit 405.

     Can you see that?

A.   I do.

Q.   Do you recognize Government Exhibits 404 and 405?

A.   I do.

Q.   At a high level, what do you recognize them to be?

A.   That is the Digital Ally body-worn camera units.

Q.   Are these fair and accurate depictions of the Digital Ally body-worn camera equipment previously utilized by the Evergreen Park Police Department?

A.   The earliest form of this -- of this camera system, it did not have that plastic clip on the top.  Later on, engineering modified it and put that clip on it, but it appears to the normal person they would say it's the same system.

Q.   Okay.

MR. ROTHBLATT:  Your Honor, at this time the government would move to admit Government's Exhibits 404 and 405 into evidence.

MR. MITCHELL:  No objection, Judge.

THE COURT:  They're admitted.

(Government's Exhibit Nos. 404 and 405 were received in evidence.)

MR. ROTHBLATT:  Your Honor, may I publish to the jury?

THE COURT:  Yes.

BY MR. ROTHBLATT:

Q.   Okay.  I want to start on the right side on Government Exhibit 405.  I'm going to make this a little larger.

The portion I've just kind of blown out here, what does that depict?

A.   That's the camera head that's the eye of the camera.

Q.   And where was that typically affixed to officers?

A.   That would be affixed to the trunk primarily square in the lower upper portion of the officer's -- and, again, it depends upon the height of the officer.  If you have a 6'5" officer, it's closer towards the belt.  If you have a 5 foot officer,

it's going to be higher up on the chest.

Q. And did you ever conduct training with officers on where to affix the body-worn camera equipment?

A. Yes.

Q. I'm going to blow up a larger portion here, and there's a cord kind of in the middle that I'm trying to highlight there.

What is that cord?

A. That's the cable that transfers or communicates with the DVR, the larger piece there. It is -- it conducts the message, so to speak, from the camera head, which is both the audio and the visual, into the DVR.

Q. And how is it connected -- I'm going to blow up here.

How does it connect to the DVR?

A. It is -- the earlier phases of the body camera system, it's permanently embedded into the camera unit. Later on as it was reengineered, in the back you could unscrew it and take it out and replace the cable. But it -- this appears to be a later version, and on the back there would be three screws you unscrew and put a new cable in if needed.

Q. And I'm sorry. I may have misspoken. This connection point here is to the camera; is that correct?

A. That's to the camera head, right.

Q. And over here, where is the connection to?

A. That goes into what I referred to as the DVR.

Q. And so this portion here on the left that I'm going to

Coughlin - direct

199

highlight, is this the DVR?

A.   That's the DVR, and that bulge there is where the battery is inserted.

Q.   And where would the DVR typically be affixed or held by an officer when they're operating their body-worn camera equipment?

A.   In this unit, it would be in their pocket of their shirt or of their bulletproof vest.

Q.   I'm going to show you now Government Exhibit 405 which is already in evidence.

     And does this reflect similar equipment that we just went through in Government Exhibit 404?

A.   It does.

Q.   And here on the left, though, there's no connection between the DVR and the cable; is that correct?

A.   That is correct.

Q.   So is that how the cable connects to the DVR?

A.   That slides into that port that you see at the top of the DVR.  And then that plastic piece clips over the top to try to hold it steady.

Q.   In your time dealing with this equipment, did you become familiar with it?

A.   Yes.

Q.   And how did you become familiar with the Digital Ally equipment?

A.   Through experience.

Q.   Did you ever operate body-worn camera equipment, the Digital Ally body-worn camera equipment?

A.   Yes.

Q.   And how was it activated?

A.   On the camera head in this view here which is to the right, when it's affixed to the clip to the uniform top, on the right portion of the camera, there's a button, and when you depress that button, a red light would be activated.  And that would indicate to the officer that the body-worn camera was functioning.

Q.   When an officer recorded some interaction through their body-worn camera equipment, you mentioned that they put it into a docking system?

A.   Correct.

Q.   What happened after they put the equipment into the docking system?

A.   So it would sit upright.  So as you see the orientation of this picture, it's upright as you see it.  It would sit in upright.  And then on the side, there's a port where you would take the cable that's permanently affixed to the dock and plug it in.  And then the dock would then take upon itself to transfer the data, which is the video and the audio.

Q.   Once that data was transferred to Evergreen Park Police Department's systems, was there any way for an officer to go in

and alter or delete that data?

A.   There's no way for an officer to delete, edit at any point, whether it was in the dock or not.

Q.   In your capacity dealing with the body-worn camera equipment for the Evergreen Park Police Department, did you ever work on the equipment because of malfunctions?

A.   Yes.

Q.   And I'm talking specifically about the time when Digital Ally was utilized by the Evergreen Park Police Department.  Did that -- did that equipment ever malfunction?

A.   Yes.

Q.   And what were the typical problems that you would see when you worked on that equipment?

A.   Well, there was -- I'll start with the typical problem. The typical problem is the connector as you see here that goes into the DVR, there's a number of copper connections on like a male/female connection that must connect precisely.  And over time, the cable connection to the DVR would be less than appropriate or necessary, and, therefore, the system wouldn't work.  That would be one of the problems that the system had.

Q.   In an instance where the cable wasn't connecting to the DVR, might the red light camera still -- the red light on the camera still be active?

A.   Yes, there's been occasions where that was the case.

Q.   And were you involved in the process of switching from

Digital Ally to Axon?

A.   I was a participant.  I was not the decision-maker.

Q.   And as part of your participation, did you advocate for a switch from Digital Ally to Axon?

A.   I definitely advocated for a switch from this particular design or product to a single unit based.  Ax- -- the one that we went with fit that description.

Q.   Okay.  Why did you advocate for a switch from the Digital Ally three pieces to an Axon one piece?

A.   Dependability, something we could rely on.  And this vendor has had a one-piece unit for many years, and this -- what we went with was their most recent updated version of a one-piece unit.

Q.   I'm going to shift gears here, Officer Coughlin, to the present investigation.

     Were you involved in any way in the arrest or encounter on October 10, 2021, in Evergreen Park?

A.   No.

Q.   Did you have involvement in the uploading, review, and logging of body-worn camera recordings?

A.   For this item?

Q.   Yes.

A.   Yes.

Q.   And were there certain recordings that did not -- were not uploaded as part of the process?

A.   There was one that was a complete failure.  And I believe, though I'm not sure of this, one was uploaded partial but not a complete recording.

Q.   And which one was not uploaded, not a successful recording at all?

A.   I think it was Officer Guzman.

Q.   And which one was a partial upload?

A.   I believe it was Officer Hartmann.

Q.   I'm going to direct your attention now to Government Exhibit 101A which is already in evidence.

        MR. ROTHBLATT:  So I can seek to publish.

        THE COURT:  Yes, you may.

   (Video played in open court.)

BY MR. ROTHBLATT:

Q.   And I'm freezing the frame here.  This is at the 36-second mark of Government Exhibit 101A.

        Do you recognize the officer depicted here?

A.   It looks like Officer Guzman.

Q.   Okay.  And do you see a red light here in the middle of his chest?

A.   I do.

        MR. ROTHBLATT:  Oh, Judge, I don't think that actually published.  So if we could redo that procedure, that would be helpful.

        THE COURT:  Okay.  Thanks.

MR. ROTHBLATT: Okay. Sorry.

BY MR. ROTHBLATT:

Q. So, Officer Coughlin, do you recognize the officer depicted here?

A. I believe that's Officer Guzman.

Q. And then if you look in the center, do you see a red light on his chest?

A. I do.

Q. Is that red light where the body-worn camera equipment is typically seated?

A. Typically.

Q. I'm going to direct your attention now to the 42-second mark.

(Video played in open court.)

BY MR. ROTHBLATT:

Q. Do you recognize the officer in the back here that I'm --

A. That's Officer Hartmann.

Q. And looking towards the center right portion of his chest, do you see a red light?

A. I do.

Q. Is that sometimes where the body-worn camera equipment is worn by an officer?

A. Yes.

Q. Now directing your attention to Government Exhibit 101J which is also in evidence.

MR. ROTHBLATT:  Permission to publish, Judge.

THE COURT:  Yes.

(Video played in open court.)

BY MR. ROTHBLATT:

Q.  And I'm freezing this here.

Can you see a red light here?

A.  I do.

MR. ROTHBLATT:  And I'm going to play a bit more.

(Video played in open court.)

BY MR. ROTHBLATT:

Q.  Do you recognize the officer depicted here?

A.  It's too fuzzy for me.

Q.  All right.  Do you see a red light in the center of the officer's chest?

A.  I do, yes.

MR. ROTHBLATT:  I'm going to play a bit more of the video, from the 1-second mark on.

(Video played in open court.)

BY MR. ROTHBLATT:

Q.  Pausing at the 4-second mark.

Do you recognize the officer depicted here?

A.  Not with certainty.

Q.  Okay.  And in the center, do you still see a red light?

A.  I do.

MR. ROTHBLATT:  Your Honor, may I have a moment?

THE COURT: Sure.

(Counsel conferring.)

MR. ROTHBLATT: Nothing further, Judge. Thank you.

THE COURT: Okay.

Cross.

CROSS-EXAMINATION

BY MR. MITCHELL:

Q. Officer Coughlin, good afternoon.

A. Good afternoon.

Q. I want to start off with the grant writing that you did.

A. Yes, sir.

Q. You said before you began when you came in 2015, that Evergreen Park Police Department, they did not have body-worn cameras?

A. That's correct.

Q. And so you essentially wrote the grant to get the body-worn camera financing to get them to the officers?

A. The majority of financing, that's correct.

Q. Okay. Can you explain to the jury what was the purpose of you writing the grant to get the body-worn cameras for Evergreen Park Police Department?

A. What was the motivation?

Q. What was the purpose?

A. To seek to purchase the body-worn camera system for the department is what the purpose was.

Coughlin - cross

207

Q.   Why did they need them?

A.   Well, we felt that the -- there was a movement of foot in -- in the -- in the field of law enforcement to go with body cameras.  And we -- we felt, the department, I use that term, is that these would be great devices to provide visual and audio information about the activity of the police officer as they perform their duties.

Q.   And so essentially you talked about it because you thought it would be better for the officers to have it or not to have it?

A.   To have it.

Q.   Okay.  And what was the discussion about to why they needed to have it?

A.   More effective policing.

Q.   And why would it make it more effective?

A.   Good information to be presented to the public if they desired to see it through FOIA, as well as for the officers, they could use it for their own training purposes if necessary or appropriate, and also for use in trials if it's appropriate, or requested by the State's Attorney's Office.

Q.   So what steps did you put in once you got the grant and you initiated this and body-worn cameras, what did you do to ensure that they were used properly?

A.   The state of Illinois has some guidance and guidelines about how body cameras were to be used, things like a 30-second

prerecord element. We would inform the officers of the technology that was being introduced, how it was going to be utilized, and what their roles in the utilization of that technology was.

Q. And did you give any instructions concerning this docking part of it?

A. Yes, absolutely.

Q. What was the instruction that you gave?

A. That once they finished at the end of their shift, they were to come in, set that device in the dock and plug it in and leave the power and the power switch on.

Q. Okay. And was there a reason why that procedure that you established -- because, again, you said the body cam was to get information and to better policing and information. Was there a reason why the instructions were to dock it following your shift?

A. Because it uploaded the data, the information, the video and audio information.

Q. Why not wait a few days? Why not wait until the next week?

A. Technically the units that I talked about at the beginning, they had the technical ability to hold up to 20 hours of data. But it was more efficient and I think more reliable to -- at the end of their eight-hour shift to upload it at that point, at the end of their shift when they weren't using the cameras.

Q. So when you say more reliable, in what way? How was it

more reliable to do it right after your shift as opposed to two or three days later?

A. First of all, the body camera would get into a routine. It would be docked at the end of their shift. They would plug it in. There would be no expectation or reason that they would forget not to put it on the dock and plug it in.

Q. Okay. Am I correct your understanding is that if, in fact, it wasn't docked after that shift or maybe wasn't done until two or three other shifts that, what, tapes would run out or something would happen?

A. It would -- the system would not work properly.

Q. Okay. And so when you talked about earlier that in your experience there were -- there were problems with the old system, the government asked you about the typical problem, and you mentioned this issue with the cording, right?

A. The cable?

Q. The cable.

A. Yes.

Q. Okay. And can you describe any other problems other than the cable?

A. It would be software malfunctions. I mean, all computers, and basically this is a mini computer, there would be a software glitch. And when that happened, I would attach the DVR to my computer, and then I'd call the manufacturer and ask them to come in and take a look at the DVR, see if they could

explain or diagnose what the problem was and fix it.

Q. So if I understand you correctly, one of the issues that undermines the reality or the reliability is that if they're not docked at the end of the shift, if it takes too long, too many hours, sometimes it may not function right?

A. Well, we never realized that experience because everyone docked it. I never saw an experience where they didn't dock it.

Q. And so the other problem is that if the cord somehow gets worn or is it just comes loose?

A. It comes loose. It could have been bent in an activity or it just comes loose.

Q. And if it comes loose, does the light go off?

A. Do you mean does the light turn off?

Q. Yes.

A. Okay. If it comes loose, there have been occasions of my experience where the light would remain on. The officer would think it's recording and, in fact, it never recorded.

Q. Okay. So if, in fact, it was -- the cord was pulled off or whatever happened, it wouldn't record?

A. If, in fact, the cord was completely detached, the light would not go on and it would not record.

Q. Okay. But if it was only partially detached or because it was worn in some way, the light would be on and it wouldn't record?

A. It could.

Q. That's a possibility?

A. That's a possibility.

Q. Okay.

A. That's the right way to put it.

Q. And is it your testimony that if the cord is completely removed or detached the light goes off?

A. That light would never turn on.

Q. It won't turn on at all?

A. If -- because the power source is in the battery that's connected to the DVR.

Q. Okay. So let me ask you about the particular body-worn cameras that were used on October 10, 2021.

A. Yes, sir.

Q. Okay. Have you had a chance to review any of those cameras?

A. Do you mean the recording of those cameras?

Q. No, the cameras themselves.

A. Oh, yes.

Q. You did?

A. Review them?

Q. No, reviewed -- evaluate the cameras for malfunctioning.

A. I -- I did a written report that an officer's body camera did not record on that occasion. And I do not recall what the long-term outcome was because I never had a problem with that

camera again, to my knowledge.

Q.    Let me ask that question again.

A.    Mm-hmm.

Q.    You said that you knew after judge -- after Officer Guzman redocked his that it didn't record anything.

A.    Okay.  Let me explain how I knew that.

So, again, it goes through the upload process in the typical way.

Q.    Yes.

A.    And then the next morning, if it was a Monday morning, I would see that there was an arrest involved; or if it's the next day, Monday to Tuesday, I would see there's an arrest involved.  Then I would go into the Digital Ally system on my computer, and I would start looking for the officers that were involved in the arrest, and I would start tagging them.

In this particular case, there was no body camera recording for Officer Guzman.

Q.    Okay.  So you -- if I understand your testimony, you believe, or at least you know that Officer Guzman at the end of shift docked his body-worn camera --

A.    That's --

Q.    -- right after shift?

A.    That's my understanding.

Q.    Okay.  Do you know that, or are you just guessing?

A.    Back in '21, I believe it was docked.

Coughlin - cross

213

Q.   Okay.  And is there a document that'd refresh your recollection so that you would know that it was actually docked on a particular day?  Did you maintain records like that?

A.   No.

Q.   Okay.  So you're believing that it was docked on that day?

A.   Correct.

Q.   Okay.

A.   Because that was the typical behavior.

Q.   Okay.  And so then you would go in the next day or whatever and see that it's been docked, upload was tried, and then you would tie it to the arrest?

A.   If I can modify that a little bit.

Q.   Okay.

A.   I would go into my system and see what was uploaded.  I wouldn't see technically it being docked because that's in a separate room.  But I would see what was uploaded into the system.

Q.   Okay.  And -- and you believe because when you would look into it, it had to be the next day or the day after, somewhere like that?

A.   It certainly would.

Q.   Okay.  And so once you looked at Officer Guzman's video that had been uploaded and realized nothing had been recorded, what did you do to assess the body-worn camera that he wore?

A.   There was a document, it's a review document, when I

Coughlin - cross

214

identified anybody's body-worn camera that should have recorded that did not record, I made a report, and I handed that onto the supervisor who would then bring it to the officer's attention.

Q. Okay. I'm sorry. I don't think you answered my question.

A. I apologize.

Q. Okay. What did you do in your role to figure out why that particular body-worn camera malfunctioned? Did you take a look at the camera itself? Did you touch it with your hands?

A. Typically I would, yes.

Q. Did you do it in this case?

A. I do not recall one way or the other.

Q. Okay. So as you sit here today, you don't know if this particular camera of Officer Guzman didn't record because of some malfunction? You don't know?

A. I do not know why it didn't upload, correct.

Q. Okay. You are assuming, though, because of how it works that either, A, the cord may have disconnected and therefore the light was on and it didn't record, right?

A. Is that a question?

Q. Yeah.

A. Yes.

Q. That's what you're assuming. That's one of the things you're assuming, correct?

A. That's my -- yes.

Q.   And because Officer Guzman didn't tell you that it didn't record, you assumed he didn't know it wasn't recording.  You're assuming that too.

A.   Both of those.

Q.   Okay.  You are aware, though, that there's a way to look at the camera to determine, the officer themselves, to see if it's recording.  You know that, right?

A.   That's the red light.

Q.   Well, beyond just a red light, you can actually look down at the camera and see that it's functioning, other than just looking at the light.

A.   The only way they'll know it's functioning is if the light is on or it's not on.

Q.   Do you know anything about the camera vibrating when it's not working properly?

A.   When it is working properly it vibrates.

Q.   Oh.  So one of the ways you can tell if it's functioning properly is if it's vibrating?

A.   That's correct.

Q.   So one of the ways that an officer can tell that it's not recording if it's not vibrating?

A.   Correct.

Q.   Did Officer Guzman ever tell you that it was not vibrating?

A.   No.

          MR. ROTHBLATT:  Objection.  Hearsay.

MR. MITCHELL:  Did you learn --

THE COURT:  Sustained.

MR. MITCHELL:  I'll rephrase, Judge.  I'll rephrase.

BY MR. MITCHELL:

Q.  In your review of this missing nonrecorded video, were you able to determine why it occurred; yes or no?

A.  No.

Q.  Now, do you recall creating a document called a chain of custody report with respect to the body cam worn that was docked in this case, Guzman, Warniczek, and Hartmann?

A.  I don't recall a document by that name.

Q.  You -- so you have never seen a chain of custody document from the Evergreen Park Police Department with respect to accessing these docketing videos?

A.  I would need to be refreshed.

Q.  Okay.

A.  I'm not sure what that --

Q.  Okay.

A.  -- you're referring to.

Q.  If someone asked you to pull the video off, you would have to record from the docketing, just provide it so they could take a look at it, you would have to record that, right?

A.  Could you say that again?

Q.  In your experience since 2025 starting this body-worn camera process at Evergreen Park, when a person -- when an

officer docks it, it's -- it's -- that timing is reported in the police station and recorded at some point, correct?

A.   Yeah.  I believe the system records it.

Q.   And if the information that's been recorded is now removed from the system, the storage system so that it could be reviewed or copied by some other officer, that data is also recorded, correct, in some sort of report?

A.   Let me clarify your question.

Q.   Yes, please.

A.   You said removed from the system?

Q.   Well, downloaded.

A.   Okay.  Downloaded.  Because it can't be removed.

Q.   Okay.

A.   But downloaded, yes --

Q.   So --

A.   -- from the body camera.

Q.   Right.  So essentially because this is evidence --

A.   Mm-hmm.

Q.   -- a chain of custody has to be created because it's evidence, right?

A.   Correct.

Q.   The video, the audio that's recorded on those days, you have to log and create some sort of chain of custody of when it was created, yes?

A.   Correct -- yes.

Q.   When it was uploaded, yes?  And anytime that it is downloaded and shared just as a chain of custody issue.

A.   Correct.

Q.   Okay.  Have you seen a chain of custody document with respect to the video in this case?

A.   I do not recall seeing that.

Q.   Okay.  Do you know exactly how many days after October 10, 2021, that Officer Guzman loaded his video?  I know you said you thought it was assuming after the shift, but do you know?

        MR. ROTHBLATT:  Objection.  Misstates the evidence.

        THE COURT:  Overruled.

BY MR. MITCHELL:

Q.   As you sit here, you testified you assume because that was the normal practice it was always uploaded at the end of shift.

A.   Correct.

Q.   So if Officer Guzman's shift ended on the 10th, it should have been uploaded on the 10th, correct?

A.   Unless he finished his shift on the 11th.

Q.   Right.

A.   Yes.  Correct.

Q.   And if his shift ended on the 11th, it should have been uploaded on the 11th?

A.   Correct.

Q.   It shouldn't have been uploaded on the 12th, right?

A.   Unless it was uploaded from a following shift.

Q. What about the 15th?

A. If he was working on the 15th or the 14th, it would have been uploaded.

Q. Okay. So recordings that were taken and made with the body cam on the 10th, if he was working multiple shifts, he wouldn't upload it until the very end?

A. He would upload it at the end of every shift.

Q. Okay. And just so I understand, then there's a chain of custody document created to document that time and date, correct?

A. The system records all the functions. Now, the document, you referred to that, I'm not familiar with the actual piece of paper.

Q. Okay. I'm going to direct your attention to December 7, 2021, right, December 7, 2021. So that's about a month and a half after this incident.

A. Okay.

Q. You recall being asked by the U.S. Attorney's Office to provide copies of these videos to be reviewed?

A. Not in a specific way; but I'm sure if I was asked, I provided it.

Q. Okay. If I showed you an e-mail that you received from the government or subpoena and you responded, would that refresh your recollection?

A. Sure.

(Counsel conferring.)

BY MR. MITCHELL:

Q.   I'm going to show you what I marked as Defense Exhibit M for identification.  I want you to take a look at that.  And, again, just take your time to read it.

A.   Yes, sir.

Q.   Have you had a chance to review it?

A.   I did review it.

Q.   Officer Coughlin, does it refresh your recollection?

A.   Faintly.

Q.   You were asked to provide copies of the downloaded videos. You recall that?

A.   I do.

Q.   And it was from the government, correct?

A.   Yes.

Q.   Okay.  Involving the videos from that day, October 10, 2021, that had been uploaded?

A.   Correct.

Q.   And you did provide copies, and at that point it was discovered that things were not recorded.  Remember that?

A.   I'm not sure at that point I discovered it because I believe I discovered it earlier on.

Q.   Okay.

A.   But yes.

Q.   And you were asked what happened to the video that's not

recorded, do you recall that, from the government?

A.   I don't recall that.

Q.   You were asked two questions.  Remember?

A.   Mm-hmm.

Q.   One question was:  Officer Guzman's body camera didn't record the incident nor any activity on this date, any activity on this date.

A.   Correct.

Q.   You recall that?

A.   I do.

Q.   And you remember what you told the government in regards to why that happened?

A.   I -- I would have to refresh my memory again.

        MR. ROTHBLATT:  Objection, Judge.  Can we have a sidebar on this?

        THE COURT:  Yes.

   (Proceedings heard as sidebar:)

        MR. ROTHBLATT:  Judge, unless this is going towards impeachment, what he said to the government is hearsay.  That is an out-of-court statement defense counsel is trying to offer for the truth of the matter.  So unless it's impeaching of something he has said today, I don't see how this is admissible.

        THE COURT:  Okay.  What's the state -- by the statement, what do you mean?

MR. MITCHELL:  You're asking me, Judge?

THE COURT:  Yes.  I'm just trying to make sure I understand what the objection is to.  So it's a statement of what did you tell the government on the -- about why the --

MR. MITCHELL:  He has testified today that in his experience and what he knows in his shoes, and he's articulated a particular bases of a malfunction.  He's articulated possibly three.  He speculated to that because that's what he's done.  What I want to know is that none of those justifications or reasons were given to the government when he was asked those questions.

THE COURT:  Okay.  And so the government is saying that's hearsay what you told the government.  The question to him, what did you tell the government when they asked why the Guzman body camera didn't record --

MR. ROTHBLATT:  Judge, it is hearsay.  And not only is that hearsay, it's not even relevant to his testimony today which per the Court's guidance and per the government's representations to the Court, at no time did we solicit any information about why the particular body-worn camera equipment utilized by Officers Guzman and Hartmann malfunctioned.  We didn't ask those questions.  We didn't ask him to speculate.  Defense counsel did in his cross-examination.  He's entitled to do that, but then he's not entitled to try to impeach based on information that we didn't even seek to solicit in the first

place using hearsay information.

MR. MITCHELL: Judge, the government offered as their exhibits the -- and had Mr. Coughlin examine a typical, and I think that's the way they said, the typical, what was used at that time and why it would malfunction. And they showed the tag. They explained the tag could be removed, the cord, the whole nine yards. And that's what they're eliciting today so that the jury now can speculate that that's what happened with respect to this case.

What I am trying to show is that all of this new information that he's testifying today, he had an opportunity to tell the government before. And when he was asked that specifically, none of that was raised.

THE COURT: That --

MR. ROTHBLATT: That's not accurate. That's not what he was asked back in 2021. He wasn't asked what the typical problems were with the body-worn camera equipment. That's a misrepresentation about what information was asked and relayed.

THE COURT: Okay. I guess I'm -- all the questions so far were about what were the typical malfunctions, or are you arguing from the defense that there were questions about why the specific equipment here malfunctioned?

MR. MITCHELL: Judge, what I am hoping to show through my line of cross-examination is that this is some recent issue that's trying to explain the absence of this that didn't exist

in 2021, it didn't exist at the time that this was discovered when the -- when it was first reviewed and Mr. Coughlin was asked, and that these details now, typical problems, typical things, things that worked and what he knows, this is recent, Judge. And that's what I put in my motion *in limine*, that these opinions, these -- these -- these analyses, this examination that he is now providing was provided for the first time less than a month ago, two weeks before this trial. And what I am trying to show is that this concern of video that didn't exist, or maybe it did exist and it's now missing, or maybe it was never recorded, that the jury needs to understand that this understanding of what might have happened didn't occur back then. It was not explained that way to anyone.

MR. ROTHBLATT: Judge, this is apples and oranges. We have not asked the witness to speculate as to why the equipment malfunctioned and the videos don't exist here. That's per the rules. It's -- that would delve into improper speculation. We've never done that. We are simply introducing evidence to rebut any allegations by defendant which he's clearly making that there was bad faith on the part of the officers or intentional misconduct by the officers that resulted in the videos not being there. We have introduced evidence appropriately that this equipment simply wasn't perfect. And the officers will testify. They believed they had activated it. They were surprised when there was no ultimate body-worn

camera recordings from their equipment. And we can argue a connection between those. We're not having Officer Coughlin do that. Officer Coughlin was not asked in 2021 what are the typical problems you have with Digital Ally equipment. He wasn't asked that question so he's not providing any inconsistent information. So this attempted impeachment by omission is improper.

MR. MITCHELL: I don't think I've ever raised any questions or raised any inference of bad faith here at all, Judge, with respect to any officers doing anything. I think the government is still kind of stuck on this issue that was raised in the suppression motion which you clearly ruled upon. You've already talked about this issue of bad faith and the inferences of bad faith. I haven't touched that at all. But as you already ruled, that the credibility of these officers in testifying about what occurred is fair game. And what I am pointing out is that this new Evergreen Park police officer who was involved from the very beginning, he was involved with getting the body-worn cameras, he's beginning with the docketing, he's in with the chain of custody and everything else. And when the government asked him in 2021, well, what happened, and he does not provide any explanation whatsoever, not one, and now we have a possibility of three.

MR. ROTHBLATT: Judge, because the witness didn't speculate in 2021 and is not speculating now, there's no

inconsistency. He's not providing different information. He was asked different questions in 2021 and provide -- in 2025 and provided different consistent answers. This line of questioning improperly suggests to the jury that he has provided inconsistent information when he has not. And it's an incredibly difficult issue to remedy with appropriate questioning by the government.

THE COURT: What -- okay. Maybe I'm just not -- I guess I'm not following why is it that difficult to remedy. I mean, I -- because then -- I mean, earlier it seemed like the government wanted to get into the red light means that the camera was on. I mean, if -- I just think the more we try to slice which aspects of this general topic we can get into and can't, the more difficult it becomes. And so either -- I guess my inclination is, okay, the defense can keep going down this pathway, but then I'm going to allow the -- I'm going to allow the government to get into the, you know, what I ruled out before which is his lay opinion because that seems like what effectively the defense is now asking about. And everyone is going to ask whatever questions they want on this topic, or I'm going to --

MR. MITCHELL: I'm not asking for opinion, Judge. I'm asking what he said to the government in regards to why there was no recording. That -- he -- he -- he answered that question in writing to the government. I'm not asking for an

opinion, Judge.

MR. ROTHBLATT: Judge, defense counsel has already asked for his opinion. That ship has sailed. He has unquestionably opened the door to redirect questions about what could have gone wrong here that would have led to particular issues, specifically to this equipment. He has unquestionably asked those questions on cross; and I believe if the Court goes through the transcript, it can see that.

THE COURT: Okay. So I'm going to allow -- you can ask this question on cross, and I am also going to allow just fulsome redirect, including -- I just think -- okay. There might be slight differences about -- in some of the questions as to some of them might be getting at why was the footage not uploaded versus, you know, why was the light on the camera on. But they're all just getting at the same general topic which is what could be the source of what was going on with these cameras in the time at -- in 2021 on that day.

And so I just -- I think rather than trying to slice it very finely, it just makes more sense, everybody can ask -- you know, defense can ask -- you know, you can ask about what he said, what he -- how he answered the government at the time. On redirect, the government can ask -- everyone can just make clear what exactly he thinks and what he doesn't think or doesn't know on this topic of the cameras and what happened with them.

MR. ROTHBLATT: Very good, Judge.

THE COURT: Okay. So that's overruled.

(Proceedings heard in open court:)

THE COURT: Okay. Overruled.

You can proceed.

BY MR. MITCHELL:

Q. Officer Coughlin, you remember you had a chance to review the e-mail that you received about the questions regarding the video of the incident that was not recorded?

A. Is that the document you just --

Q. Yes.

A. I remember you handed it to me, yes.

Q. Okay. Do you need to refresh your recollection on the questions and your answers again?

A. Yes.

Q. Okay.

A. Thank you.

Q. Showing you Defense Exhibit M.

A. Okay.

Q. Do you recall now the questions that were asked of you concerning the video portions that were not evidenced on the recording that you provided?

A. I do.

Q. Okay. Do you recall what your response was to those questions?

A.   The two questions?

Q.   Yes.

A.   Yes.

Q.   Okay.  So question No. 1, do you recall what that was?

A.   The question or the answer?

Q.   The question.  Do you want me to read it for you?

A.   Yeah, please.

Q.   Okay.  The question was -- is:  Officer Guzman's camera did not record this incident nor any activity on that date.

        And your response was?

A.   I believe my response was no, it did not, something to that effect.

Q.   Okay.  And you mentioned that you believed that it might have malfunctioned?

A.   That would make sense to me, yes.

Q.   Okay.  And then part two of the question concerns Officer Hartmann's video.  You recall that?

A.   Vaguely.

Q.   Does not appear to have recorded the suspect before he fled the vehicle.

        Do you remember asking that question?

A.   I remember that.

Q.   And you remember your response?

A.   That was it didn't function was my recollection.

Q.   You said something about the software player.  You told the

government there's something wrong with their software player. You recall that?

A.   I do, but I'm not sure that's in the right context because -- because my understanding of that is that what the state -- what the federal government received from me was a thumb drive.  And on the thumb drive, when the body camera is uploaded along with the data of the body camera and the audio, there's a software component that makes the user of the thumb drive able to see it by using that software component.  That's my understanding of that.

Q.   Do you also remember saying that you just reviewed the video and audio at your end and all appears to be working properly?

A.   On the body camera that was available.  So I was specifically pointing out that what they couldn't see that I sent them, it worked on my end.  The software must not have been uploaded properly for them to see it.

Q.   Later on, you were asked to provide -- let me back up.

In addition to uploading the video and reports of malfunction when something goes wrong, your department, Evergreen Park, also does I think what is called a 60-day review confirmation?

A.   Correct.

Q.   Okay.  Can you explain to the jury what that is?

A.   Sure.

The supervisors of the police officers will randomly select a body camera from sometime during the 60 day of an officer that reports to them. They will then review it. And if they have an issue with the beat officer's use of the body camera, their performance, their performance of the body camera, they will then have a sit-down with the officer and discuss the issues that may be involved in that.

Q. Okay. And the 60-day body cam review is submitted to you because you in that position have to make sure everything is functioning correctly and the records are complete, correct?

A. Let me explain that.

Q. Okay.

A. Because that's not quite what it is.

So I -- what happens is the officers -- the supervisors look at their calendar, and for a two-month period of time, they're responsible for those people that report to them to select a body camera recording and then have that sit-down and then send me back a document that says they performed that function, and I put it into a file folder.

Q. Okay. And that 60-day review is designed for what purpose?

A. That the supervisors are paying attention, so to speak.

Q. Paying attention to what in regards to the body-worn camera?

A. To the officers and the use of the body camera.

Q. That the body cameras are used properly?

Coughlin - cross

232

A.   As well as the body cameras are functioning properly.

Q.   Okay.  And so do you recall whether or not you were advised by the supervisor of Officer Hartmann in the 60-day review that his body camera was working fine?

A.   I couldn't tell you one way or the other.

Q.   Okay.  And if you saw a report that was given to you, body cam supervisor's 60-day review dated September 30th '21 which is basically ten days before this incident --

A.   Mm-hmm.

Q.   -- would that refresh your recollection?

A.   Of the document?

Q.   Yes.

A.   Yes.

     (Counsel conferring.)

BY MR. MITCHELL:

Q.   Let me show you what I marked for identification purposes Defense Exhibit N.  Take a look at that.

     Do you recognize that?

A.   I do.

Q.   Okay.  I'll take it back.

     Again, my question was do you have a recollection of receiving a 60-day review confirmation body-worn camera from the supervisor of Officer Hartmann on or about September 30, 2021?

A.   Sometime thereafter, yes.

Coughlin - cross

233

Q.   Okay.  And that referenced a 30-day period between September and October of 2021, correct?

A.   That would be the 60 day.

Q.   Okay.  And as far as you can tell from looking at that, there was no report that it was malfunctioning?

A.   Not of the selected recording.

Q.   Okay.  Now, in addition to that 60-day recording, do you recall receiving a similar report with respect to the same supervisor for Officer Guzman?

A.   I would have expected to receive one.  I couldn't tell you one way or the other right now.

Q.   If you saw the report, would that refresh your recollection?

A.   It would.

Q.   Defense Exhibit O for identification.

     Did you have a chance to review it?

A.   I have.

Q.   Does the document review refresh your recollection of whether or not you received from the supervisor for Officer Guzman a 60-day review dated September 30, 2021?

A.   Yes.

Q.   And it again covered the same period of September and October 2021, approximately ten days before this event?

A.   What was the date on the top of that?

Q.   October -- September 30, 2021.

A. Yes.

Q. And the event that we're talking about here was October 10, 2021.

A. Correct.

Q. Okay. And in reviewing that report, there doesn't appear, and I'm asking, that there's any indication that these body cameras worn by these two officers is malfunctioning in any way.

A. Clarification.

Q. Okay.

A. What the supervisor was doing was picking one -- one body camera recording, a random body camera recording, and see if that was appropriately functioning and how the officer did. So in both of those cases, whichever one once they -- that supervisor picked, the body camera and the officer seems to have been performing properly.

Q. Okay.

A. Okay.

Q. And that's the only way you know if it's malfunctioning if something, when you look at it, it's not there?

A. It's not working, right.

Q. Okay. And, again, you don't know why it's not working --

A. Correct.

Q. -- particularly with any camera?

A. Correct.

Coughlin - cross

235

Q.   Okay.   Now, do you know an officer by the name of Lieutenant Wendy Franklin?

A.   I do.

Q.   And who is she?

A.   She is a lieutenant with the Evergreen Park Police Department.

Q.   And what's her position?  What does she do?

A.   Presently she's in charge of special services for the police department.

Q.   And what did she do back in 2021 in relationship to body cam video?  Did she help you in any way?

A.   She was -- I'm not sure of her role back in '21.  But it's more likely that -- I hate to -- I hate to tell you what she did or she didn't do back in '21 because I know her position changed.  And I think she was in charge of special services at that point, but body cameras didn't really report to special services.

Q.   Okay. So when -- the body cam recording system media, what does that mean?  When it's uploaded, is that what you're talking about?

A.   Yes.

Q.   Okay.  And so if an officer gives it to a different officer to upload, not themselves, can they do that?

A.   No.

Q.   It has to be them?

Coughlin - cross

236

A.   They have to put it in the dock and plug it in.

Q.   And how do you know that that officer actually uploaded it as opposed to a different officer?  How would you know that?

A.   I would not know it one way or the other.  I would know if the device uploaded, but I wouldn't know if they put it in or someone else put it in.

Q.   So if a chain of custody report concerning this uploaded videos of these three officers in particular, Officers Warniczek, Guzman, and Hartmann, were uploaded on different days, you would know who actually uploaded them?

A.   No.  I would know the unit that uploaded but not the officer that put it into the dock.

Q.   And when you say the unit, what do you mean?

A.   The body camera itself.

Q.   Does it have like a number, like a 602 or a 961?

A.   It has a serial number.

Q.   Okay.  And the serial number is a three-digit number?

A.   No, it's a series of numbers with letters included.

Q.   So when a -- when the system media on the report indicates that the uploaded document occurs number 602, what does that reference?

A.   I don't know what 602 references at all.

Q.   What about the number 961?

        MR. ROTHBLATT:  Objection, Judge.  The witness testified he's not familiar with this document; it's not in

evidence.

THE COURT: Sustained.

I think you could ask some more questions about foundation.

MR. MITCHELL: Yes.

THE COURT: Also, and I'm sorry to interrupt, but it is a little past 5:00. Is --

MR. MITCHELL: We can stop here, Judge. I've got a little bit more, so I -- we could stop here.

THE COURT: Okay. So we're going to pause here for the evening.

And, sir, you're still on the stand, so please don't discuss your testimony with anybody overnight which is basically a break. And we'll resume tomorrow morning at 9:30.

Also, reminder for the jury, please don't discuss the case or research the case overnight. Thank you.

We'll see you at 9:30 tomorrow.

COURT SECURITY OFFICER: All rise.

(Jury out at 5:05 p.m.)

THE COURT: Okay. Thanks.

Sir, if you could please step out. Thank you.

(Witness exits the courtroom.)

THE COURT: Okay. Is there anything else we should discuss today?

MR. ROTHBLATT: Judge, we can just give the Court a

brief update on our scheduling --

THE COURT: Okay.

MR. ROTHBLATT: -- where things stand.

I think we're on a good trajectory. And we should be in a position to, depending on the length of cross-examination, conclude our presentation of evidence either very late in the day tomorrow or early on Thursday.

THE COURT: Okay. What does that mean for the charge conference timing? Because I guess it depends on any defense case, the length of that, and obviously how long -- or whether that projection sticks or not. So does that mean we're looking at an instructions conference on Thursday probably, or do you want to do that sooner?

MR. ROTHBLATT: I think the government would be comfortable doing it either after court tomorrow or during the day on Thursday, whatever the Court --

MR. MITCHELL: I would wait till Thursday, Judge, if that's okay. I don't -- I like to kind of continue to focus on the witnesses at this point.

THE COURT: Okay. Okay. What does -- I'm just trying to think. I mean, maybe we just play it by ear and see how things go. But if we are holding a charge conference sometime on Thursday, you know, do we just ask the jury to take a longer lunch break? I mean, maybe that's what we'll wind up doing. We'll just have to see. Maybe just play it by ear.

MR. ROTHBLATT: Yeah. Judge, I -- we were just discussing. I don't know how many contested instructions we have here. I don't think it's that many. So perhaps it could be done over a lunch break or --

THE COURT: Okay.

MR. MITCHELL: We're still talking about the same instructions from the first time, right? Okay.

MR. ROTHBLATT: Correct.

THE COURT: Okay.

MR. MITCHELL: Yeah, there wasn't many objections from the first time.

THE COURT: Okay. All right. Well, then I guess at this point, unless somehow things go much faster than expected and we wind up with a chunk of time tomorrow afternoon, we can plan on the charge conference being Thursday at some point.

Okay. Well, thanks. Anything -- actually, so at that conference, are we covering instructions for both phases, or are we covering instructions for just phase 1 and deferring any consideration of instructions for phase 2 until after the verdict on phase 1?

MR. MITCHELL: I will prefer to defer, Judge.

MR. ROTHBLATT: I mean, for expediency purposes, I think it would make sense to do it in one fell swoop. Obviously the second phase may not be necessary, but it would probably make sense to -- yeah, the second phase instructions

are not terribly long, and it would facilitate the parties getting ready for the second phase if it becomes necessary rather than having to come back, do another conference and do another preparation for introduction of evidence and presentation.

THE COURT: Okay. I mean, another possibility would be to do phase 2 during deliberations; but, I mean, I guess then you just have no way of knowing obviously how long the deliberations take.

Okay. I guess right now I'm more inclined just to do one conference with all the -- because they're not that long, but I -- again, we could probably just play that by ear a little bit on Thursday.

Okay. Anything else we should discuss?

MR. ROTHBLATT: No, Your Honor.

MR. MITCHELL: No, Judge.

THE COURT: All right. Thank you.

MR. SCHIED: Thank you, Judge.

(Adjourned at 5:10 p.m., until 5/7/2025, at 9:30 a.m.)

*   *   *   *   *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Kathleen M. Fennell*


*/s/ Joseph A. Rickhoff*


*/s/ Kelly M. Fitzgerald*                May 7, 2025
Official Court Reporters                 Date
United States District Court
Northern District of Illinois
Eastern Division

242

I N D E X

OPENING STATEMENTS                                          PAGE

By Mr. Rothblatt                                             15
By Mr. Mitchell                                             21


WITNESSES                                                   PAGE

DARICE GOODWIN

Direct Examination By Mr. Schied                            26

CHRISTOPHER LECOMPTE

Direct Examination By Mr. Schied                            39

SYNTYNESE GRAY

Direct Examination By Mr. Schied                            46
Cross-Examination  By Mr. Mitchell                          61

PATRICK SMITH

Direct Examination By Mr. Rothblatt                         68
Cross-Examination  By Mr. Mitchell                          75

ARTUR WARNICZEK

Direct Examination By Mr. Schied                            83
Cross-Examination By Mr. Mitchell                          127
Redirect Examination By Mr. Scheid                         175
Recross Examination By Mr. Mitchell                        188

DANIEL COUGHLIN

Direct Examination By Mr. Rothblatt                        191
Cross-Examination By Mr. Mitchell                          206

| GOVERNMENT'S EXHIBIT | RECEIVED |
|---|---|
| Nos. 101 and 101A through J | 88 |
| No. 201C | 31 |
| No. 202C | 38 |
| No. 205A | 42 |
| No. 208A | 40 |
| No. 209A | 59 |
| No. 210A | 49 |
| No. 211A | 52 |
| No. 301 | 89 |
| No. 401 | 110 |
| Nos. 404 and 405 | 197 |
| No. 406 | 113 |

| DEFENDANT'S EXHIBIT | RECEIVED |
|---|---|
| No. A-1 | 141 |
| Exhibit B | 146 |
| Exhibit C | 147 |
| Exhibit D | 150 |
| Exhibit F | 152 |
| Exhibit G | 156 |